# EXHIBIT 1

1                TENNESSEE DEMOCRATIC PARTY

2          STATE EXECUTIVE COMMITTEE MEETING

3                SEPTEMBER 13, 2008

4

5

6  _____

7

8

9

10              TRANSCRIPT OF PROCEEDINGS

11

12               September 13, 2008

13

14

15

16

17  _____

18

19

20

21               BERES & ASSOCIATES

22       230 Fourth Avenue North, Suite 503
            Post Office Box 190461

23       Nashville, Tennessee 37219-0461
             (615) 742-2550

24

25

```
 1                    A P P E A R A N C E S

 2

 3    For Senator Kurita:

 4    Mr. Robert Rochelle
      Mr. T. Price Thompson, III
 5    Attorneys at Law
      109 North Castle Heights Avenue
 6    Lebanon, Tennessee   37087

 7

 8    For Tim Barnes:

 9    Mr. George E. Barrett
      Mr. Douglas S. Johnston, Jr.
10    Attorneys at Law
      217 Second Avenue North
11    Nashville, Tennessee 37201

12    Co-Counsel for Tim Barnes:

13    Mr. C. Dewey Branstetter, Jr.
      Mr. Michael E. Wall
14    Attorneys at Law
      227 Second Avenue North, Suite 400
15    Nashville, Tennessee 37201

16

17    On behalf of the Democratic Party:

18    Mr. W. Brantley Phillips, Jr.
      Mr. Jeffrey P. Yarbro
19    Attorneys at Law
      2700 Regions Bank Building
20    Nashville, Tennessee 37238

21

22    Mr. Gray Sasser,
      Chairman of the Tennessee Democratic Party
23

24    _____

25
```

1                             <u>INDEX</u>

2

3    <u>WITNESSES FOR TIM BARNES</u>

4

5    <u>ADAM SHAYNE HAYNES</u>

6    Direct Examination By Mr. Johnston ...............  22
     Cross Examination By Mr. Rochelle ...............  25
7

8    <u>DAVID LUCIANO</u>

9    Direct Examination By Mr. Johnston ...............  28
     Cross Examination By Mr. Rochelle ...............  31
10

11   <u>PETER NAPOLITANO</u>

12   Direct Examination By Mr. Barrett ...............  40
     Cross Examination By Mr. Thompson ...............  45
13

14   <u>DEBRA JONES</u>

15   Direct Examination By Mr. Barrett ...............  54
     Cross Examination By Mr. Rochelle ...............  58
16

17   <u>JAMES THOMAS DAVIS</u>

18   Direct Examination By Mr. Barrett ...............  63
     Cross Examination By Mr. Rochelle ...............  68
19

20   <u>LENORE MERIWEATHER</u>

21   Direct Examination By Mr. Barrett ...............  80
     Cross Examination By Mr. Rochelle ...............  86
22   Redirect Examination By Mr. Barrett .............  93

23

24   <u>GAYE LYNNETTE WALKER</u>

25   Direct Examination By Mr. Barrett ...............  97

JAMES WESLEY WALKER, JR.

Direct Examination By Mr. Barrett ................ 103
Cross Examination By Mr. Rochelle ................ 108


TIM BARNES

Direct Examination By Mr. Barrett ................ 110
Cross Examination By Mr. Rochelle ................ 122



WITNESSES FOR ROSALIND KURITA


ROSALIND KURITA

Direct Examination By Mr. Rochelle ............... 191
Cross Examination By Mr. Johnston ................ 198

```
 1                          EXHIBITS

 2

 3    Exhibit No. 1        Number 1, Contest of Election;   263
                           number 2, Supplemental Filing
 4                         Contest of Election; number 3,
                           Senator Kurita's response to
 5                         Election Contest; number four,
                           Mr. Barnes' witness list;
 6                         number 5, Senator Kurita's
                           witness list.
 7    Exhibit No. 2        "TIM BARNES' BRIEF IN SUPPORT    263
                           OF CONTEST OF PRIMARY
 8                         ELECTION"
      Exhibit No. 3        "BRIEF OF LAW FILED ON BEHALF    263
 9                         OF SENATOR ROSALIND KURITA"
      Exhibit No. 4        Transcript of Interviews .....   263
10    Exhibit No. 5        "AGREED RULES OF PROCEDURE FOR   263
                           DISTRICT 22 STATE SENATE
11                         PRIMARY ELECTION CONTEST
                           SCHEDULED FOR SEPTEMBER 13,
12                         2008"

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              BE IT REMEMBERED, on the 13th day of

 2   September, 2008, at 9:44 a.m, the above-referred to

 3   matter came on before the above-styled forum at the

 4   Downtown Sheraton Hotel, Nashville, Tennessee.

 5              The parties having announced ready, the

 6   following proceedings were had, to wit:

 7   ********************************************************

 8              CHAIRMAN SASSER:  Thank you.  I hereby call

 9   the meeting of this special committee of the State

10   Primary Board to order.

11              While you all should have a chance to review

12   the rules, I'd like to highlight a couple of points

13   before we begin.

14              As you will note, each side has agreed to

15   certain time restraints in connection with putting on

16   their case.  We have two timers to make sure that

17   neither decide exceeds its allotted time.

18              Any questions asked by any member of this

19   committee will not deduct from the time allotted either

20   side.  Each side will be given ten minutes for an

21   opening statement and I would ask the members of this

22   committee to refrain to ask any questions during those

23   opening statements.

24              Also, each side has been allotted 15 minutes

25   for their closing statements and I would again ask
```

1    members of this committee to refrain from asking

2    questions during the closing statements.

3            As agreed by Mr. Barnes and Senator Kurita,

4    Mr. Barnes, as the contestant, shall have the burden of

5    proof in this contest.  This could be interpreted as

6    meaning a tie goes to Senator Kurita.

7            Obviously, there's been much discussion in

8    the media about this race and this contest.

9            Additionally, I understand that the

10   contestants themselves or supporters of Mr. Barnes or

11   Senator Kurita may have contacted members of this

12   committee and the State Primary Board prior to this

13   meeting.

14           Again, I would like to caution every member

15   of this committee to base their decision solely on the

16   evidence presented today.

17           One final note, you will find, members of

18   this committee, there are two late filings by or two

19   filings that were made last night about 9:00 p.m. by

20   Mr. Rochelle and Mr. Thompson as counsel for Senator

21   Kurita.  Copies of those materials have been made

22   available to each of you at your seat.

23           Are there any questions before we begin from

24   the committee about how we're going to do this?  Yes,

25   Price.

```
 1              MR. THOMPSON:  You mentioned the exhibits.  I
 2   have copies of those.  I would like to be able to give
 3   those to anyone who didn't get one here today.
 4              CHAIRMAN SASSER:  Mr. Thompson is going to be
 5   passing out to the other members of the Executive
 6   Committee some filings that Mr. Rochelle and Mr.
 7   Thompson made on behalf of Senator Kurita.
 8              Mr. Barrett, Mr. Rochelle, are y'all ready?
 9              MR. BARRETT:  We're ready.
10              CHAIRMAN SASSER:  Hearing no questions from
11   the Committee, Mr. Barrett, you may proceed.  And I
12   would ask the timers to start the clock when he starts.
13   Ten minutes for his opening statement.
14              MR. BARRETT:  Don't I get a free joke?
15              CHAIRMAN SASSER:  If Mr. Rochelle will give
16   you a free joke you can have it, George.
17              MR. BARRETT:  Can I have a free joke?
18              MR. ROCHELLE:  Knowing George's jokes, I'm
19   tempted not to agree.
20              MR. BARRETT:  I'll tell my joke this way:
21   I'll introduce myself.  I'm George Barrett, lawyer in
22   Nashville, along with Douglas Johnston, Dewey
23   Branstetter and Mike Wall representing Mr. Barnes.
24              My motto is brevity is the soul's will and
25   every Sunday I sit it in the last pew at the Cathedral
```

```
 1    so if the sermon gets too long I can slip out.

 2            Several years ago we got a new Bishop, Bishop

 3    Kmeic and I was sitting in the last few pew and I saw

 4    him come in back, he's getting ready to say something.

 5            I went back and I introduced myself, "Bishop

 6    Kmeic, I'm George Barrett, I'm a native Nashvillian.

 7    I'm glad to have you here but there's a great tradition

 8    in the Dioceses of Nashville, no long sermons" and he

 9    said, "What did you say your name was?"  I said, "My

10    name is George Barrett."  He said, "Mr. Barrett, you're

11    ex-communicated."

12            The last time I appeared here was in 1962

13    when I sought to certify the certification of a

14    Democratic nominee from the United States Congress of

15    the Fifth Congressional District.

16            We were successful in this effort and the

17    State Democratic Primary Board set aside the election

18    and in the general election, Dick Fulton won by a

19    landslide and went on for a very distinguished public

20    career.

21            I'd like to thank the members of the

22    Committee for agreeing to serve and let me say that

23    setting an election aside is not a simple task and it's

24    not to be taken lightly.

25            I've set a number of them aside or have been
```

1    successful in having Courts and Primary Boards set them

2    aside and I do not take it lightly.

3              The allegations here are serious.  They go to

4    the right of the people to choose -- the right of

5    Democrats to choose who their nominee will be.

6              Let me allay your fears that you're on sound

7    legal ground.  In the Taylor case, Taylor versus State

8    Democratic Executive Committee, the State Supreme

9    Court, in effect, found that the Democratic, State

10   Democratic Primary Board is the Supreme Court of the

11   Democratic Party in choosing who your nominee should

12   be.

13             Let there be no fear that there's not legal

14   precedent for what you are doing.

15             It's also protected by Federal Law in the

16   case of Democratic Party versus Jones, where the

17   Supreme Court said that the State of California could

18   not unduly regulate the Democratic primary in that

19   state where they declared it an open primary.

20             So there's ample State and Federal authority

21   to support the proposition that we're asking you to

22   embark upon.  Let me assure you to begin with, you are

23   not plowing new ground.

24             As just a year and a half ago in 2007, a

25   similar contest was held in the State Senate which was

1  the sole judge of its members.  There are two tests to

2  challenge an election.  One is a numerosity test.  That

3  is if you lose by a number of votes, you have to be

4  able to show a number of illegal votes, of votes that's

5  not been cast that makes you the winner, and the second

6  is that if there's so much uncertainty about the

7  conduct of the election, that it creates an incurable

8  uncertainty that you may set the election aside.

9            In the Ford case, there were 13 votes

10 separating Senator Ford from her opponent.  The

11 Republican controlled Legislature could only turn up 12

12 illegal votes so they did not meet the first prong.

13           They met the second prong.  There was so much

14 confusion about the election that it created an

15 incurable uncertainty.  You're not being asked to

16 embark upon an uncharted sea.

17           There's precedent, binding or not, and

18 Senator Kurita was a member of that body and voted to

19 oust Senator Ford.  It subsequently ended up being

20 reelected.

21           We propose to present evidence in two forms

22 to support each and every allegation we make.  We have

23 live witnesses and we have affidavits.

24           The attorney for the County Election

25 Commission was kind enough to make certain election

```
 1   officials available for interviews by Mr. Rochelle and
 2   myself and Mr. Johnston last Tuesday.
 3            We are going to present our evidence in
 4   relation to the numbered paragraphs in the Contest of
 5   Election which you received a copy of and in relation
 6   to the various witnesses presented in Montgomery County
 7   so that we can show that we believe we've successfully
 8   raised credibility questions about the testimony of the
 9   witnesses in the Montgomery County Election Commission
10   and our own witnesses.
11            Ours is a simple proposition that the
12   Republicans set out to distort this election, to,
13   quote, muddy the water and choose our nominee.
14            What's the proof going to be?  Let me give
15   you just one, an officer of the Cheatham County
16   Republican Party voted in the Democratic primary.  Her
17   application for ballot, her -- the Web Page for the
18   Cheatham County Republican Party and her application to
19   vote in the Democratic primary is attached in our
20   supplemental filing for the Contest of Election.
21            There's a concerted effort of Republicans.
22   We'll present witnesses that went to the Republican
23   headquarters in Montgomery County and inquired about
24   the Senate election and were asked to vote for Kurita,
25   Senator Kurita because she was, quote, good for
```

1    Republicans.

2            She violated, Senator Kurita violated the

3    most basic law we have, one of them is the invasion of

4    the privacy of the polling place.  We allege she did it

5    twice in early voting and did it in Cheatham County and

6    we'll present a live witness that witnessed that and

7    will testify as to that.

8            Now, it's been facetiously referred to as

9    "Pottygate" but Mr. Rochelle answered the allegations

10   to Senator Kurita but he did not address the

11   allegations of her manager, a male followed her into

12   that polling place and that has not been addressed.

13   That stands unrefuted as of this time.

14           A voting analysis which we attached showed

15   that 1200 new voters voted in this election, 500 of

16   whom had not previously voted and 700 of whom had voted

17   in one to seven Republican elections back to the year

18   of 2000, 39 of whom, 39 of whom had voted in the last 7

19   Republican primary.

20           You call that hardcore and that is sufficient

21   vote to change the outcome of this election.

22           And if there's any doubt as to where the

23   Republicans stood in this primary, let me read you a

24   dispatch for the Nashville City Paper, July 16th, 2002.

25           MR. ROCHELLE:  Before you start reading,

1   Mr. Chair, I would like to raise the question as to I

2   take it Mr. Barrett is going to introduce a newspaper

3   article attempting to prove the truth of the matter.

4          That's hearsay and Tennessee, as in every

5   Court in this country, hearsay is not admissible to

6   prove the truth of the fact, and so Mr. Barrett

7   started -- this is just the first example of filing

8   hearsay where in this case it's a newspaper article and

9   attempting to prove the existence of a fact, the truth

10   of a fact.

11          That nowhere is admissible in any Court in

12   this country because it's not -- history has showed us

13   over 200 years to teach us that hearsay where you read

14   it in the newspaper or say somebody else said I heard

15   somebody else say that something happened is not proof

16   that that something happened.

17          Now, y'all have to decide whether you want to

18   hear hearsay and give it what weight you wish to give

19   it or whether you want to exclude.  I raise that issue

20   now, not expecting Mr. Barrett to start introducing

21   evidence in the presentation of the case but since he

22   brought up this newspaper article I have to say to you

23   I love my friends in the media and I have great respect

24   for them but in 30-something years of being in public

25   life, I don't know that I've ever read a newspaper

```
 1    story or seen a television coverage of an event that I

 2    was involved in that was 100 percent accurate.

 3              MR. BARRETT:  May I reply?

 4              CHAIRMAN SASSER:  Before you respond, I

 5    really appreciate so many members of the public being

 6    here today and participating, but we do want to keep

 7    this on a tight schedule.

 8              If everybody can hold their applause and

 9    complaints until the end, that would be great.  Thank

10    you.

11              MR. BARRETT:  There are exceptions to the

12    Hearsay Rule.  One of them is public documents and

13    newspapers.  Let me say that Senator Rochelle's

14    response to our Contest of Election is Exhibit H is a

15    newspaper article.

16              So, we've chosen to rely upon a newspaper

17    article in response to our contest for election, and

18    thirdly, this is not a Court of Law, the Rules of

19    Evidence are not applicable.

20              MR. ROCHELLE:  And I would say to you if you

21    choose to ignore the exhibit, the newspaper article or

22    Mr. Barrett objects to it, but in that case the

23    question was, was there actually a newspaper article

24    that said Mr. Barnes was a Republican?

25              So I presented that actual newspaper article
```

```
 1   and in this case, it's just the beginning of it, we've
 2   got affidavits and all sorts of things that Mr. Barrett
 3   is going to try to introduce that's classic hearsay.
 4           That's why I raise the point.  Go ahead sort
 5   of decide which direction you're going to go now.
 6           CHAIRMAN SASSER:  Thanks Mr. Rochelle.  As
 7   you know all too well, however, this is not a Court of
 8   Law, it's a State Primary Board so we're not bound by
 9   the Rules of Evidence.
10           We're going to attempt here to give both
11   parties as wide a leeway as possible.  We want to build
12   as complete a record as possible.
13           I understand that some of your materials
14   there are some unsworn documents and for that reason
15   we're going to allow both parties great latitude in
16   what they present today.
17           MR. BARRETT:  The rules so provide,
18   Mr. Chairman.
19           CHAIRMAN SASSER:  I think you got about a
20   minute and a half left.
21           MR. BARRETT:  "Ramsey Targets Former GOP
22   Colleagues While Helping Democrat Kurita."  That's
23   July 16th, 2008 in the Nashville City Paper.
24           The last quote, "Ramsey said he's helped
25   raise money for Kurita through calling donors on her
```

```
 1   behalf as well as contributors calling him and asking

 2   if he minded if they gave to her.  'I want to do

 3   anything I can to help', Ramsey said, added that he

 4   feels 'very confident' that Kurita will defeat

 5   Democratic challenger Tim Barnes on the August 7th

 6   primary."

 7           It's no secret that Senator Kurita staged a

 8   Democratic caucus, vote for Lieutenant Governor Wilder

 9   and she did not.  That's no secret and that can't be

10   denied.

11           To add insult to injury, there's an article

12   yesterday, an AP article which is titled "Tennessee GOP

13   Democratic candidate e-mailed" -- this overlapped.

14   It's yesterday.  I think it's in today's paper.

15           "Talk about bipartisanship, two State Senate

16   candidates from opposing parties both aligned with

17   Republican Senate Speaker Ron Ramsey, briefly shared an

18   e-mail distribution list signing up for the e-mail news

19   release from Republican candidate 'Mae Faulk' resulted

20   in a confirmation notice from Democratic Senator

21   Rosalind Kurita of Clarksville."

22           CHAIRMAN SASSER:  Your time is up.

23           MR. BARRETT:  Thank you.

24           MR. ROCHELLE:  I hope you'll allow some

25   informality here today.  Since we started out that way,
```

```
 1    I have not put on my coat yet.

 2            CHAIRMAN SASSER:  I'll take mine off.

 3            MR. ROCHELLE:  Because of that, we all know

 4    each other, occasionally I'm going to call George

 5    George.  I have great respect for George Barrett and

 6    we've giddied each over other the years many times and

 7    please don't accept that as any sign of disrespect that

 8    I'm not calling somebody by their last name.

 9            George is a great friend of mine and I'm a

10    great admirer of his.  A man once said of George

11    Barrett, though, "George knows a lot of history, and

12    some of it is true."

13            If we're going to try this case based on

14    newspaper reporters writing stories -- if you'll

15    notice, he didn't copy the whole article.  George read

16    a little part at the top that they called -- wanted to

17    bring it in they could have make them read it.

18            Didn't read the rest of the story where it

19    said Senator Kurita had no knowledge whatever of any of

20    that.  It was a vendor's mistake somewhere.  That's why

21    you be cautious of the hearsay offered..

22            This is actually the second one of these

23    contests that I've ever been in.  The other one was in

24    a Court and I had a fella that got elected to the

25    County Commission by one vote in Governors Crossroads.
```

```
 1    And we won.  Fella is now State Representative Track
 2    Bone when he was running for the County Commission.
 3            So when Senator Kurita called me and asked me
 4    to be involved in this case, I thought well, I'll draw
 5    upon my massive amount of experience, that one case,
 6    and I found there's a lot more to learn, lot more to
 7    know.
 8            Let me make one personal remark to you.  I
 9    have a medical condition and that medical condition is
10    called central tremor and occasionally my hands shake
11    and occasionally my head nods.  If my head is nodding,
12    don't think that I'm agreeing with George Barrett.
13            Now, I'm not going to go into the evidence
14    right now.  That's what this hearing is about.  You'll
15    hear the evidence.
16            Basically, we've got our response that we
17    filed, we've got a reply brief that we filed.  Price
18    Thompson, who is co-counsel, my associate from
19    Clarksville, originally, we're going to enter all of
20    those exhibits, attachments, exhibits at the proper
21    time.
22            We'll just ask that they be introduced.
23    We'll provide Senator Kurita to testify and so that
24    you'll be able to ask her questions if you'd like to.
25            So we don't expect to be parading witnesses
```

1   in here.  George is going to have to parade some

2   witnesses in here.  Understand, everybody has been

3   acting under a very tight timeframe.

4           There's five days after the vote is certified

5   which usually comes 10, 11 days after the election and

6   then they have to file a contest.  It's supposed to be

7   everything, fully stated all contests, all allegations.

8   They've added a little bit at the last part here.  We

9   hadn't said anything about that yet.  We may later.

10          Then we have -- we didn't have to file a

11  response until today.  We didn't have to tell Mr.

12  Barrett or anybody else what our position was until

13  today.

14          Instead, we chose, as soon as we could get

15  prepared, to file that response.  The election workers

16  were key to this because all Mr. Barrett's allegations

17  under the first theory that he started under was --

18  dealt with misdirecting voters.

19          So we needed to talk to those folks.  The

20  attorney for the Montgomery County Election Commission

21  chose who we could talk to, got them together and we

22  interviewed them Tuesday, and then we had to have it

23  typed up.  That transcript got to us yesterday and so

24  that's why there was a pleading filed last night at

25  9:00.

```
 1              We didn't have to file any pleading but we
 2    filed the brief of law and the argument and that's what
 3    we passed out a little bit awhile ago.
 4              I hope that each and everyone of you has read
 5    the contest.  I hope that each and everyone of you have
 6    read the response.  I hope that each and everyone of
 7    you have read the argument that Mr. Barrett put forth
 8    and the argument that we filed at 9:02 last night.
 9              We ask you today to decide this case on the
10    law and the facts.  Read the exhibits, listen to the
11    witnesses, don't worry so much about the lawyers, and
12    make the right decision for both of these parties and
13    for the benefit of the people of Tennessee and the
14    Democrats of Tennessee, including them.
15              What you do here today will provide precedent
16    for -- if you're unlucky enough to have one of these
17    cases filed against in the future.  Really how you
18    treat this case, to a large extent, is going to decide
19    whether you're going to be down here every year
20    deciding, or two years deciding a bunch of election
21    contests.
22              If at anytime you have a question for me or
23    Mr. Thompson, if you'll let the Chairman know, we'll be
24    glad to respond to the best of our ability.  Thank you.
25              CHAIRMAN SASSER:  Mr. Barrett, if y'all want
```

1    to call your first witness?

2            MR. JOHNSTON:  Mr. Allen Haynes.  While he's

3    coming up, Mr. Haynes has submitted an affidavit and

4    that is -- should be in your materials in support of

5    Paragraph 5 of the contest.

6            CHAIRMAN SASSER:  Mr. Johnston, we've gotten

7    so many materials.  You want to let us know what

8    exhibit that is attached to, what document that --

9            MR. JOHNSTON:  In the exhibits attached to

10   our contest, they are attached by paragraph.  There

11   will be a sheet that says Paragraph 5 and it will be

12   right behind, should be behind that one.

13           Are we swearing these witnesses?

14           CHAIRMAN SASSER:  Yes.  The court reporter

15   can swear the witnesses in, please.

16

17                        - - -

18

19

20                  ADAM SHANE HAYNES,

21    having been first duly sworn, testified as follows:

22   DIRECT EXAMINATION BY MR. JOHNSTON:

23       Q    Mr. Haynes, we're going to try to create a

24   record here but allow everyone in the back to hear

25   everything that you have to say.

```
 1           So if you can speak closely into that
 2  microphone, I think that will help.
 3           CHAIRMAN SASSER:  Mr. Johnston, we do have an
 4  electronic evidence presenter here today.  You'd like
 5  to use that, feel free.
 6      Q    Mr. Haynes, you've just been introduced to
 7  the counsel, to the Committee.  Would you tell them
 8  just a little bit about yourself, where you live, what
 9  you do for a living, that sort of thing.
10      A    I live in Clarksville, Tennessee.  I'm a
11  student at Austin Peay State University, junior with a
12  science major.  Currently serving as President of the
13  College Democrats at Austin Peay.  Political Director
14  for the Tennessee College of Democrats.
15      Q    Now, Mr. Haynes, in this process, you have
16  supplied an affidavit in support of Mr. Barnes'
17  contest, have you not?
18      A    Yes, sir.
19      Q    And in just a minute I'm going to hand you a
20  copy of that.  Let me just ask you, in July of this
21  year, did you visit the Republican headquarters in
22  Montgomery County?
23      A    Yes, I did.
24      Q    What was the purpose in doing that, sir?
25      A    My purpose was it was open and, being
```

1    curious, I wanted to see what campaign materials they

2    had there for other candidates such as Senator

3    Alexander, obviously Marsha Blackburn had a candidate

4    there, wanted to see and what they had, being curious,

5    political signs made.  Part of the thinking.

6         Q    And when you were down there on that day, did

7    you speak to any of the Republican workers there in the

8    headquarters?

9         A    Yes, I did.

10        Q    How many did you speak to?

11        A    There were two there, one male and female.

12        Q    Tell us about that conversation, please, sir.

13        A    It was just brief conversation as I was

14   looking at materials.  We spoke back and forth about

15   different races, about what was going on in Montgomery

16   County, the two districts.

17             Obviously, I brought up the 22nd District

18   Senate race, about just wondering why there was no

19   Republican in the race, and they kind of skated around

20   that and said, you know, since I didn't live in a

21   Congressional District, it didn't matter; I live in the

22   John Tanner District, he has no Republican opposition.

23             It would be okay if I switched over to the

24   Republican -- to the Democratic primaries for Senator

25   Kurita.

```
 1        Q     And did one or both of these workers tell you

 2   that?

 3        A     One told me that, the other one just nodded

 4   her head.

 5        Q     Alright.  Let me hand you a copy of your

 6   affidavit, Mr. Haynes.  Is that a true and exact copy

 7   of that affidavit, sir?

 8        A     Yes, it is.

 9              MR. JOHNSTON:  Just for identification

10   purposes in case any of you haven't found it yet,

11   that's what it looks like and we would ask that the

12   committee accept this as an exhibit and I will pass the

13   witness to Mr. Rochelle.

14

15                           - - -

16

17   CROSS EXAMINATION BY MR. ROCHELLE:

18        Q     I'm Bob Rochelle.  I represent Senator Kurita

19   with Mr. Thompson here.

20              We wanted to check out your affidavit and

21   have some idea as to how to find these folks and talk

22   to them but did you include in your affidavit what

23   their names were?

24        A     No, sir.  I do not recall getting their

25   names.
```

```
 1        Q    You see, that makes it kind of hard for us.

 2   We're wanting to interview them and to see if maybe

 3   they said something different.

 4             But you look familiar.  Have you had a You

 5   Tube presentation that you were on?

 6        A    No, sir, I have not.

 7        Q    Have you got a Facebook?

 8        A    Yes, sir, I do.

 9        Q    Were you the one with the golf club?

10        A    No, sir.  My golf clubs are in Morristown,

11   Tennessee.

12        Q    Were you the one that was on there with the

13   picture of Senator Kurita?

14        A    No, sir, I was not.

15        Q    Who was that?

16        A    That was a friend of mine.

17        Q    Did you produce it, manage it?

18        A    No, sir, I did not.

19        Q    Wasn't you?

20        A    No, sir, it was not.

21        Q    Were you there when it was made?

22        A    No, sir, I was not.

23        Q    Alright.  Take your word on that.  You've

24   seen it, you know that it was a very frightening

25   exhibition?
```

```
 1        A     I wouldn't call it frightening.

 2        Q     It contained violence.

 3        A     Well, I wouldn't say it contained violence.

 4        Q     What was being used to strike Senator Kurita

 5   with, what was being used, golf club?

 6        A     From what I remember, yes, sir.  I've seen

 7   the video.

 8        Q     A golf club and a -- continuously struck a

 9   picture of Senator Kurita basically using a -- I don't

10   want to imitate the voice, but a frightening voice,

11   "Kill" --

12        A     No, sir.

13        Q     -- "Senator Kurita."

14        A     No, sir.  That -- the word "kill" was not in

15   that video.

16        Q     Then continuously taking the golf club and

17   beating it against the image of Senator Kurita.

18        A     Yes, sir.

19        Q     That was your friend.

20        A     Yes, sir.  He was an acquaintance of mine,

21   yes.

22              MR. ROCHELLE:  That's all.  Thank you.

23              CHAIRMAN SASSER:  Anybody on the Committee

24   have any questions?

25              MR. JOHNSTON:  We have no redirect.
```

1          CHAIRMAN SASSER:  Anybody on the Committee

2     have any questions  Thank you, Mr. Haynes.

3          MR. JOHNSTON:  Thank you, Mr. Haynes.  David

4     Luciano.  I'm sorry.  The affidavit of Mr. Luciano is

5     included in the supplemental filing that we submitted.

6

7                         - - -

8

9                     DAVID LUCIANO,

10     having been first duly sworn, testified as follows:

11     DIRECT EXAMINATION BY MR. JOHNSTON:

12     Q     You're your David Luciano?

13     A     That's correct.

14     Q     Mr. Luciano, would you tell the panel here

15     just a little bit about yourself, where you're from and

16     what you do, that sort of thing?

17     A     David, or DJ is fine with me.  There's a lot

18     of Misters in here.  I'm not into formalities.

19          But I live in Clarksville, Tennessee.  I'm a

20     student at Austin Peay State University, former

21     President of the College Democrats and I deliver pizzas

22     for Papa John's.  So if you guys are hungry later.

23     Q     Mr. Luciano, did you call sometime in July at

24     the Montgomery County Republican Party headquarters?

25     A     That's correct.

1      Q     And what did you do that for, sir?

2      A     I had heard in passing with the conversation

3   with Adam about his experience at the Montgomery County

4   headquarters and so I decided to check myself and I

5   called and the lady that answered the phone informed me

6   she was the President of the Montgomery County

7   Republican Party and at that time I told her that I was

8   new to Clarksville and I was looking to try to find

9   some places.

10         She gave me the directions to the party

11   headquarters and then she told me about different races

12   that were going on and she told me -- I gave her my

13   address.

14         She told me I was -- I was in Marsha

15   Blackburn's District but she was safe from her contest

16   and that if I wanted to muddy up the waters, a lot of

17   other Republicans were doing the same in voting in the

18   Democratic primary for Senator Kurita because the

19   Democratic Party was livid of her vote on ousting

20   Wilder.

21         MR. ROCHELLE:  If I might object, this is

22   another example here.  This man has gone way beyond the

23   affidavit that he filed and, again, those type of

24   matters are supposed to be included in the original

25   contest.

```
 1          Again, we've got an affidavit talking about
 2   somebody who is not named in the affidavit where we
 3   could go and interview them, and so at some point, I
 4   think you're going to have to put some limits on just
 5   how much wavering from the affidavit can be done.
 6          A SPEAKER:  Have a copy of the affidavit you
 7   can put on the screen, please?
 8          MR. JOHNSTON:  I do.
 9          MR. JOHNSTON:  Can you see the affidavit and
10   read it from here, Mr -- I've got an extra copy.  Let
11   me just hand this to you.
12          CHAIRMAN SASSER:  Thank you Mr. Rochelle.
13          Mr. Johnston, if we can keep the testimony as
14   close as possible to the affidavit and, again, Mr.
15   Rochelle, one of the things we're trying to do here,
16   have as complete a record as possible.
17          I would encourage if there's issues like this
18   to please address them on cross examination.  You'll do
19   a very effective job on that.
20          MR. ROCHELLE:  Again, I'm trying to reserve
21   an objection on things.  You would rather me not do it
22   that way and do it when I do cross examination, I'll be
23   glad to.
24          MR. JOHNSTON:  I would just point out, too, I
25   think the officers of the Republican Party in
```

```
 1    Montgomery County are listed on their website.  Could
 2    easily have been found by anybody.
 3    BY MR. JOHNSTON:
 4        Q    Mr. Luciano, is that a true and exact copy of
 5    the affidavit that you submitted on behalf of
 6    Mr. Barnes?
 7        A    That is correct.
 8             MR. JOHNSTON:  We would ask the committee to
 9    accept this affidavit as the next numbered exhibit.  I
10    pass the witness.
11
12                           - - -
13
14    CROSS EXAMINATION BY MR. ROCHELLE:
15        Q    David, I'm Bob Rochelle.  When you called,
16    were you involved in the Barnes campaign?
17        A    I was working as a volunteer, yes, sir.
18        Q    How about the other fella, David that was or
19    Adam that was just here, was he involved?
20        A    He was a volunteer, as well.
21        Q    So did y'all come up with this thing, let's
22    call the Republican Party and see if we can get some
23    information out of what they're planning to do?
24        A    I don't know what Adam was thinking of.  He
25    was just up here.  For me it was concerning to me as a
```

```
 1    Democratic that the Republican Party was trying to
 2    influence our race, our primary, and I wanted to
 3    checkup on that myself.
 4         Q    And that was well-known in the Barnes
 5    campaign, that there needed to be --
 6         A    I don't know what was well-known from other
 7    people aside from myself.
 8         Q    In your affidavit you didn't name anybody.
 9    You said you called and somebody said they were an
10    officer.
11         A    She informed me she was the officer.
12         Q    And she told you because Marsha Blackburn had
13    it easy or had --
14         A    She said she had it safe.
15         Q    You live in Marsha Blackburn's district?
16         A    I assume I do.  I live in Clarksville.  I
17    mean I've never voted for her.
18         Q    Marsha Blackburn was the one that had the
19    opponent.
20         A    Right.  But I believe she handed the race to
21    him pretty easily.  I don't think that's what she was
22    referring to.
23         Q    So you're saying that the people you talked
24    to were telling you Marsha Blackburn is going to win
25    and that the people in her base of support didn't need
```

```
 1    to go out and vote for her, they could go vote

 2    somewhere else.

 3         A    I just know what the lady told me on the

 4    phone is that she was safe.

 5              MR. ROCHELLE:  On that pizza, you check back

 6    in here about 11:30, okay?

 7              CHAIRMAN SASSER:  Anybody on the Committee

 8    have any questions?

 9              MR. OWEN:  I just move that we accept the

10    affidavit as is and nothing else, just as Senator

11    Rochelle suggested.

12              CHAIRMAN SASSER:  Can we get a second on Mr.

13    Owen's motion?

14              A SPEAKER:  Second.

15              CHAIRMAN SASSER:  All in favor?  Aye.

16              All opposed?  Motion carries.  Any redirect?

17              MR. JOHNSTON:  No redirect.

18              CHAIRMAN SASSER:  Thanks.

19              MR. JOHNSTON:  The next item we have is an

20    affidavit from Ms. Alma Lewis which I will place on the

21    screen and read and ask that the committee accept the

22    affidavit.

23              "AFFIDAVIT OF ALMA L. LEWIS.  I, Alma L.

24    Lewis, a resident of 4135 Lem Davis Road, Cunningham,

25    Tennessee, 37042 would state as follows:  On the
```

1   morning of August the 7th, 2008 at about 6:30 a.m., I

2   received a telephone call at my home from a woman

3   stating that she was with the Republican Party.  She

4   asked me if I was going to vote for Tim Barnes.  I said

5   yes.  She told me that Tim Barnes was a Republican and

6   that the Leaf Chronicle had gotten it right when they

7   printed that he was.  She said the follow-up article

8   was wrong when it printed he was a Democrat.  She told

9   me if I wanted to vote for Tim Barnes, I would have to

10  vote Republican and write in Tim Barnes.  My husband

11  and I discussed it and we were so confused by all of

12  this that we decided we would just vote for Rosalind

13  Kurita because we wanted to vote Democrat.  We would

14  have voted for Tim Barnes if there hadn't been all this

15  confusion about whether he was a Democrat or not.

16  FURTHER THE AFFIANT SAITH NOT."   Alma L. Lewis.   Sworn

17  to and subscribed before me this the 26th day of

18  August, Elizabeth Klein, Notary Public.

19          I ask that the Committee accept the affidavit

20  of Alma Lewis.

21          CHAIRMAN SASSER:  Accepted, Mr. Rochelle?

22          MR. ROCHELLE:  If I can just comment on these

23  affidavits since we don't have them here for cross

24  examination.

25          First of all, I didn't see Alma Lewis on your

```
 1   witness list.  We made a deal, we wouldn't call anybody
 2   or use anything unless we gave notice but I didn't see
 3   Alma Lewis listed anywhere so understand we're taken by
 4   surprise.
 5           But if you'll look at this affidavit, again,
 6   who was it she's talking to?  Don't know.  It says
 7   because somebody called her on the phone that they got
 8   so confused they decided they would just vote for
 9   Rosalind Kurita.
10           Now, I really don't want to object to them
11   introducing the affidavit but I think you have to give
12   it the weight that it's worth and that's not much.
13           MR. PHILLIPS:  For the benefit of the
14   committees and the members present, I also want to make
15   clear what the rules were of the parties, that the
16   parties agreed to.
17           The parties agreed that all affidavits and
18   other evidence with the exception of voter history
19   information would be submitted to the Primary Board by
20   12 noon on Thursday, September the 11th.
21           The affidavit that just was read into the
22   record fell within that dead line.  I just want to make
23   everyone aware of kind of what the evidentiary
24   deadlines were on the parties in terms of submitting
25   documents to this body.
```

```
 1              CHAIRMAN SASSER:  Mr. Barrett.

 2              MR. BARRETT:  I have great difficulty with

 3    these.  Judge Collier in Chattanooga one time told me,

 4    "Mr. Barrett, we're tired of looking at your hand,

 5    we'll believe the document."

 6              I placed on there an affidavit by Jesus

 7    Quiles, which is addressed in Paragraph 6 of the

 8    contest of election, in which he attempted to vote at

 9    Sango Elementary School shortly before the close of the

10    polls and there's an exchange between he and the

11    election officers.

12              It's also directed to the interview of Vickie

13    Koelman, K-O-E-L-M-A-N, the Election Coordinator of

14    Montgomery County.  That transcript hasn't been filed I

15    believe by Mr. Rochelle?  Has the transcript been

16    filed?

17              MR. ROCHELLE:  I think it needs to be filed.

18    Can we just agree to file the transcript --

19              MR. BARRETT:  I agree.

20              MR. ROCHELLE:  -- our interviews with the

21    election workers?

22              MR. BARRETT:  Yes, I agree with that.  I'll

23    read this, Mr. Quiles, he's unavailable.

24              CHAIRMAN SASSER:  You might want to stand

25    closer to the microphone.
```

```
 1            MR. BARRETT:  I'm sorry.  I can't read it up
 2     there.  My eyesight is not good.
 3            MR. ROCHELLE:  Here, George.
 4            MR. BARRETT:  I'll give it back to you.  "I
 5     Jesus Quiles state as follows:  That on Thursday,
 6     August 7th, 2008, I went to vote for Tim Barnes in the
 7     primary election.  I went to Sango Elementary thinking
 8     that was where I was supposed to go.  I got there
 9     around 6:30, 6:45 and told I was not supposed to vote
10     at Sango Elementary but at Rossview.  By the time I
11     would have gone over to Rossview, the polls would have
12     been closed so I was not able to vote.  No one told me
13     I had any option about that, they just told me I
14     couldn't vote."
15            We would like to move that in.
16            MR. PHILLIPS:  Before you do that, Senator
17     Rochelle, let me just make clear, too, this may
18     streamline the process today, as the parties agree, all
19     documents with the exception of the voter histories
20     that were filed prior to noon on Thursday are going to
21     be accepted into the record automatically.
22            MR. BARRETT:  We agreed.
23            MR. ROCHELLE:  We agree, it's all accepted
24     in.  We can comment on them and object to parts of it
25     if we wish.
```

```
 1          MR. PHILLIPS:  Absolutely.  In terms of
 2   making motions about whether things need to be admitted
 3   and things like that as you would do in Court on a
 4   piecemeal, that is unnecessary as far as this body is
 5   concerned.
 6          MR. ROCHELLE:  Okay.  My question is, George
 7   got to file his own case but we have the comments from
 8   the election officials in regard to Mr. Quiles'
 9   affidavit.
10          Would you like to hear that now?  It's in the
11   argument we presented or the written argument that you
12   have.  Would you like to have this read now so that you
13   hear all the information about Mr. Quiles at one time?
14          CHAIRMAN SASSER:  I think it probably be more
15   appropriate if you do that as part of your own case.
16          MR. ROCHELLE:  We'll do it anyway you wish.
17          CHAIRMAN SASSER:  Let's let Mr. Barnes
18   present his case and then we'll let you present Senator
19   Kurita's.
20          MR. ROCHELLE:  Please note that this
21   affidavit doesn't say where this fella lives and that
22   gets important as to whether or not he was -- what
23   might qualify as a failsafe voter or provisional voter
24   or whatever, and we were trying to find out what spurs
25   that requirement and what spurs it is that you moved to
```

```
1    a different district, moved within your precinct, some

2    issue like that.  That's what allows the Election

3    Commission folks to make a determination.

4            I think it's going to be suggested that he

5    didn't get to vote and somehow or another the election

6    folks did something wrong in this.  In this affidavit

7    here he doesn't say anything about where he lived,

8    whether he changed his address.

9            In fact, I think you're going to find that he

10   lived within the district the last time the Election

11   Commission heard from him and he would not have

12   qualified for a failsafe vote or provisional vote.

13           So, just note that's the key thing here.  He

14   doesn't say he's moved.  He doesn't even say where he

15   lives now so we could go in and investigate whether or

16   not he might have been entitled to a provisional vote.

17           MR. BARRETT:  The next paragraphs are

18   Paragraphs 7 to 11.  Two of our witnesses are not here

19   yet.  They will be here.  They should be here by 11 or

20   so.

21           I'm going to skip over to Paragraph 13 of the

22   contested election, and I call counsel Peter

23   Napolitano.

24

25                         - - -
```

1                    PETER NAPOLITANO,

2      having been first duly sworn, testified as follows:

3    DIRECT EXAMINATION BY MR. BARRETT:

4        Q    Mr. Napolitano, would you state your

5    profession, please, sir?

6        A    I've been an attorney for 27 years.

7        Q    And where do you practice?

8        A    I practice in Clarksville.

9        Q    And you live there, of course.

10       A    Yes, sir, I do.

11       Q    You're a resident voter.

12       A    Yes, I am.

13       Q    Did you vote in the August 7th primary?

14       A    Yes, I did.

15       Q    Which precinct did you vote?

16       A    I voted at the Saint Bethlehem Methodist

17   Church, which is where I also attend church.

18       Q    How did you come to give an affidavit in this

19   case which is attached to the -- under Paragraph 13 to

20   the contest for election?

21       A    Well, the day after the election, I had heard

22   on the news and read in our local newspaper that

23   Mr. Barnes had lost by a narrow margin of what, 19

24   votes, 18, 19 votes, and there was some content of the

25   TV news article and the newspaper to the effect of

1   voter confusion and things like that, and I was

2   immediately struck by that based on my own experience

3   at the polling place, and I contacted Mr. Barnes.

4           It was on a Saturday and I didn't expect to

5   find him at his office but I called and left a message,

6   nevertheless, and then I called him back again on

7   Monday.

8           So I initiated the contact to share my

9   experience at the polling place to see if it was

10  relevant to his narrow defeat.

11      Q    Go ahead, tell us what happened.

12      A    Well, I went there and I went to the first

13  table.  They've got it broken down by alphabet and I

14  went to the first lady at the table there and she asked

15  me to produce my voter registration card.  She asked me

16  to fill out this oh, I guess about a 6 X 5 piece of

17  paper on which I was to declare a party.

18          I announced to her that I did not have any

19  party affiliation any longer; that I would vote in all

20  subsequent elections and that day for who I felt was

21  the best candidate for the position.

22          She said, "Well, you have to declare a

23  party."  I said, "I do not have a party and I am here

24  to vote for Mr. Barnes."  She said, "Well, you can't do

25  that until you declare a party."  I said, "I'll tell

1    you a third time I don't have a party affiliation and

2    I'm not going to declare one."

3           She said, "Well, what was" -- "in prior

4    election, what was your party affiliation?"  And I

5    thought back to the last Presidential election and my

6    error in judgment in voting Republican, and I said,

7    "Well, I voted Republican."  She said, "Well, alright,

8    check off Republican box."

9           I did.  I signed that form and she instructed

10   me to go over to the registry line.  I went over to

11   that table and signed the log and I was asked again to

12   check off Democrat or Republican and to be consistent

13   with the first sheet, I checked off Republican, signed

14   it and then I was given a little ticket and I went on

15   to the voting machine.

16          A gentleman inserted a key in the machine and

17   I proceeded to vote.  I went through 8 or 9 screens and

18   at the end when it asked -- the yellow light came on

19   the machine, asking me to confirm all my selections,

20   and at that point, I realized I did not see Mr. Barnes

21   or Ms. Kurita's names on any of those screens.

22          So I backed paged it.  I went all the way

23   back to the beginning and I carefully looked at each

24   screen and ended up the same way, no Kurita, no Barnes.

25          I called for assistance of the gentleman who

1    had put the key in the machine.  Told him the problem.

2    I said, "I'm here to vote for Mr. Barnes.  There's no

3    opportunity for me to vote on any of these screens."

4              He said, "Well, it's too late to do anything

5    now, you've already reached the end of the line with

6    the machine and all you can do now is press that

7    button."  I said, "No, I'm not pressing that button and

8    I want to see somebody else if that's all you can tell

9    me."

10             By the end -- about a half hour, there were

11   four people including a supervisor, all of whom were in

12   disagreement as to whether they could reset the machine

13   because I had not pressed that confirmation button.

14             And finally a supervisor was called and she

15   brought a three ring looseleaf binder I guess with some

16   rules and regulations for this.  She found the exact

17   section applicable to my problem and she stated to the

18   other three election employees, Election Commission

19   employees that yes, we can reset the machine but he's

20   going to first have to go back and start over again and

21   sign a new declaration paper declaring he's a Democrat.

22             Even with that supervisor saying that, there

23   was a woman there among the four employees who

24   disagreed with her and said no, you can't do that.

25             Well, the supervisor called the final shot

```
1    and I was sent back to the first table.  We did it, we

2    destroyed the other paper.  I don't remember if we

3    destroyed the paper or I crossed out Republican and

4    checked off Democrat and initialed it.

5              I know I did that on the registration line.

6    I had to go back to the second table, cross out

7    Republican, check Democrat and initial my changes.

8    That was counter-initialed by the supervisor.

9              I then went back to the machine and they

10   rekeyed it and lo and behold I had my choice of voting

11   for Mr. Barnes or Ms. Kurita, and I did.  And so I was

12   not disenfranchised.

13             My point was, I'm a retired police sergeant

14   from New York.  I've been an attorney 27 years.  I

15   stood up for myself with these people.

16             Four people didn't know what to tell me, what

17   -- you know, you have two people disagreeing with the

18   supervisor.  You had people that didn't know what to

19   do.  I specifically went there saying, "I don't have a

20   party affiliation, I'm here to vote for Mr. Barnes."

21             And I end up with no opportunity to vote for

22   him.  I did not assert myself as I am known to do from

23   time to time.  I would have just simply accepted the

24   decision of the first, second and third Election

25   Commission employees and just walked out of the church
```

```
 1    and, you know, not having been able to vote for

 2    Mr. Barnes.

 3            I thought, I'm not an average person who is

 4    just going to accept the authority from somebody there

 5    without challenge or with challenge.  And I couldn't

 6    help but wonder how many people not as assertive as

 7    myself experienced the same thing?

 8       Q    Mr. Napolitano, have you ever had that happen

 9    in a previous election?

10       A    No, I haven't.

11            MR. BARRETT:  You may ask him.

12            THE WITNESS:  I can't help but wonder what

13    all the chuckling is about from that group of ladies

14    back there?  They find my testimony amusing?

15            CHAIRMAN SASSER:  I'll remind everybody that

16    who is here as our guest, we are trying to be

17    respectful of everybody who is up here participating.

18            I'd ask the same respect for my guests as for

19    the all members.  Thank you so much.

20

21                            - - -

22

23    CROSS EXAMINATION BY MR. THOMPSON:

24       Q    Hello, Mr. Napolitano.  My name is Price

25    Thompson.  I represent Senator Kurita along with Mr.
```

```
 1   Rochelle.

 2        A     Good to meet.

 3        Q     Appreciate you coming here today and am I

 4   getting your name right, Napolitano?

 5        A     That's very good.  I've been practicing at it

 6   for 59 years now and I still mess it up.

 7        Q     That's great.  Well, I first want to say that

 8   would you be surprised to hear that there's going to be

 9   testimony from an official at the Saint Bethlehem

10   polling location that will testify by transcript that

11   there was no one objecting to you changing your vote or

12   changing your primary at anytime after you had gone

13   into the voting booth?

14        A     Nothing would surprise me.  I would imagine

15   if that's the case, then none of those people would

16   want to be known to have gotten it wrong and been part

17   of that conflict.

18        Q     Let me ask you one more question.  I heard

19   your righteous indignation on several occasions this

20   morning where you said, "I was there to vote for Tim

21   Barnes."

22        A     Correct.

23        Q     You said that about four, five times; is that

24   correct?

25        A     No.  I said it twice.  I said it when I first
```

1   entered the church, went up to the first table and I

2   was asked to declare a party.  I said, "I don't have a

3   party affiliation at this point.  I'm hear to vote for

4   Mr. Barnes.  I end up checking off Republican and

5   there's no opportunity to vote for Mr. Barnes."

6          I then said it to the -- a second time to the

7   gentleman who was responsible for my voting machine

8   when I said, "I can't find Mr. Barnes on the screens."

9   He said, "That's because you checked off Republican on

10  the program.  This is the primary and you have to vote

11  Democrat."

12         I said, "Well, I don't want to" -- "I want to

13  vote for Mr. Barnes."  That was the second or third

14  time and that was the end of it.

15     Q    That was an important thing that you told him

16  that day, the candidate you wanted to vote for would

17  help you guide him to the right primary, correct?

18     A    I would hope so.  That's not what happened.

19     Q    If you would just show me in the affidavit

20  where you told the election officials there at the

21  polling location that you were there to vote for

22  Mr. Barnes.  I'd appreciate you showing me that

23  language.

24     A    Okay.  I confess I can't see that.  It's kind

25  of blurry.  Okay.  Good.

```
 1        Q    I believe Mr. Barrett handed you a copy of

 2   your affidavit.  If you would show me where you told

 3   the election officials that you were there to vote for

 4   Mr. Barnes.

 5             Can't find it, can you?

 6        A    I'll take your word for it, without

 7   belaboring these proceedings.  That doesn't mean I

 8   didn't say it.

 9        Q    It's pretty important thing, isn't it?  You

10   said it five times here today.  Why didn't you say it

11   in your affidavit?

12        A    I'm testifying under oath today.

13             A SPEAKER:  It's in there.

14             MR. THOMPSON:  You can point out where it

15   says, "I'm here to vote for Mr. Barnes."

16             A SPEAKER:  Says right here.

17             THE WITNESS:  Where is it?

18             A SPEAKER:  Paragraph 5.

19             THE WITNESS:  Yeah, Paragraph 5.  It says it

20   right there.  "I advised two people who responded that

21   I was unable to find the screen with Mr. Barnes' name

22   and my intent to vote from him."

23        Q    You told them that at the voting machine.

24   You said here you told the people when you walked in

25   the polling location, "I'm here to vote for
```

```
 1  Mr. Barnes."

 2          You didn't put that in your affidavit.  If

 3  that's something important, you should have.  That's

 4  all the questions I have.

 5          CHAIRMAN SASSER:  If there's no objection

 6  from Mr. Barrett -- I'm sorry, any questions from the

 7  Committee?  Thank you.

 8          Any redirect, you guys?

 9          MR. BARRETT:  No.

10          CHAIRMAN SASSER:  Without objection from Mr.

11  Barrett or Mr. Rochelle, I'd like to let us have a ten

12  minute break.  I caution everybody on the Executive

13  Committee and on the Special Committee do not discuss

14  this matter among yourselves.

15          The Sunshine Laws apply to us.  All

16  deliberations should be done in public and in this

17  room.  Thank you.

18  (10:45 a.m., a recess was had until 11:00 a.m.)

19          CHAIRMAN SASSER:  Mr. Barrett.

20          MR. BARRETT:  How much time do we have?

21          A SPEAKER:  You've got -- you used 19.

22          MR. BARRETT:  I looked for this lady at the

23  recess and I didn't see her.  Let me see if she's here.

24  I looked for Ms. Debra Jones.

25          Is she here?  Would you come forward,
```

```
1    Ms. Jones, please, ma'am?

2              Paragraph 15 of the Contest of Election --

3    before I question Ms. Jones, I'd like to direct your

4    attention to the interview of the machine operator at

5    the precinct at Outlaw Field where Ms. Jones voted and

6    that would be beginning on Page 83 of the transcript.

7              I don't believe you have that before you.

8    That was the machine operator that Montgomery County

9    Election Commission made available for interviews by

10   Mr. Rochelle and us on Tuesday and that transcript was

11   completed yesterday and we've had an opportunity to

12   examine it.

13             This witness is going to testify as to her

14   experience when she attempted to vote at Outlaw Field

15   in Montgomery County and it's somewhat contrary to the

16   testimony given by the machine operator.  The machine

17   operator beginning on Page 84 and particularly 87, says

18   that she called tech, technical information at the

19   Election Commission because she was having trouble --

20             CHAIRMAN SASSER:  Mr. Barrett, just to be

21   clear, the testimony you're talking about now in the

22   transcript, we don't have that in front of us here at

23   the Committee.

24             If you could provide maybe a little more

25   context.
```

```
 1           MR. BARRETT:  I'm trying to.  This is the

 2    testimony of the witnesses not under oath -- not under

 3    oath, that the Montgomery County Election Commission

 4    made available on Tuesday for us to interview.

 5           Obviously what they did was go down our

 6    Complaint and when we mentioned a particular precinct,

 7    they interviewed the election officers, the various

 8    election officials and made some of those available for

 9    us to interview on Tuesday.

10           Mr. Rochelle and I, we both were invited.

11    There was a transcript made of that.  Counsel for the

12    Montgomery County Election Commission was present at

13    the interview as was Mr. Phillips, and there's a record

14    made of that.

15           As I say, these people did not testify under

16    oath.  This machine operator, Ms. Landry and her

17    husband, both young people, married and both worked as

18    machine operators at what's called Outlaw Field in

19    Montgomery County.  They admitted that they were having

20    trouble with the machine making it come up with the

21    primary that the person wished to vote in.

22           Ms. Landry says -- she testified she talked

23    to the Special Clerk which is one in each precinct

24    supposed to be troubleshooting.  Beginning on Page --

25           MR. ROCHELLE:  Mr. Chairman, this is what I
```

```
 1    was getting at earlier.  If that's not in the record
 2    yet, the best evidence of what was said of these
 3    interviews which Mr. Barrett and I and Mr. Phillips all
 4    agreed would be filed and considered as evidence.
 5              We keep hearing about unsworn.  It's all
 6    filed and considered for evidence.  I think we now need
 7    to jointly file that transcript so that it's available
 8    to you.  I would ask Mr. Barrett if we can jointly do
 9    it.
10              CHAIRMAN SASSER:  We can make that obviously
11    part of the record.  These proceedings -- the reason I
12    was asking Mr. Barrett to give some context to us to
13    simply those of us sitting up here today do not have a
14    copy of that transcript.
15              MR. ROCHELLE:  I think we referred to it on
16    Page 17 of our argument that I think that was filed
17    last night.
18              CHAIRMAN SASSER:  That would be Page 17 of
19    the response of Senator Rosalind Kurita to contest the
20    election?
21              MR. ROCHELLE:  Reply argument.
22              MR. BARRETT:  It's on Page 17.  It says the
23    testimony of Aspen Landry and he starts out and says --
24    this is Mr. Rochelle speaking to Ms. Landry, Page 17 of
25    Mr. Rochelle's filing of last night which is styled --
```

1    which is styled, "Reply Filed on Behalf of Senator

2    Rosalind Kurita."

3              Page 17, it says -- it begins, "You say you

4    read the affidavit of Ms. Jones and you think you know

5    what she's referring to."  Ms. Landry, Affirmative.

6              Then she goes into a long information of how

7    the machines worked.  And she says she spoke to the

8    Special Clerk and the Special Clerk gave her the phone

9    number for tech.  She explained that's the technician

10   at the Election Commission that responded to inquiries

11   about that.

12             "The tech explained to me", and she goes on

13   to say what he explained.  Now, the third time -- she

14   talks about the two previous times she put the key in

15   to release the primary.  On the third time, I put it in

16   and got frustrated because it finally gave -- didn't

17   give me the choice.  This is right before I had talked

18   to Special Clerk and I called the tech.  I told my

19   husband, I said, Tom, who is the other one working,

20   this is the third time this is happened?  It didn't

21   give me a check.  I say put it up, let's go talk to

22   somebody.

23             She said well, this woman was standing there

24   and she didn't know what was going on.  Maybe that was

25   the Debra because this is the one I finally vocalized

1   it to someone else.  Tom said she doesn't have to wait,

2   my machine is open, she can come over and she can use

3   my machine while you figure this out, and I said, well,

4   let me at least look at the machine and see and it has

5   to be the right one.  So she used it.  I mean it was

6   correct.  Everyone that used my machine voted for the

7   party they wanted to vote for.  But there was some

8   confusion on that because my card, I don't understand

9   that you can put it so it quickly, removed it right

10  way.  You have to give it a minute but everyone voted

11  for the party they voted -- that they wanted to vote

12  for.

13        I'm going to offer Ms. Jones' affidavit, put

14  it up on the screen and ask her to look at it and read

15  it.

16

17                        - - -

18

19                   DEBRA JONES,

20    having been first duly sworn, testified as follows:

21  DIRECT EXAMINATION BY MR. BARRETT:

22      Q    Would you state your name for the record,

23  please, ma'am?

24      A    Debra Jones.

25

1        Q     Where do you live, Ms. Jones?

2        A     I live in Clarksville, Tennessee at 1007

3   Garfield Way.

4        Q     And do you vote in Clarksville?

5        A     Yes, I do.

6        Q     Did you vote in the August the 7th primary?

7        A     Yes, I did.

8        Q     Where do you vote?

9        A     Outlaw Field.

10       Q     That's a voting precinct?

11       A     Yes, it is.

12       Q     Approximately what time did you go to vote?

13       A     It was between 8 and 9.  I had a doctor's

14   appointment.  I don't remember the exact time.

15       Q     And would you explain to the Commission what

16   happened when you went in to vote?

17       A     When I went in to vote I went to the first

18   table where they check your identification and your

19   voting card.  They asked me to declare a party.  I

20   declared myself Democrat.

21            I then went to the next section where it's

22   alphabetized.  I filled out the information card and

23   again they marked in the back that I was Democrat and I

24   signed the book.  They gave me the card and I proceeded

25   to the voting machine.

```
 1        Q    Yes, ma'am.
 2        A    Whenever she went to put the key in the
 3   machine after several tries she came back to me and
 4   said, "I can't get it to come up Democrat."  She said,
 5   "It's not going to make a difference, is it?"
 6             I said, "Well, my candidate is Democrat, the
 7   person I want to vote for is Democrat" and she said,
 8   "Well, all the candidates are on there, it's just it's
 9   going to say Republican."
10             So I went ahead, I went through the voting
11   machine and --
12        Q    The various screens.
13        A    Each screen.  Cast my vote.  Did not see
14   Senator Kurita or Tim Barnes on the ballot.  I went
15   ahead and confirmed my vote because I really didn't
16   know what to do.  My husband was there with me.  He was
17   actually on the other machine.  So her offering me the
18   other machine wasn't possible because he was voting at
19   the same time.
20             As I left, went out with my husband, I said,
21   "I don't know what to do, I wasn't able to vote for the
22   person that I wanted to vote for."  He said, "Well, I'm
23   not sure.  We couldn't tell, either."
24             The way I came in contact with Mr. Barnes,
25   they had actually called my husband at the house to
```

1   speak to him and he had told them that I had had an

2   incident that had occurred while I tried to vote.

3        Q    And did you subsequently give an affidavit?

4        A    Yes, I did.

5        Q    That was attached to the Contest of Election.

6   Would you read it, please, ma'am?

7        A    "I, Debra Jones, resident of 1007 Garfield

8   Way Clarksville, Tennessee would state as follows:  I

9   voted on election day at my regular voting precinct at

10  Outlaw Field Airport.  I declared Democrat and when I

11  got to the voting machine the woman working the machine

12  said she could not get Democrat to come up and that I

13  would have to vote Republican.  Consequently, although

14  it were my intention to vote for Tim Barnes, Tim

15  Barnes' name did not come up on the machine and I was

16  unable to vote for him.  Further the "--

17       Q    Further the affiant saith not.

18       A    I have vision, too.

19            CHAIRMAN SASSER:  I can never pronounce that

20  word, either.

21       Q    Affiant saith not.  That's sworn to.

22            Now, do you remember what the young lady who

23  was operating the machine looked like?

24       A    She was a young woman, blond, thin,

25  approximately I would say between 18 and 25 years old.

```
 1        Q    And was there also a young man, machine

 2   operator?

 3        A    Yes, there was.

 4             MR. BARRETT:  You may ask.

 5

 6                        - - -

 7

 8   CROSS EXAMINATION BY MR. ROCHELLE:

 9        Q    Thank you.  Ms. Jones, I'm Bob Rochelle.  I

10   represent Senator Kurita.

11             I guess I have to ask you the obvious

12   question.  When you were there and you heard them

13   saying there was something the matter with the machine,

14   is it -- well, is it possible that, in fact, the lady

15   said this machine is not working right and you heard

16   that?

17        A    Uh-huh.

18        Q    But Mr. Barrett told you she has testified

19   that in the three instances where it occurred where she

20   was pulling the clicker out too fast, that it would

21   come up, a primary would come up and in each of those

22   three instances the primary matched the place to vote

23   and her husband then testified and verified that as to

24   the last one which they think was you, that, in fact,

25   it was the Democratic Party.
```

```
 1              Now, in your affidavit, you don't say

 2   anything about asking to see somebody else like Lawyer

 3   Napolitano did, seeing somebody, I don't want to vote

 4   Republican, I want to vote for Tim Barnes.

 5              Did you say anything?

 6       A    No.  I had just told her that my candidate

 7   was Democratic.  When she said it only comes up

 8   Republican, I told her again, I said, "Well, my

 9   candidate who I want to vote for",  which  was Tim

10   Barnes -- "is Democratic."

11       Q    Okay.  And you didn't make a complaint to the

12   election folks that day.  When was it that Mr. Barnes'

13   campaign called you and asked you if you had any

14   problems at voting?

15       A    I couldn't tell you the exact date.

16       Q    Well, was it two days later, ten days later?

17       A    A couple of days prior to me making the

18   affidavit.  So this was on the 25th of August.

19       Q    Okay.  So about the 22nd, 23rd, 24th of

20   August.

21       A    Yes.

22       Q    When was the election, August the 7th?

23              MR. BARRETT:  Yeah.

24       Q    That's when you had to go back and remember

25   what happened.
```

```
1        A     Yes.

2        Q     Voting places can be somewhat intimidating.

3   I take it there's a bunch of folks there and you have

4   to be filling out this form and signing over here.

5              Is it possible these two young folks who were

6   the machine operators are telling the truth?

7        A     No.

8        Q     It's not.  You don't think there's anyway --

9        A     I think my husband could even reaffirm when I

10  spoke to him the day of the election that this was what

11  I had relayed to him as well.

12       Q     I'm not saying that you didn't hear her say

13  this machine is not operating.  She says I said that.

14       A     Right.

15       Q     But then she describes the action that she

16  took to make sure that you got to vote as a Democrat.

17       A     I think my vote should reflect that.  I don't

18  know if there's a way to pull it by my name.

19       Q     No, ma'am.  Your application --

20       A     I asked my husband when we got back to the

21  car, I said -- because he actually voted Republican.

22       Q     I can't ask you too much outside your

23  affidavit there.

24       A     Okay.

25       Q     What I'm saying to you is, 10, 15 days after
```

```
 1    the election is when you first had to recount this to

 2    put it into the affidavit; is that correct?

 3         A    That's correct.

 4         Q    I guess we just have a difference in the

 5    memories of the three witnesses then.  So, we thank you

 6    for coming today and helping giving us an idea of what

 7    you think.  Thank you.

 8         A    Thank you.

 9              MR. BARRETT:  Mr. Barrett, redirect?  Wait,

10    one second, Ms. Jones.  Any questions from the

11    Committee?

12              MR. OWENS:  Thank you, Mr. Chairman, Members.

13              Ms. Jones, on Page 19 of this, I guess you

14    don't have that but in the statement from the Election

15    Commission workers, I guess she's responding to a

16    question from Senator Rochelle and that starts in the

17    middle of the page where it says, "So if Debra

18    Jones" -- let's see.  The question starts out, "So

19    these three instances where you pulled the card out --

20         A    Yes.

21         Q    -- all three of them, whichever primary

22    popped up, it was the primary that was on the

23    application to vote?

24         A    Yes, or exactly.

25         Q    So if Debra Jones was one of those three, she
```

1   would have heard you say something like, 'This machine

2   is not working or something like that'.

3        A     That's correct.  And we had several people

4   complain because they didn't see the person on their

5   ballot that they wanted.  And we had to explain to them

6   that this is a primary and they were only going to see

7   the Republican nominee or the Democrat, you know, so

8   lots of them didn't understand that that's what they

9   were coming to vote for.  So maybe she was confused on

10  that.  She heard me say that the machine wasn't working

11  properly and she didn't see the names so perhaps she

12  got confused.  I don't know."

13        So, Ms. Jones, you asked, according to your

14  affidavit, you asked to vote in the Democratic primary.

15        THE WITNESS:  Correct.

16        MR. OWEN:  Were you allowed to vote in the

17  Democratic primary?

18        THE WITNESS:  No, I was not.  It was a

19  Republican ballot that came up.

20        MR. OWEN:  And were you confused?

21        THE WITNESS:  No, I wasn't.

22        MR. OWEN:  Okay.  Thank you very much.

23        THE WITNESS:  You're welcome.

24        CHAIRMAN SASSER:  Anybody else have any

25  questions?  Thanks so much for your time, Ms. Jones.

```
 1              MR. BARRETT:  Thank you Ms. Jones.  Thank you

 2    for coming.  We want to call Mr. Davis.

 3

 4                         - - -

 5

 6                   JAMES THOMAS DAVIS,

 7      having been first duly sworn, testified as follows:

 8    DIRECT EXAMINATION BY MR. BARRETT:

 9         Q    This is directed at Paragraphs 18, 19 and 20.

10    There were three affidavits, Tamala Lavender, Walter

11    Lavender and Stanley Aldridge and the -- all four

12    affidavits, and Mr. Davis who is here in person.

13              Mr. Davis, would you state your name please,

14    sir?

15         A    James Thomas Davis.

16         Q    And where do you live, Mr. Davis?

17         A    I live in Cheatham County, Chapmansboro,

18    Tennessee.

19         Q    Where do you vote?

20         A    I vote at West Cheatham High School.

21         Q    And were you working on election day at a

22    precinct?

23         A    Yes, sir.

24         Q    Which one was it?

25         A    The Harpeth High School.
```

```
 1        Q    Is that in Cheatham County?

 2        A    Cheatham County, 6th District.

 3        Q    You had already voted that day at your

 4   precinct; is that correct?

 5        A    Right.  I vote in West Cheatham.

 6        Q    And you gave us an affidavit, didn't you,

 7   Mr. Davis?

 8        A    Yes, sir, I sure did.

 9        Q    Have you had an opportunity to read that

10   affidavit?

11        A    Yes, sir.

12        Q    Mr. Davis --

13        A    I got something wrong with my hearing, I

14   guess.

15        Q    You told us that earlier.  I hope you can

16   hear me alright.

17        A    I can hear but I can't understand.

18        Q    Well, lot of people say that about me,

19   Mr. Davis.

20        A    Old age.  That's what it is.

21        Q    You or me?  Just tell us what happened that

22   afternoon while you were working at that precinct.

23        A    Well, we were standing over there and

24   observing people coming in, going in to vote and Ms.

25   Kurita, she came up, waiving her hands and all of a
```

```
 1    sudden she -- she had a sign.  All of a sudden she put

 2    it down and walked across the line.

 3         Q     Walked across what line?

 4         A     The line that you go, you're supposed to stay

 5    100 feet behind the line.

 6         Q     She walked across it and where did she go?

 7         A     She walked across it and walked into the

 8    voting place where to vote.

 9         Q     How long was she in there?

10         A     Approximately ten minutes, give or take a

11    minute or two.

12         Q     Did you see her come back out the voting

13    precinct?

14         A     Yes, sir, I did.

15         Q     Was this while polls were open?

16         A     They were voting.  People in there voting

17    when she went in because I saw them go in before.

18         Q     Did anybody else with her go into the polling

19    precinct?

20         A     Well, her campaign manager went.  He had a

21    sticker on his right side of his shirt.

22         Q     What did the sticker say, the best you can

23    recollect?

24         A     It had Kurita on it.

25         Q     How long was he in there?
```

```
 1       A    Oh, approximately ten minutes, give or take a

 2   few minutes.

 3       Q    Did you observe him leaving the voting

 4   precinct?

 5       A    Yes, sir.

 6       Q    Could you see what they did when they went

 7   into the polling place?

 8       A    No, sir, I couldn't see what they did.  I

 9   could just see them when they went in and come out.

10           MR. BARRETT:  I think that's all.  Affidavit

11   if you want to -- I'm happy to read it.  It's in the

12   record.

13           CHAIRMAN SASSER:  That would be fine.

14           MR. BARRETT:  Be it first duly sworn he makes

15   affidavit, citizen and resident of Cheatham County,

16   Tennessee.

17           On August the 7th, I volunteered to work as

18   an election observer at Harpeth Hill High School

19   polling station in the 6th District.  At approximately

20   2:00 p.m. on the August 7th I personally observed

21   Senator Rosalind Kurita come to the polling station to

22   come with the individual that had previously been

23   identified to me as her campaign manager for Senator

24   Kurita's campaign.

25           Senator Kurita and the individual identified
```

1   as her campaign manager at the polling station crossed

2   the designated line over which no campaign should take

3   place.  That line was clearly delineated and observed

4   by all other campaign workers.

5           Senator Kurita's companion had placed on the

6   right side of his shirt a sticker, emblem meant to

7   designate himself as a supporter of Senator Kurita.

8           I objected to the comparison of Senator

9   Kurita, that was inappropriate for him -- companion of

10  Senator Kurita, it was inappropriate for him to enter

11  the polling station as a political adversary, however

12  my objection was not acknowledged.

13          I called attention to this intrusions at the

14  polling station to a designated poll worker who also

15  took no steps to terminate the intrusion of Senator

16  Kurita or her campaign worker.

17          Senator Kurita and her escort remained in the

18  polling station in the presence of prospective voters

19  for the period of approximately ten minutes until they

20  exited the polling station.

21          I am familiar with Senator Kurita to the

22  extent necessary to know that Harpeth High School was

23  not designated voting district for her to be casting

24  her personal vote.

25          The intrusion into the voting precinct was

1   not only observed by myself, but was also observed by

2   Stanley Aldridge, Tommy Lavender, as well as his wife

3   Tammie Lavender.  It is my belief that other people

4   also observed this intrusion.  Signed by Mr. Davis.

5            I have no further questions.

6            CHAIRMAN SASSER:  Thank you.  Mr. Rochelle.

7

8                         - - -

9

10  CROSS EXAMINATION BY MR. ROCHELLE:

11       Q    Mr. Davis, I'm Bob Rochelle.  I represent

12  Senator Kurita over here.  I visited the school you

13  were at the other day and have some awareness of things

14  as to the layout and such as that.

15            I believe you stated with Senator Kurita, you

16  didn't say anything, that she had any insignia on or

17  anything like that, did you, in your affidavit?

18       A    No, I didn't see anything.

19       Q    Speak into the mike there and speak up so

20  they can hear you.

21       A    I didn't see anything, no.

22       Q    And so you saw Senator Kurita go in the

23  entrance door.

24       A    Yes, I sure did.

25

1        Q    You know that was the entrance door of the
2    school building.
3        A    School building where they were voting, yes.
4        Q    And do you know that the -- do you vote in
5    that precinct?
6        A    No, I vote in the Ford precinct, West
7    Cheatham School.
8        Q    Do you know that, in fact, that building
9    houses a gymnasium where the voting was taking place?
10       A    Yes.  Also a restroom.
11       Q    Yeah.  This is the "Pottygate".
12       A    Yeah.
13       Q    You saw her go into the building housing the
14   gymnasium.
15       A    She wasn't in the building.  I didn't know
16   where she went after she went in there.
17       Q    You said you saw her --
18       A    I saw her enter into the building, yes, sir.
19       Q    Enter into a building that you know housed a
20   gymnasium where you know the voting was taking place.
21       A    Yes.  And I confronted her election manager
22   and I asked him why did she go in.
23       Q    Well, that's okay.  I can't take you too far
24   out of your affidavit.  Who were you there in support
25   of?

```
 1        A    Who did I support?

 2        Q    No.  Who were you there at the voting place

 3   in support of?

 4        A    I'm --

 5        Q    Who were you out there campaigning for?

 6        A    Oh, Mr. Jim (sic) Barnes.  Jim (sic) Barnes.

 7             MR. ROCHELLE:  Oh, okay.  So Mr. Barnes.

 8   Okay.  Alright.  Alright.  I think your testimony and

 9   your affidavit matches up pretty much.

10             THE WITNESS:  Yeah.  Well, you know, if you

11   know the truth, the truth will set you free.

12             MR. ROCHELLE:  Amen.

13             THE WITNESS:  Exactly the way I saw it I

14   tried to tell it the way I saw it.  I appreciate it.

15             MR. ROCHELLE:  Thank you.

16             CHAIRMAN SASSER:  Mr. Barrett, any redirect?

17             MR. BARRETT:  Hold on one second.

18             CHAIRMAN SASSER:  Do you have any redirect,

19   any questions for Mr. Davis from the committee?

20             MR. OWEN:  I don't have a question.  Is it

21   appropriate to ask questions regarding the contest, the

22   initial statement from Mr. Barnes at this time

23   regarding this testimony?

24             CHAIRMAN SASSER:  Yes.

25             MR. OWEN:  Mr. Barrett --
```

```
 1              MR. PHILLIPS:  Mr. Davis, you're excused.

 2              MR. OWEN:  -- my question goes to the --

 3              MR. BARRETT:  Are you through with Mr. Davis?

 4              MR. OWEN:  Yes, sir.

 5              MR. BARRETT:  Mr. Davis has to get back to

 6    the church revival.  Been cooking chicken since early

 7    this morning.  Everybody is invited.

 8              THE WITNESS:  You're invited.

 9              MR. OWEN:  We'll probably be here until

10    Sunday anyway.

11              Mr. Barrett, my question goes to your initial

12    statement in the challenge and you're saying that

13    because of Senator Kurita's entering into the building

14    regardless of what she entered it for, but she was

15    there for ten minutes, why is going to the restroom for

16    ten minutes grounds for disenfranchising an entire

17    voting precinct?  That's my question.

18              MR. BARRETT:  I don't know what she did in

19    there.  Nobody knows what she did except her.  She

20    did -- excuse me.  Let me finish.  She did cross the

21    boundary line.

22              There's a reason for that boundary line and

23    she crossed it, and her campaign manager crossed it

24    wearing campaign paraphernalia.  There's a clear

25    violation of the law.
```

1    I'm going to read you the law.  I'll tell you

2  why -- it's part of the overall circumstances of the

3  election.  It's like putting feathers on something.

4  One feather may not be enough to sink it but if you put

5  enough on you'll sink it and all this tied together I

6  think leads to an inescapable uncertainty, incurable

7  uncertainty.

8    There's a quote from the Supreme Court that

9  says -- if he can find it, in effect, that crossing

10  that line is enough to constitute a serious violation

11  of the right of the people to vote without harassment

12  or intimidation.

13    MR. ROCHELLE:  I think you need to produce

14  that case.  That's not what that case said.

15    MR. BARRETT:  What does it say?

16    MR. ROCHELLE:  They were construing the

17  statute that I passed that said you had to establish a

18  boundary away from the entrance of the building and

19  what that case was -- Supreme Court said yes, you can

20  do that, that it's within the authority of the Courts

21  or of the State to prohibit campaigning within a

22  reasonable distance from the entrance of the building.

23    That's all that case says.  It's very

24  important but that's what the case says.

25    CHAIRMAN SASSER:  If we're going to cite and

1    argue about what a case says, does anybody have a copy

2    of this thing?

3          MR. BARRETT:  Doug is trying to find it.

4    Showed it to me this morning.

5          CHAIRMAN SASSER:  Alright.  It's okay with

6    y'all if somebody, we can get Mr. Yarbro over there to

7    get the cite, we can get the case and we don't need to

8    rely on Mr. Rochelle and Mr. Barrett for their

9    interpretation.

10          MR. BARRETT:  The case is Emery vs. Robertson

11    County Election Commission, 586 S.W. 2d, 103, and it

12    says -- this appeal is two consolidated cases involves

13    the validity of August 1978 contests of the office for

14    Sheriff in Robertson County.

15          In a written opinion from the 22nd of

16    September, 1978, the learned Chancellor voided 68 votes

17    and found two illegal voters that were barred from

18    casting their ballots.

19          The Chancellor's comments about these

20    irregularities are significant.  The Court upon review

21    of testimony involved with these five irregularities

22    does not believe that there's been a showing by a

23    preponderance that anyone of these five instances or

24    occurrences should in anyway affect the outcome of the

25    election.  It does not mean that these acts are to be

1    condoned.

2          It is this Court's position, as it should be

3    the position of all persons charged with the

4    responsibility of fairness, that no person shall be

5    within 100 feet distance and be in a position to have

6    someone believe that he may or may not be trying to

7    influence voters or the operation of the election

8    process.

9          That's the law.  The mere presence of

10   crossing that line and entering that building lead some

11   people to believe that they were trying to improperly

12   influence the voter which is contrary to the law and

13   it's a misdemeanor.

14         CHAIRMAN SASSER:  Mr. Rochelle, can you

15   reserve your response to that until after, when you

16   present your case?  Is that acceptable?

17         MR. ROCHELLE:  That would be fine.

18         MR. BARRETT:  We have a little bit of a

19   dilemma in regards to Paragraphs 7 to 11 which deals

20   with activities at the Jaycee Activities Center in the

21   Fairgrounds voting precinct in Montgomery County.

22         We've got three live witnesses, one of whom

23   is here and the other two are on their way from

24   Clarksville.  I understand they departed there some 20

25   minutes ago which means it will be at least another 20,

```
 1   30 minutes before they get here.

 2             We're ready to put Ms. Meriweather on but

 3   before we do that, I'd like to offer a little

 4   background to that testimony in relation to the

 5   witnesses interviewed by Mr. Rochelle, Senator Rochelle

 6   and myself.

 7             Let me have a little background.  Attached to

 8   Mr. Rochelle's response to Senator Kurita to the

 9   contest on the primary election, Exhibit B, C and D --

10             A SPEAKER:  What page?

11             MR. BARRETT:  Exhibit in response to Senator

12   Rochelle, their applications to vote.  That will help

13   you find it.  It's marked down at the right hand corner

14   Exhibit B, D & C.

15             That shows that the 201st person to apply for

16   a ballot was James Walker, Jr.  That's the gentleman

17   that's on his way from Clarksville.

18             The 202nd person to apply for a ballot was

19   his wife, Lynnette Walker.  Both of them are in the car

20   together.  And the 203rd person to apply for a ballot

21   in that precinct was Ms. Meriweather who is here and

22   I'm going to ask her to come up here in a minute.

23             Before I do that, I want to direct your

24   attention to some of the testimony of the officer of

25   the election at that precinct, one Ms. Pace.
```

 1          Ms. Pace was very insistent about her

 2    testimony at the time that we took -- she gave her

 3    statement and I want to read a little bit of it to you

 4    because I think it raises questions about her

 5    credibility.

 6          CHAIRMAN SASSER:  Mr. Rochelle, is the

 7    testimony that Mr. Barrett is about to read, is that in

 8    the materials you distributed to us this morning?

 9          MR. ROCHELLE:  If you'll look at Page 5, it

10    starts about the middle of the page, Mrs. Pace.  Now --

11    it depends on what part George is going to refer to.

12          We put the parts that we thought were

13    relevant and addressed the issue in there so, just so

14    you'll have it there, it's Page 5.  I think the bottom

15    half of the page.

16          CHAIRMAN SASSER:  The Committee will note

17    this is the reply argument filed on behalf of Senator

18    Rosalind Kurita.

19          MR. BARRETT:  Little bit more than is in Mr.

20    Rochelle's file.  I'm not -- he's like any lawyer, he's

21    going to show what's favorable to him.

22          Ms. Pace was -- I asked her a particular

23    question because I understood that she was on an Art

24    Board that had been the recipient, Public Art Board

25    that had been the recipient of grants from the

```
 1   Legislature through the effort of -- partly through the

 2   effort of Senator Kurita.

 3           We don't live in a vacuum and we know that

 4   grants to counties and cities from the State are

 5   usually cleared with the Legislature, Legislators from

 6   that area or district.

 7           MR. ROCHELLE:  Again, Mr. Barrett is

 8   testifying.  The Arts Commission didn't ask Legislators

 9   where they were going to give their money, that I

10   remember.

11           But she's not a member of the Arts Commission

12   or Senator Kurita is not.  She's a member of an Arts

13   Caucus, I think, 35 members of the Legislature that say

14   we love folks in the arts.

15           If you're going to testify, let's get the

16   right names and the rights groups involved.

17           MR. BARRETT:  I'm going to do that, Mr.

18   Rochelle, if you'll just give me a minute.  I was very

19   careful to ask Ms. Pace, very emphatic, I say, "Now,

20   Ms. Pace, do you know her, being Senator Kurita?

21           "Yes, I do.

22           "How do you know her?

23           "Well, I know her ever since she ran for

24   office, started running for office years, I'm not sure

25   how many years ago" and I said, "About eight years ago"
```

```
 1   and she said, "I'm not sure.  I first knew her when her

 2   picture was in the paper with Dr. Kurita, Dr. Kurita

 3   was doing some sort of new eye procedure.  That was the

 4   first thoughts I had of her."

 5          Now, I said, "Did you ever call upon her for

 6   any assistance?  I mean personal."

 7          "No, I haven't."

 8          "Do you serve on Art Boards?

 9          "On a what?"

10          "One of the community boards."

11          "Art board did you say?"

12          "Yes, ma'am."

13          "No.  I've been a teacher, educator for 41

14   years and I've worked with Teachers Association, if

15   that's what you mean."

16          Now, I want to direct your attention to a

17   filing we made in which we attached the membership of

18   the Clarksville Art Commission which shows her as an

19   officer and it shows that Commission the recipient of

20   grants from the State of Tennessee, if I can put my

21   hands on it.

22          Then I asked her how she voted in the

23   primary.  She said she thought Republican.

24          A SPEAKER:  Ms. Pace or Ms. Meriweather?

25          MR. BARRETT:  I'm talking about Ms. Pace, the
```

```
1    officer of the election who testified about denying

2    belonging to an Arts Board, who testified she voted in

3    Republican primary and she voted in the Democratic

4    primary, and who testified that Mr. Walker appeared to

5    be under the influence of something and that response

6    -- I'm raising questions about her credibility, one,

7    the art, two, whom she voted for and three, her

8    so-called testifying -- testimony about the, quote,

9    conduct and appearance of a couple of a voters, Mr. and

10   Mrs. Walker, and they'll be here to testify and Ms.

11   Meriweather is here to testify.

12            CHAIRMAN SASSER:  Mr. Barrett, just for

13   everybody on the Committee and the State Primary Board

14   that's been so patient out there, being so diligent,

15   we're going to let this go until about noon today.

16            We're going to take a 30 minute break for

17   lunch, wherever we are, if that's convenient with

18   counsel.

19            MR. BARRETT:  You're going to when?

20            CHAIRMAN SASSER:  Noon today and take 30

21   minute break for lunch, if that's convenient with

22   counsel.

23            MR. BARRETT:  She may take five, ten minutes

24   depending on Mr. Rochelle's cross examination.  If we

25   could then adjourn, the Walkers would be here by the
```

1    time you come back from lunch.

2         CHAIRMAN SASSER:  We'll let Ms. Meriweather

3    complete her testimony and have questions from the

4    Committee and break for lunch.

5         MR. FORRESTER:  What is Mrs. Pace's position

6    and title?

7         CHAIRMAN SASSER:  For the record, Chip

8    Forrester asked for clarification on Mrs. Pace's title

9    position and title.

10        MR. BARRETT:  She was the officer of the

11   election, which means she was the chief -- one election

12   worker described her as the chief honcho.

13        MR. FORRESTER:  In Montgomery County.

14        MR. BARRETT:  No, that precinct only.

15

16                        - - -

17

18                 LENORE MERIWEATHER,

19    having been first duly sworn, testified as follows:

20   DIRECT EXAMINATION BY MR. BARRETT:

21        Q    Ms. Meriweather, would you state your name

22   for the record, please?

23        A    Lenore Meriweather.

24        Q    Ms. Meriweather, everybody got to hear you

25   now.  This is your chance to sing out.

1        A    That's usually not a problem.

2        Q    I didn't think so from talking to you

3   previously.  Where do you live, please, ma'am?

4        A    I live at 1104C Plymouth Road, Clarksville,

5   Tennessee.

6        Q    And where do you vote?

7        A    At the Jaycee Building.

8        Q    In the Fairgrounds.

9        A    Yes.

10       Q    In Montgomery County.

11       A    Yes, sir.

12       Q    Did you vote in the August 7th primary?

13       A    I did.

14       Q    Approximately what time did you go vote,

15  please ma'am?

16       A    It was after work.  Get off from work about

17  3:30, had a couple errands.  Probably about between 5

18  and 5:30.

19       Q    You gave an affidavit.  Do you remember that,

20  Ms. Meriweather --

21       A    Yes, I do.

22       Q    -- and in which you said what happened when

23  you went to vote?

24       A    Yes, sir.

25       Q    The record shows that you're the 203rd person

```
 1    to apply for a ballot in that primary.

 2         A    If you say-so.

 3         Q    Thank you.  That's what the record shows.

 4              And describe when you came in to vote, would

 5    you just tell us what you observed when you came in to

 6    vote?

 7         A    When I first went in to vote, naturally I

 8    went to the wrong spot.  I went to where you sign in

 9    but I had to go and fill out the --

10         Q    A little piece of paper?

11         A    Yes.  And I was behind a couple and --

12         Q    Would you describe that couple, please?

13         A    Man and a woman.  They were -- it was a white

14    couple and I really didn't pay that much attention to

15    what they looked like.  I just know that.

16              And I remember the man asking -- at that time

17    I didn't know what her name was, asking a lady that

18    handed him the paper, "What about Tim Barnes?"  She

19    said, "He's a Republican."

20         Q    Let me ask you a question right there.  The

21    lady that handed this gentleman before you, right

22    before you an application for a ballot, what did she

23    look like?

24         A    She was -- she's a white lady.  She had on a

25    red jacket, pair of glasses.  Her hair was light
```

1   colored.  I don't think it was blond.  It was just

2   light.

3       Q    We've established through the testimony that

4   that's Ms. Pace.  She was the officer of the election

5   for that precinct.

6            Go ahead.  What did Ms. Pace say to him?

7       A    He asked, "What about Tim Barnes?"  And she

8   said, "Oh, he's a Republican."  That sort of annoyed me

9   when she said that.

10      Q    What did you do?

11      A    I said, "Did you tell that man that Tim

12  Barnes was a Republican?"  She said "No, no, I didn't

13  say that."  I said, "Yes, you did."

14           He's not a Republican because my Local has

15  endorsed him, my union local.  I said, "He's not a

16  Republican."  She said, "Well, if I said that I didn't

17  mean to say that.  What I meant to say was, he's

18  running against her."  I said, "Well, that's not what

19  you said."

20           But the couple that moved further down and I

21  really don't know if they heard what I said because my

22  intention was directed at Ms. -- at that time, I didn't

23  know if it was Pace or Page but it was Margaret.

24      Q    Go ahead.  What happened next?

25      A    After that, I got my sheet to fill out,

```
 1   marked Democrat.  Went down to the first place I went,

 2   signed in, went to the voter booth and I was still kind

 3   of annoyed.  So I asked the lady --

 4       Q    Which lady was this?

 5       A    This was the lady that was by the booth where

 6   I went.

 7       Q    Operating the machine, machine operator?

 8       A    Yes.  Yes.  And I said, "Where are they doing

 9   that at?"  She's telling -- what she told that man,

10   that Tim Barnes was a Republican.  The lady in return

11   said, "Well, they've been doing it all day."

12       Q    What did you say then?

13       A    I went ahead and voted.  I -- after I

14   completed my vote, I started out the building, turned

15   back around to go get the lady's name.  She was bent

16   down.  I saw the first name was Margaret.  The last

17   name had about four letters in it but I couldn't see it

18   real clearly so I knew it was Pace or Page.

19            After I did that, I turned back around and my

20   business agent for my union was outside on the highway

21   and I went and told them what had happened.  I also

22   called the president of my union, spoke with them about

23   it.  I didn't know what else to do.  So that's what I

24   did.

25       Q    Did you subsequently give an affidavit?
```

```
 1        A     Yes.

 2        Q     This is affidavit of Ms. Meriweather.  "On

 3   Thursday, August the 7th after work I went to vote at

 4   my precinct at the Jaycees Building.  I signed in and

 5   filled out the paperwork.  There was a couple in line

 6   ahead of me and I heard the man say, 'What about Tim

 7   Barnes?  What is he?' to which the election official

 8   with a name tag that said Margaret Pace replied, 'He's

 9   a Republican.'  I said to her, 'Margaret Pace, did you

10   just tell that man Tim Barnes is a Republican?'  And

11   she said, 'No, I didn't.'  Then she said, 'Well, if I

12   did, I didn't mean to.'  When I got to the voting booth

13   I said to another election official, an

14   African-American lady, 'Why is Margaret Pace saying Tim

15   Barnes in a Republican?'  The lady said, 'I don't know.

16   They've been doing that all day.'  I voted, then went

17   outside, told Ricky Wallace about what happened and I

18   called Robert Lewis, also.  Mr. Wallace is a steward

19   and Mr. Lewis is president of the Machinists Local."

20              That's a Trane plant in Clarksville.  You may

21   ask.

22

23                          -  -  -

24

25
```

1    CROSS EXAMINATION BY MR. ROCHELLE:

2         Q    You've taken over up here, George.  You've

3    got stuff laying everywhere.  I don't want to knock it

4    off.

5              Ms. Meriweather, I'm Bob Rochelle and I

6    represent Senator Kurita.  I read your affidavit very

7    good, heard your testimony.

8              Do you know the name of the lady that you

9    were talking to?

10        A    Yes, sir.  Her name is Margaret Pace, I

11   believe.

12        Q    And at the end of the day, after that, when

13   you went on and to vote and you saw the machine

14   operator --

15        A    Yes, sir.

16        Q    -- what was her name?

17        A    Lena Crouch.

18        Q    Alright.  You didn't mention her name in the

19   affidavit but is she the one that is supposed to have

20   said that, that I've been doing it all day or

21   something?

22        A    Yes, sir.  I didn't mention her name.

23   Sometimes you know a person's face and don't know their

24   name.  Clarksville is not a great big place.  I know

25   the children, they're friends of my children.  I know

```
 1    the mother but I wasn't real sure of what her first

 2    name was.

 3         Q     Y'all been neighbors 15, 20 years, I take it.

 4         A     No.  No, sir, we're not neighbors.

 5         Q     You're not.  Okay?

 6         A     Our kids just went to school with mine.

 7         Q     Alright.  I don't know whether you have read

 8    the response that we filed.  Have you had a chance to

 9    read the response?

10         A     No, sir.

11         Q     Well, we'll take that up with the Board in

12    regard to the incident regarding Ms. Pace.  I just

13    wanted to talk to you about Lena Crouch for a minute

14    because we met -- we interviewed Lena Crouch the other

15    day and she explained that she had known you for many

16    years and that we asked her if you made that statement

17    about what's with Margaret Pace doing this and she

18    didn't remember you asking.  Then we told her that you

19    had put in your affidavit about how she said Margaret

20    Pace been doing that all day.

21         A     No, sir.  I didn't say she said Margaret

22    Pace.  I said she said, "They've been doing it all

23    day."  Who she was referring to, I don't know.

24         Q     She says she doesn't remember that, either.

25               And so I asked her, "Is there any
```

```
 1   circumstances where you might have said that, that

 2   they've been doing it all day?"  Her response, "No."

 3        A    She said it.

 4             MR. ROCHELLE:  That's all.

 5             MR. BARRETT:  In order that the record be

 6   clear, these are the questions that Mr. Rochelle asked

 7   Ms. Crouch and this is her responses.

 8             "Do you know Lenore Meriweather? "

 9             "Yes, I do."

10             "Did she make complaint to you that day?"

11             "If she did I can't recollect that she did.

12   I can't recollect."

13             "Specifically she said she complained to you

14   about Margaret Pace was telling people that Tim Barnes

15   was a Republican."  You said, "Oh, she's been doing

16   that all day."  Answer:  "I don't remember that."

17             "Did you say that?"

18             "No.  If I did, I don't remember saying

19   that."

20             MR. ROCHELLE:  Finish it up.  What's the next

21   question?

22             MR. BARRETT:  I've closed my book.  You can

23   ask her that.

24             MR. ROCHELLE:  Can't do that, now.  The next

25   question is, "Is there any circumstances where you
```

```
 1    might have said that?"  The answer, "No."
 2              MR. BARRETT:  Any questions?
 3              CHAIRMAN SASSER:  Anybody on the Committee
 4    have any questions?
 5              MR. OWEN:  I have one.  I apologize for
 6    taking so much time on these questions but this is a
 7    very serious allegation.  This is the most serious
 8    allegation we've heard so far as far as I'm concerned.
 9              Now, Ms. Meriweather, let me ask you, what
10    you were testifying to is exactly what you have said in
11    your affidavit.
12              THE WITNESS:  Yes, sir.
13              MR. OWEN:  You stand by that testimony and
14    you are under oath and you swear that what you have
15    just said is true.
16              THE WITNESS:  Yes, sir, I do.
17              MR. OWEN:  Okay.  Is Ms. Pace here?  Okay.
18    Thank you very much.
19              MR. BARRETT:  I did find for the members --
20              CHAIRMAN SASSER:  Can we excuse Ms.
21    Meriweather?
22              MR. BARRETT:  I think so, yeah.  Yeah.  Thank
23    you Ms. Meriweather.  You may leave.
24              I referenced -- Exhibit 3 to the contestants,
25    that's us, witness list and the Exhibit 3 is the
```

```
 1    Tennessee Art Grants for the fiscal year 2007 which

 2    shows to Montgomery County, City of Clarksville,

 3    Clarksville Montgomery County Arts and Heritage

 4    Development, several grants, one of 12,000, one 5200,

 5    one 500 and the Board of Directors which shows Margaret

 6    M. Pace, secretary/treasurer of the Clarksville Art and

 7    Heritage Development Council, Exhibit 2 and 3.

 8              MR. ROCHELLE:  Ms. Meriweather leave?  I want

 9    to ask her one more question.

10              CHAIRMAN SASSER:  I think she's gone.

11              MS. ABLES:  Could you tell me if the poll

12    workers in this district were selected or recommended

13    by either particular party?  Typically those are, at

14    least in my district, the party, each party has

15    approval of the poll workers and are submitted by the

16    two parties.

17              The poll workers that are involved, is there

18    any information on who they were recommended by or

19    which party they were representing at that time?

20              MR. ROCHELLE:  There is nothing in the record

21    on it.  I think what we find in Wilson County, and I'm

22    sure it's the same in Montgomery County, they're so

23    hard-up for election workers that they can't get the

24    party to find enough folks to come in.  They go out and

25    try to find folks.
```

1          The record that you're going to see here in a

2    little bit shows Margaret Pace is -- in fact, that

3    whole crew out there, election workers, been election

4    workers 15, 20 years.  But now I don't think it's

5    anywhere in the record as to whether they were chosen

6    or solicited by either party.

7          If I could comment on this suggestion, and I

8    have to look at Senator Owen on this one, if you serve

9    on an Arts Commission or an arts group in your local

10   community, that somehow or another -- and you apply for

11   a grant from the Tennessee Arts Commission, that

12   somehow or another you're going to be beholding to your

13   Legislator.

14         Senator Kurita is not on the Tennessee Arts

15   Commission.  She's a member of the Tennessee

16   Legislative Arts Caucus.

17         It's sort of like having the Old Hickory Lake

18   Caucus.  We all love Old Hickory Lake but before they

19   drain it, they don't have to caucus.

20         And so in regard to this exhibit you just had

21   presented to you, I would suggest to you that in real

22   life, the Tennessee Legislative Caucus that supports

23   the audits and is composed of about 35 Legislators, in

24   law and in practice, has no say-so at all over the

25   decision of the Tennessee Arts Commission on how grants

```
 1    are made.

 2              MS. ABLES:  This may be for you, George, I'm

 3    just curious if anybody out there has looked into

 4    Ms. Pace's voting history, though?  Does she have a

 5    record of being on one side or the other in her own

 6    voting history?

 7              MR. BARRETT:  We've got it.  While they look

 8    for that, let me address -- I'm not --

 9              CHAIRMAN SASSER:  I'll remind counsel for

10    both people we've had some people travel from East

11    Tennessee starting at 4 a.m. Central Time.  Might be

12    getting hungry for lunch.

13              MR. BARRETT:  I didn't offer membership on

14    the Arts Commission to pass judgment on that.  I

15    offered membership to test her credibility as a witness

16    where she denied serving on such a commission and yet

17    she was the secretary/treasurer.  That's what that

18    inference was offered for.

19              It doesn't have anything to do with the Arts

20    Commission or arts caucus or anything else.  It goes to

21    the credibility of the witness, and I want to ask Ms.

22    Meriweather, if I may, one more, couple more questions

23    which goes to the credibility of Ms. Pace, if that's

24    alright.

25              Anybody object?
```

1   REDIRECT EXAMINATION BY MR. BARRETT:

2       Q    Did you have a chance, Ms. Meriweather, to

3   observe the couple before you, immediately before you

4   when you went in the polling booth?

5       A    Yes, I did.

6            CHAIRMAN SASSER:  Ms. Meriweather, you're

7   still under oath.

8            THE WITNESS:  Okay.

9       Q    Yes, you did?

10           CHAIRMAN SASSER:  Repeat the question.  I'm

11  sorry to interrupt.

12      Q    Did you have a chance to observe the couple

13  before you, immediately before you when you went into

14  the polling place?

15      A    I observed it was a man and woman and I

16  observed that they were white.

17      Q    Was it a large man, do you remember,

18  physically?

19      A    No, sir, I don't remember.

20      Q    You don't remember.  Do you remember his

21  conduct, demeanor?  Was he loud?

22      A    I wouldn't say that -- in my opinion he

23  wasn't loud.  He just asked a question.

24      Q    Did he appear to be under the influence of

25  anything?

```
 1        A    He didn't appear -- by what he said, what

 2   about Tim Barnes, he didn't appear to be under the

 3   influence of anything.  He could have been under the

 4   influence of a lot of things but --

 5        Q    But he didn't appear to.

 6        A    He didn't appear to.

 7        Q    Did he appear to be agitated?

 8        A    No.  He asked the question, she answered the

 9   question and that was about it.  He asked, "What about

10   Tim Barnes" and she said, "Oh, he's a Republican" and

11   then he didn't say anything.  I took it from there.

12   You know, he kind of moved off.

13             MR. BARRETT:  That's all.

14             CHAIRMAN SASSER:  Mr. Rochelle, do you have

15   anything?  Anybody on the Committee have anything?

16             We're still looking for that answer.  Without

17   objection from anybody, we need to let Ms. Meriweather

18   go.  She's already escaped once.

19             Thank you so much.  If it's okay with you --

20             MR. ROCHELLE:  Question, and I thought she

21   was trying to say it was directed to me as to Margaret

22   Pace.

23             MS. ABLES:  Yes, if she had a strong history

24   in one party or the other.

25             MR. ROCHELLE:  Let me remind you we're going
```

1    to have a lot of testimony about Margaret Pace when we

2    present our evidence and we'll explain all of these

3    situations that you heard about, at least offer a

4    contrary view.

5            One of the odd things about this case is that

6    one of the foundations of Mr. Barrett's original case

7    was that Margaret Pace was a Republican who was leading

8    the effort to get people in to -- to vote in the

9    Republican primary so they wouldn't be able to vote for

10   Rosalind Kurita or couldn't vote -- excuse me, wouldn't

11   be able to vote for Tim Barnes.

12           You would think that the leader of that

13   effort, as she was identified, would have then gone

14   into the Democratic primary and voted for Rosalind

15   Kurita against Mr. Barnes.

16           In fact, she didn't really remember how she

17   voted but she said I think I voted in the Democratic

18   primary but, in fact, she voted in the Republican

19   primary.

20           So the leader of the effort to get Barnes

21   supporters into the Democratic primary, supposedly you

22   would have thought if she was a leader of that effort

23   she would have been in the Democratic primary voting

24   for Kurita.  She voted in the Republican primary.

25           MS. ABLES:  I appreciate that but my real

```
 1    question was -- I don't know if this is still on -- my
 2    real question was her history.
 3              MR. ROCHELLE:  I think she's a switch-hitter,
 4    my best memory of it.
 5              MR. BARRETT:  Are we waiting on the Walkers?
 6              CHAIRMAN SASSER:  Mr. Owen wants to say one
 7    thing.
 8              MR. OWEN:  Very quickly, and Senator Rochelle
 9    will recall the Tennessee Arts Commission receives its
10    funding from the license tags money and does not
11    receive funds directly from the Legislature.
12              I think that's irrelevant to what we're
13    talking about here.  Mr. Barrett says it's irrelevant.
14    He was talking about the credibility.  Mr. Rochelle
15    agrees that that's where the money comes from and goes
16    and how it is appropriated by the Arts Commission.
17              CHAIRMAN SASSER:  Thank you very much.
18              Without objection, let's break for 30 minutes
19    for lunch.  Let's have everybody eat very quickly.
20              Members of the Executive Committee just stay
21    seated for one second.  I'm about to give you
22    instructions about how to get some food.
23    (12:07 p.m., a luncheon recess was had until 1:03 p.m.)
24              CHAIRMAN SASSER:  Mr. Barrett, do you have
25    another couple witnesses you want to get to and then
```

```
 1   maybe before we start we'll ask the two timers where we

 2   are on time for both parties?

 3            A SPEAKER:  Mr. Barnes has used up 56 minutes

 4   of his 90 minutes and Ms. Kurita's side has used 23

 5   minutes of her time.

 6            MR. ROCHELLE:  What was this?  On cross

 7   examination, you're including cross examination?

 8            MR. PHILLIPS:  That's what the rules say.

 9            MR. ROCHELLE:  In time?

10            MR. BARRETT:  Ms. Walker, please.

11

12                         - - -

13

14                  GAYE LYNNETTE WALKER,

15    having been first duly sworn, testified as follows:

16   DIRECT EXAMINATION BY MR. BARRETT:

17       Q    Would you state your name for the record,

18   please, ma'am?

19       A    Gaye Lynnette Walker.

20       Q    Ms. Walker, you're going to have to speak

21   right into that very close so they'll hear you.  Speak

22   straight into that.

23            Where do you live, Ms. Walker?

24       A    In Clarksville, Tennessee.

25       Q    And are you a registered voter?
```

```
 1        A     Yes.

 2        Q     Did you vote in the August 7th primary this

 3   year?

 4        A     I did.

 5        Q     Where did you vote?

 6        A     At the Jaycees.

 7        Q     Could everybody hear her?  They can't hear

 8   you, dear.

 9              Now, where did you vote?

10        A     At the Jaycees.

11        Q     Is that also the same as the Fairgrounds?

12        A     Yes.

13        Q     And what time did you go vote?

14        A     It was after 4:30 when I got off.

15        Q     With whom do you go vote?

16        A     My husband.

17        Q     Do you remember what number voter you were

18   in?

19        A     201 and 202.

20        Q     201 was you and 202 was your husband?

21        A     One or the other.  I can't remember which.

22        Q     201st, 202nd person.  Do you know who was

23   immediately in front of you?

24        A     The 200th because he was the 200th voter and

25   they sung He's a Jolly Good Fellow to him.
```

```
 1        Q     Who sang that?

 2        A     The people that signed in.

 3        Q     The 200th voter, when he got there they sang

 4   You're a Jolly Good Fellow.  Who was behind you?

 5        A     My husband was behind me and then there was

 6   another lady behind him.

 7        Q     Do you know who she was?

 8        A     Uh-uh.

 9        Q     Do you know, was she an African-American?

10        A     Yes.

11        Q     Tell us what happened -- were you in front or

12   behind your husband?

13        A     I was in front of him.

14        Q     You were in front of him.  Tell us what

15   happened when you went up and asked for an application

16   for a ballot.

17        A     She said we had --

18        Q     Who is "she" now?

19        A     The first lady you gave your card to.

20        Q     Did you know who she was?

21        A     No.  She was just an older lady with a red

22   jacket on.

23        Q     What did you say and what did she say?

24        A     She told us that we had to choose Democrat or

25   Republican and we wasn't sure.  She said if you want
```

```
 1   Kurita, vote Democrat, if we want Barnes, vote

 2   Republican.

 3        Q    Say that again.

 4        A    If we wanted to vote for Kurita, we had to

 5   vote Democratic and if we wanted Barnes, we had to vote

 6   Republican.

 7        Q    What did you say?

 8        A    We just marked Republic because we wanted to

 9   vote for Barnes.

10        Q    Then you went on around and voted.

11        A    Yes.

12        Q    Did you hear your husband ask for a ballot?

13        A    Uh-huh.

14        Q    What did she tell him?

15        A    The same, because we asked together.

16        Q    You asked together.

17        A    Yeah.

18        Q    Did he ask for a Republican ballot?

19        A    Uh-huh.

20        Q    Then you went around and voted.  When you

21   voted, did you find Tim Barnes' name where you could

22   vote for him?

23        A    No.

24        Q    You gave an affidavit, didn't you, Ms. --

25        A    I did.
```

```
 1        Q    That affidavit says be sworn, my husband and

 2   I went out to vote at the Fairgrounds on Thursday,

 3   August 7th.  When we arrived to start filling out our

 4   cards we had to mark Democrat or Republican.  We did

 5   not know that we would have to pick.  When we asked the

 6   lady who gave out the cards what was Kurita, she said

 7   Democrat.  Well, we wanted to vote for Tim Barnes and

 8   she said that he was a Republican.  When we were voting

 9   we noticed that another member -- that neither one of

10   them was on the ballot they gave us and I overheard

11   another lady say that the first lady should not be

12   telling people Tim Barnes was a Republican and that she

13   was misinforming people.  When we were walking out the

14   door after talking to a man that was standing at the

15   machine and showing how to vote, my husband told him,

16   "They need to say something to that first lady."  He

17   told my husband two, three votes are not going to make

18   matter anyway.  Then further you saith not.

19             Now, did you hear what the lady behind you

20   said after -- the African-American lady said to

21   Ms. Pace when she said Tim Barnes was a Republican?

22        A    No.

23        Q    You didn't find --

24        A    I went ahead and my husband and I kind of

25   together.  They were closer to the same machine voting.
```

```
 1        Q    Was your husband agitated?

 2        A    No.

 3        Q    Had he been drinking?

 4        A    No.  He don't drink.

 5        Q    He doesn't drink?  He wasn't under the

 6   influence of anything?

 7        A    No.

 8        Q    Was he loud?

 9        A    No.

10        Q    Was he boisterous?

11        A    No.

12        Q    Was he obnoxious?

13        A    No, no, because the guy that was at his

14   machine walked us to the door and stood there and

15   carried on a conversation with us.

16             MR. BARRETT:  You may ask.

17             MR. ROCHELLE:  No questions.

18             MR. BARRETT:  No questions?  Did you say no

19   questions?  Thank you, Ms. Walker.

20             CHAIRMAN SASSER:  Does anyone on the

21   Committee have a question?  Ms. Walker, I have a

22   question that's somewhat delicate.  I apologize for

23   asking.

24             Does your husband have any sort of medical

25   condition or anything like that that could lead someone
```

```
 1    to think he was under the influence?

 2              THE WITNESS:  No.

 3              CHAIRMAN SASSER:  Thank you.

 4              MR. BARRETT:  Mr. Walker.

 5

 6                        - - -

 7

 8              JAMES WESLEY WALKER, JR.,

 9     having been first duly sworn, testified as follows:

10    DIRECT EXAMINATION BY MR. BARRETT:

11         Q    Mr. Walker, state your name for the record.

12         A    James Wesley Walker, Jr.

13         Q    And where do you live, Mr. Walker?

14         A    Clarksville, Tennessee.

15         Q    And where are you employed?

16         A    Lamar Advertising.

17         Q    How long have you been employed with Lamar?

18         A    22 years.

19         Q    What do you do for left arm March?

20         A    I'm Operation Manager.

21         Q    Operation Manager.  Are you a registered

22    voter in Montgomery County?

23         A    Yes.

24         Q    Did you vote in the August 7th primary?

25         A    Yes.
```

```
1        Q     Where do you vote?

2        A     At the Fairgrounds, at the Jaycee building.

3        Q     What time did you go vote?

4        A     It was after 4:30 when my wife got off work.

5        Q     Did you go with your wife to vote?

6        A     Yeah.

7        Q     Did you hear her testify?

8        A     Yeah.

9        Q     Can everybody hear him?  Tell us what

10  happened.  The record shows that she was the 201st and

11  you were the 202nd person to vote and Ms. Meriweather

12  was the 203rd person to vote.

13            Tell us what happened when you and your wife

14  went into the polling precinct to make application for

15  a ballot and cast your vote.

16       A     We walked up to get our cards filled out and

17  it said that we had to pick Republican or Democrat and

18  we asked the lady which one do we pick if we want to

19  vote for Kurita or Barnes.  She told us Kurita was

20  Democrat and Barnes was Republican.

21       Q     What did you do then?

22       A     We marked Republican on the card.

23       Q     Then did you go vote?

24       A     Yeah.

25       Q     Could you find Mr. Barnes' name on the
```

Beres & Associates

```
 1    Republican primary ballot?

 2         A     No.

 3         Q     So you didn't vote for him?

 4         A     No.

 5         Q     Now, let's backup a little bit.  Were you

 6    boisterous, Mr. Walker?

 7         A     No.

 8         Q     Were you a angry?

 9         A     No.

10         Q     Were you obnoxious?

11         A     No.

12         Q     Were you under the influence of alcohol or

13    drugs?

14         A     No.

15         Q     Do you drink?

16         A     No, sir.

17         Q     You gave an affidavit, I believe, didn't you,

18    Mr. --

19         A     Yes, sir.

20         Q     You've had an opportunity to read it?  Let me

21    read it.  This is Wesley Walker states as follows:  My

22    wife and I went to vote at the Fairgrounds on Thursday,

23    August the 7th.  When we arrived and started filling

24    out our card we had to mark either Democrat or

25    Republican.  We did not know that we would have to
```

1    pick.  When we asked the lady who gave out the cards

2    what was Kurita, she said Democrat.  Well, we wanted to

3    vote for Tim Barnes and she said he was a Republican.

4    When we were voting we noticed that neither one of them

5    was on the ballot they gave us and I overheard another

6    lady say that the first lady should not be telling

7    people Tim Barnes was a Republican and that she was

8    misinforming people.  When we were walking out the door

9    after talking to a man that was standing at the machine

10   and showing you how to vote, I told him they need to

11   say something to the first lady.  He told me that two

12   or three voters were not going to matter anyway.

13             Is that accurate?

14   A    Yes, sir.

15   Q    Tell us what the lady that you sought an

16   application from, the first lady you spoke to, what did

17   she look like?

18   A    She was gray haired woman with a red jacket.

19   Q    We've established her name is Pace, Ms. Pace.

20   A    I don't know her name.

21   Q    Who was the lady behind you?

22   A    I don't know her name.

23   Q    Was she African-American?

24   A    Yes, sir.

25   Q    Did you hear her speak to Ms. Pace when she

```
 1   said that Tim Barnes was a Republican?

 2        A    Well, after we had voted, because she was

 3   looking for it on the machine, too, and she couldn't

 4   find it on the machine.

 5        Q    Did you hear her exchange with Ms. Pace?

 6        A    I heard her tell -- I don't think she was

 7   just talking to herself but she told them she didn't

 8   need to be telling people that, that it was wrong.

 9        Q    And you were not agitated.

10        A    No.

11        Q    You're not angry.

12        A    No.

13        Q    You're not boisterous.

14        A    No.

15        Q    You're not loud.

16        A    No.

17        Q    And you were not under the influence of

18   anything or drugs.

19        A    No.

20             MR. BARRETT:  You may ask him.

21

22

23

24                          - - -

25
```

```
 1    CROSS EXAMINATION BY MR. ROCHELLE:

 2        Q    Mr. Walker, I'm Bob Rochelle.  I represent

 3    Senator Kurita.  I want to thank you for being here

 4    today, helping us discover all the facts in this case.

 5             As I heard your statement a moment ago you

 6    said that your wife voted first, then you voted, and

 7    then there was Ms. Meriweather behind you.

 8             Was Ms. Meriweather the one that said she

 9    couldn't find him on the ballot, either?

10        A    If she's an African-American woman, she was.

11    I'm not for sure what her name is.

12        Q    She was the one right after you in the line.

13        A    Yeah, I believe so.

14        Q    And she told you I can't find Barnes, Kurita

15    on the ballot that she was voting.

16        A    She didn't tell me, no.

17        Q    But you heard her say that.

18        A    Yes.

19             MR. ROCHELLE:  Well, let me refer the

20    Committee, if I could, to Exhibit B of our response

21    that was filed previously, the application to vote of

22    Lenore Meriweather that shows she voted in the

23    Democratic primary.

24             That's all.

25             CHAIRMAN SASSER:  Mr. Barrett, any redirect?
```

```
 1    Anything on the Committee on questions?

 2              A SPEAKER:  I have a question.  Mr. Walker,

 3    is this your first time to vote in a primary or have

 4    you voted before in a primary?

 5              THE WITNESS:  No, we voted before.

 6              A SPEAKER:  Thank you.

 7              CHAIRMAN SASSER:  We have another one.

 8              A SPEAKER:  Mr. Walker, I'm just curious,

 9    when you couldn't vote for Mr. Barnes, why didn't you

10    take any other action after you left the polling other

11    than the affidavit?

12              THE WITNESS:  I really didn't know you could

13    do anything.  I talked to the guy that was helping with

14    the machine.  The way he acted, we done voted

15    Republican.  There wasn't nothing else we could do.

16              A SPEAKER:  You just felt you didn't have any

17    options at that point?

18              THE WITNESS:  Yeah.

19              A SPEAKER:  Thank you.

20              CHAIRMAN SASSER:  Any other questions?  Mr.

21    Walker, thank you and your wife so much for your time

22    today.

23              MR. BARRETT:  Call Tim Barnes.

24

25                              - - -
```

```
 1                        TIM BARNES,

 2    having been first duly sworn, testified as follows:

 3   DIRECT EXAMINATION BY MR. BARRETT:

 4        Q    State your name for the record, please, sir.

 5        A    Tim Barnes.

 6        Q    And where do you live, Mr. Barnes?

 7        A    974 Dixie D Road, Adams, Tennessee, in

 8   Montgomery County.

 9        Q    And where do you vote?

10        A    Well, I early voted but I normally vote at

11   Sango Elementary.

12        Q    What's your profession?

13        A    I'm an attorney.

14        Q    And how long have you been a lawyer?

15        A    23 years.

16        Q    And how long have you lived in Montgomery

17   County?

18        A    22 years.

19        Q    Have you ever voted Republican, Mr. Barnes?

20        A    No.

21        Q    You're a yellow dog Democrat?

22        A    Yes.

23        Q    Have you run for public office before?

24        A    Yes, I have, two years ago.

25        Q    What did you run for?
```

```
 1        A     I ran for the 68th House seat against the

 2   Republican incumbent, Curtis Johnson.

 3        Q     That's part of Montgomery County?

 4        A     Yes.

 5        Q     That's part of the county that's represented

 6   by Senator Kurita?

 7        A     Yes, it is.

 8        Q     Did she give you any help in your primary?

 9        A     No, she did not.  She didn't raise any money,

10   didn't make any contributions, did not attend any

11   fundraisers or any other events.

12        Q     Did she attend any rallies you had?  She

13   didn't attend any events for you.

14        A     No.  As a matter of fact, we had one probably

15   less than five miles from her home which was at the

16   Eastland Green Golf Course that had between 150 and 200

17   local Democrats there.

18              We had Secretary of State Riley Darnell, we

19   had then Majority Leader of the House, Kim McMillan,

20   John Morgan.  I can't remember everybody but the

21   featured speaker was Ned Ray McWherter.  She did not

22   attend that.

23        Q     She did not attend that?

24        A     No.  Joe Pitts was also running at the same

25   time against a Republican.  Ken "Togasocki" was there
```

```
 1    and no, Senator Kurita did not attend.
 2         Q    Did not attend.  Do you know whether or not
 3    she gave any assistance to Mr. Pitts in his campaign
 4    that year?
 5         A    I just know from talking with Mr. Pitts that
 6    she did not contribute to his campaign, did not attend
 7    any of his events, either.
 8         Q    So that's two Democrats running in that same
 9    county.
10         A    In Montgomery County against Republicans.
11         Q    That was in '07.  I believe that was an off
12    year for the Senate seat in your county?
13         A    That's correct.  She was not running.  She
14    was out of session and for whatever reason chose not to
15    support either myself or Joe Pitts.
16         Q    Now, you're married.  You're a lawyer,
17    Mr. Barnes.  You know you have to answer verbally.  You
18    can't shake your head.
19         A    I'm sorry.  I am a lawyer.  I'm rarely a
20    client, though.
21         Q    They're the worse witnesses.
22         A    I recommend for lawyers to be a client.  It
23    gives you a different perspective.  Yes.  I'm married
24    24 years, be 25 December the 30th.
25         Q    And what does your wife do?
```

1        A     She is a tenured full professor at Austin

2   Peay State University.   She teaches English.

3        Q     Teaches English.   Favorite subject.

4              When did you come to decide to run for the

5   State Senate for the Democratic primary for this year's

6   primary?

7        A     Well, I can tell you it was a very difficult

8   decision and I went back and forth probably in the

9   winter, 2007, 2008 and seriously started considering it

10  in about January or February of this year, and did so.

11             Of course, like many Democrats, I was very

12  incensed at my State Senator's vote that resulted in

13  giving control of the State Senate to the Republicans,

14  and that was one of the primary reasons that I decided

15  to run, plus a lot of encouragement from the local

16  Democrats there in Montgomery County.

17       Q     Did you have any communications from Senator

18  Kurita when word got out that you were going to run for

19  the State Senate against her?

20       A     Well, indirectly.   What I started getting, I

21  started getting calls from prominent Democrats who said

22  things like, "Look, Senator Kurita will not stop

23  calling me unless I call you and ask you to drop out of

24  this race.   I'm not asking you to drop out of this

25  race, I want you in this race but if she asks you will

```
 1    you please tell her so she'll stop calling me that I
 2    asked you to drop out of this race?"
 3         Q    And you did not drop out.
 4         A    No, I did not.  Of the few calls that I got,
 5    no one seriously asked me to drop out of the race.
 6         Q    What kind of campaign did you run?
 7         A    I run a very positive, clean campaign.  I
 8    followed the rules.  I was very circumspect about
 9    sticking with issues.  I made no personal attacks and I
10    was proud of the campaign and am proud of the campaign
11    that I ran.
12         Q    Did Senator Kurita make any personal attacks
13    on you?
14         A    Yes.  There toward the end, I do know that
15    she was polling constantly because I had a lot of my
16    supporters to call me and say we're receiving these
17    calls and they're polling calls.  I was not polling so
18    I knew it had to be her campaign.
19              And there around early voting we started --
20    the negative ads hit and I was just savaged for being a
21    lawyer and about ten percent of my practice involves
22    representing people charged with DUI and I was cast as
23    the person who puts drunk drivers back on the road and
24    sends wife beaters back home.
25         Q    Send what back home?
```

```
 1        A     Wife beaters.

 2        Q     Do you do domestic relations?

 3        A     I do domestic relations and, of course, part

 4   of that involves occasionally domestic assault.  I will

 5   say that some of the later ads got more politically

 6   correct and they said I send spouse abusers back home

 7   rather than wife beaters, so --

 8        Q     Were these ads both in the TV media and the

 9   newspaper?

10        A     Yes.  I quit watching network television

11   because it seemed like I couldn't watch the news

12   without seeing myself in black and white grainy slow

13   motion and I really didn't like for my three children

14   to see those ads.  So it was full-time there for about

15   three weeks.

16        Q     Alright.  What else were you subject to

17   during the course of this campaign, especially the

18   closing days?

19        A     Well, in all honesty as far as the negative

20   campaigning, I was prepared for that.  I had knowledge

21   of her prior campaigns and I knew what she had done

22   against Representative Tommy Head and I was prepared

23   for that sort of thing, and that's part of the give and

24   take, rough and tumble, although I thought some of the

25   things were unfair.
```

Beres & Associates

```
 1              I clearly was on record as supporting inhome
 2    healthcare.  She sent pieces out saying that I was
 3    going to cut inhome healthcare and was on record in the
 4    Leaf Chronicle on July 23rd of saying that I supported
 5    the expansion of that.  But, you know, I can accept
 6    that.
 7              The thing that later in the campaign that was
 8    very difficult for me to accept, I started receiving
 9    calls at my office of people saying, "We really don't
10    appreciate these calls you're making because they're
11    offensive, they're annoying, they're repetitive" and I
12    say, "We're not making any calls."
13              I checked to make sure that we had nobody in
14    my campaign making the kind of calls and they would
15    show up on caller I.D. at 999 -- all 999s.
16              They were -- the nature of these calls were
17    purported to be from my campaign.  They would come late
18    at night.  One woman told me she received 11 phone
19    calls and they would say things like, "Hurrah, Tim ",
20    and hang up or they would purport to be stuttering.
21    Say, "Vote - vote - vote - vote for Tim" and then hang
22    up.
23              As I say, they would be repetitive.  And when
24    the people started calling me saying that they didn't
25    appreciate that, I was very upset with that because it
```

```
 1    purported to be from my campaign and that was my first
 2    experience with that kind of dirty political trick and
 3    I knew that it was costing me and I felt like that it
 4    was illegal.
 5              I looked up the statute on harassing
 6    telecommunications and it fit that statute so we put
 7    the word out so we knew it would get back to the Kurita
 8    campaign that we're going to go to the DA about
 9    prosecuting these calls.  Lo and behold they stopped.
10    That was after quite a period of time of that.
11        Q    Was there any response from your colleagues
12    at the Bar on these attacks on your professional
13    conduct as a lawyer?
14        A    Yes, there was.  I didn't know that they were
15    going to do it.
16        Q    Who is "they"?
17        A    The local bar.
18              MR. BARRETT:  Wait a minute.  He's got an
19    objection.
20              CHAIRMAN SASSER:  Mr. Rochelle.
21              MR. ROCHELLE:  Mr. Chairman, Members of the
22    Subcommittee, I know you don't want us objecting but I
23    have to say to you there has not been a word yet stated
24    by Mr. Barnes that was contained in his original
25    contest, statement of contest or that was contained in
```

```
 1   the supplemental that we let them get by this and just

 2   trying to be agreeable, trying to get everything out.

 3          All of these statements -- of all of these

 4   statements not a single statement yet has been pled in

 5   a statement that was supposed to have been

 6   jurisdictional.

 7          Now, I know you don't want us objecting but I

 8   do feel the necessity to inform you that we never heard

 9   any of this stuff before.  If we had, we would have

10   been able to take some effort to account for it.

11          CHAIRMAN SASSER:  Duly noted.  I would note

12   for the record, however, you're going to have a chance

13   here in a minute to cross-examine Mr. Barnes and ask

14   him about this and your objection is noted for the

15   record.

16          Mr. Barrett, I'd also want you to bear in

17   mind that your time is limited.  You're going -- some

18   of your time will be consumed when you hopefully want

19   to cross some of Mr. Rochelle's people as well.

20          MR. BARRETT:  Thank you.

21   BY MR. BARRETT:

22     Q    What --

23     A    They did it without my even knowing about it.

24     Q    Who is "they"?

25     A    The Montgomery County Bar Association.  Not
```

```
 1    as a Bar Association, but members of the local bar.

 2    They took out a full page ad.  I'll tell you, when your

 3    colleagues do something for you like that, it makes you

 4    really proud of the kind of people you associate with.

 5             I'm proud to be a lawyer, by the way.

 6             They took out a full page ad that said

 7    basically -- we have it here, but if anybody wants to

 8    see it, but it said we do not -- we reject these unfair

 9    attacks on Tim Barnes who is one of the most honest

10    members of the Bar who is known for his integrity.  We

11    think these type of attacks are beneath the dignity of

12    a State Senator and we demand a retraction.  I'm

13    paraphrasing.  That's what they felt like they had to

14    do after that.

15        Q    Did you subsequently learn that your wife was

16    threatened?

17        A    Well, I learned during the course of the

18    campaign.  What happened was the Austin Peay College

19    Democrats endorsed me.  She didn't know they were going

20    to endorse me.

21        Q    Who is "she"?

22        A    My wife.  Right after that endorsement, my

23    wife was called in to President Hall's office.  Had

24    never been called into the President's office before.

25             She's been there, I'm sorry, I can't remember
```

1    but over 16, 17 years and has an impeccable record and

2    the President informed her there's been a complaint to

3    the Board of Regents and I hate telling you this but

4    you're being closely watched and you have to make sure

5    that you don't do any campaign activity on Austin Peay

6    time.

7             Of course, she reassured him she never would

8    do anything, never has and never would.  It was very

9    circumspect about that and she knew the rules.

10            As a matter of fact, two years ago she had a

11   conversation with the General Counsel at the Board of

12   Regents to make sure what the parameters were.

13            So, I took that as very intimidating.

14            CHAIRMAN SASSER:  Mr. Barrett, I might

15   encourage you to move along here a little bit.  Let's

16   get back, if we can, to some of the facts of the

17   contest rather than talking so much about --

18        Q    You heard rumors about the Republicans

19   attempt to persuade the Republicans to vote for

20   Democrats for Senator Kurita?

21        A    That's correct.

22        Q    What, if anything, did you do about that?

23        A    Well, that, of course, went into my decision

24   to contest the election when I heard about all the

25   activities and the -- because I just felt like it

1    wasn't fair result and my party had not fairly chosen

2    their nominee.

3        Q    Did you solicit many of these affidavits?

4        A    Yes, I did.  Well, I did not solicit them.

5    The only one I contacted directly was Ms. Jones.

6            Everyone who has been here to testify and

7    every affidavit that's been submitted were people who

8    called my office that I did not previously know.

9            The people who have been here to testify just

10   did it because they felt like it was the right thing to

11   do and they did not know me before.  They called me of

12   their own volition and choice.

13       Q    Did you learn there were Republican calls

14   being made into the district?

15       A    Yes.  That was Ms. Alma Lewis contacted me

16   and, again, I did not know her and she's the one who

17   submitted the affidavit that said that she received

18   telephone calls 6:30 a.m. on election day that said

19   that a person identifying themselves as being with the

20   Republican Party and first question asked, "Are you

21   voting for Tim Barnes?"

22           When she said, "Yes", "We're just here to

23   remind you that Tim Barnes is a Republican, that the

24   Leaf Chronicle reported he was a Republican."  They

25   later retracted that.  "In fact, he is a Republican and

```
1    you need to make sure you're going to vote in the

2    Republican primary if you're going to vote for Tim

3    Barnes."

4            That was an attack I was appalled by and

5    worried about how that cost me.

6            MR. BARRETT:  You may ask him.

7            CHAIRMAN SASSER:  Mr. Barrett, you have

8    approximately 11 minutes remaining.

9            MR. ROCHELLE:  He won't ever make it.

10

11                        - - -

12

13   CROSS EXAMINATION BY MR. ROCHELLE:

14       Q    Mr. Barnes, I'm Bob Rochelle and I think we

15   met the other day, Tuesday, at the interviews.

16            Well, you had several things there.  On this

17   event that Governor McWherter was at, did not Senator

18   Kurita call you and express her apologies for not being

19   able to be at the event in advance?

20       A    What she said specifically was -- and keep in

21   mind, it's the biggest political event for Democrats in

22   years -- "My computer has been broken, I have a

23   computer repairman coming to my office and I sure would

24   hate to miss the computer repairman so I won't make

25   your event."
```

1      Q    Well, Mr. Barnes, let me tell you what you

2  told your clients many times and your witnesses.  When

3  I ask you a question, answer the question.

4           The question is, did Senator Kurita call you

5  in advance of the meeting to tell you that she would be

6  unable to attend and to express her apologies for not

7  attending?

8      A    She called me the date of the event about two

9  hours before the event started because I was working on

10 my speech at the time.

11     Q    I'm going take it that that's yes.

12     A    You can take all my answer for however you

13 want to take it.

14     Q    Alright.  None of the things that you

15 testified to did you put into an affidavit to be filed

16 with your contest, did you?

17     A    No.

18     Q    You're aware that under the law of Tennessee,

19 which is binding, that anything that you think was

20 grounds for overruling the election that you had to put

21 in that contest or else it couldn't be considered by

22 this Board?

23     A    I'm aware of that.

24     Q    I feel for you but you lawyers -- I'm a

25 lawyer -- we have to go by the law, we have to honor

```
 1    the law.  So I sympathize with you about DUIs and all

 2    that.  I've been through the same thing myself.

 3              Politics can be a rough business, can't it?

 4    A     Of course.

 5    Q     Well, you lost.

 6    A     At the end of the day, the numbers that were

 7    certified, I had 19 votes fewer.

 8    Q     Alright.  You lost.  It's hard to lose.  I've

 9    been there, Mr. Barnes.  I know what you're feeling.

10    It's hard to lose.

11    A     Uh-huh.

12    Q     And I'm glad you had an opportunity to talk

13    about these things but, like me, you got to go on.

14    There's another day.  There's a lot of other things in

15    your future that you can accomplish.

16              I hope you'll use this hearing as an

17    opportunity to have gotten it all out of your system

18    and to go on.  I think you may come to be a Senator of

19    Tennessee in the future and I hope you'll try to, but

20    you understand and what you're representing to this

21    Board, you want them to decide this case on the law,

22    don't you?

23    A     That's why I have all these good lawyers

24    here, that's correct.

25              MR. ROCHELLE:  That's all.
```

```
 1              CHAIRMAN SASSER:  Thank you.  Anybody on the
 2    -- do you want any redirect?
 3              MR. BARRETT:  No.
 4              CHAIRMAN SASSER:  Anybody on the Committee
 5    have any questions for Mr. Barnes?  Thank you,
 6    Mr. Barnes.
 7              MR. JOHNSTON:  Mr. Chairman, and Members of
 8    the Committee, that is our case.
 9              The one thing that I did want to make sure of
10    is that included as Exhibit A to the brief that we
11    submitted, was a voter analysis sheet and that is also
12    part of our case.
13              A SPEAKER:  Can you refresh us where that is?
14              MR. JOHNSTON:  It should be at the very back
15    of the brief that we submitted in support of the
16    contest.
17              A SPEAKER:  The original brief?
18              CHAIRMAN SASSER:  The last page.  The
19    document is entitled Tim Barnes' Brief in Support of --
20    it's the last page, very last page.
21              Thank you, Mr. Johnston.  Mr. Rochelle.
22              MR. ROCHELLE:  First off, for the record, if
23    I could ask in regard to the response that we filed, we
24    have exhibits, if we can go over those quickly.
25              Exhibit A is the application to vote of
```

```
 1   Michael Biggs.  He voted in the Republican Party and

 2   stated he wanted to vote in the Republican Party.

 3           Exhibit B is the application of Lenore

 4   Meriweather.  Her application to vote shows that she

 5   voted in the Democratic Party, notwithstanding

 6   Mr. Walker's statements that she couldn't find Barnes

 7   and Kurita on the ballot.

 8           Next is the application to vote Exhibit C of

 9   Lynnette Walker.  Shows that she voted or filled out

10   her application to vote as Republican.

11           Next is the application to vote of James W.

12   Walker, Jr. but is signed Wesley Walker.  Shows that he

13   filled out his application to vote Republican.

14           Exhibit E is a compilation of the signature

15   book.  That's the poll books they call it you have to

16   sign after you've taken your application for vote.  You

17   take it to the next lady on.  On Page 19 is the

18   signature of Mr. Biggs, verifying that he wants to vote

19   in the Republican Party.

20           On Page 29 the signature of Nancy Burchett,

21   showing that she says she wanted to vote in the

22   Republican Party.

23           On Page 113 is the signature of Debra Jones

24   showing that she voted in the Democratic Party as she

25   stated.  Actually, she stated she couldn't find the
```

1   names on the Democratic ballot.

2           Lenore Meriweather shows she voted, you can

3   barely tell it, but it does have a click there besides

4   Democrat.  Wesley Walker, and Lynnette Walker, both on

5   Page 262, signed that they wanted to vote in the

6   Republican Party.

7           Next is an Attorney General's opinion that

8   deals with a jurisdiction issue that we filed with the

9   Board that your lawyer will have us discuss, either

10  one.

11          Next is the application to vote of Debra

12  Jones, Exhibit G, showing that she voted in the

13  Democratic -- wanted to vote in the Democratic primary.

14          Next is Exhibit H.  The first page is just

15  trying to show you where it was located on the front

16  page.  If you look over here at the right down toward

17  the bottom it says Kurit, K-U-R-I-T.

18          If you'll look on the second page, I put an X

19  beside it where the newspaper said Kurita and

20  Republican challenger Tim Barnes, Clarksville attorney.

21          Next is Exhibit I which is the application --

22  excuse me, it's the voter card of Jesus Quiles which

23  shows that he was supposed to be living at 3125 Holly

24  Point and that that was in the 20th voting district.

25          Notice what was one line through is that he

```
 1   had previously been registered since 2002 in the 20th

 2   District.  He didn't change voter places.  This was the

 3   fella that showed up at a precinct called Sango.

 4           The next exhibit is, so you'll have them

 5   available for you to look through is the specific

 6   statues that we referred to in regard to how to

 7   challenge a voter, how to keep Democrats out of

 8   Republican -- how to keep Republicans out of Democratic

 9   Party primaries and likewise in the reverse.

10           Now, if it's alright with you, Mr. Thompson

11   and I are going to read into the record portions of the

12   transcript of the interviews that were done with

13   election workers, and if it's alright with you, we'll

14   just alternate to save our voices on things.

15           CHAIRMAN SASSER:  It might be helpful if we

16   could get the transcript posted on the overhead if you

17   have an extra copy.

18           MR. ROCHELLE:  I can give you the testimony,

19   page number.

20           CHAIRMAN SASSER:  Okay.  This will be in your

21   --

22           MR. ROCHELLE:  It's in the argument.  It's

23   the only place we could put it.

24           CHAIRMAN SASSER:  If I may address counsel.

25   Members, we can follow along if I understand correctly
```

```
 1   in the reply argument filed on behalf of Senator
 2   Rosalind Kurita, correct?
 3           MR. ROCHELLE:  Understand why we're doing it
 4   this way.  We could give you each 196 pages to read but
 5   the transcript only got to us yesterday morning.  We
 6   didn't get started on that until about 10:00 or so and
 7   so this was the only way really we could get it to you
 8   where you weren't having to read forever.
 9           CHAIRMAN SASSER:  Mr. Rochelle, I'm sure your
10   questioning reads like a novel.  We're very pleased
11   that you gave it to us on that form.
12           MR. ROCHELLE:  Page 70, the testimony of
13   Margaret Pace.  Page 70.
14           MR. BARRETT:  Page 5?
15           MR. ROCHELLE:  Let me sort of set what
16   happened first.  On Tuesday, September the 9th, all the
17   attorneys and the parties, including Mr. Phillips from
18   the party, spent over four hours interviewing various
19   Montgomery County election officials and then we went
20   through each one of these allegations that Mr. Barrett
21   has presented something about.
22           The first one was the Jaycee Fairgrounds
23   polling location.  If you'll remember, they submitted
24   an affidavit from four voters, one voter Michael Biggs,
25   said he told election workers he wanted to vote in the
```

1    Democratic primary but was given a Republican ballot.

2            The exhibits we just filed shows that he

3    shown as having voted in the Democratic primary,

4    notwithstanding the affidavit.

5            Election documents -- excuse me.  I'm in

6    error.  There election document shows that he voted in

7    the Republican primary and that's what the document

8    showed where he was.

9            The other three -- I'm on Page 4.

10            The other three voters, Meriweather,

11    Walker -- and Walker alleged that Margaret Pace told

12    them that Barnes was a Republican and was telling

13    people that all day.  They didn't put anything in there

14    about the interviews in their brief even though those

15    interviews were conducted before they filed their --

16    before Mr. Barnes' brief was filed.  Just basically

17    ignored it.

18            I'm on Page 5.  This is the testimony of

19    Margaret Pace, Page 70.  Mr. Rochelle:

20        Q    "I believe you were sitting next to Sheila

21    Edmondson?

22        A    Yes, I was.

23        Q    At some point during the day Ms. Edmondson

24    said you made a mistake?

25        A    I did.

1      Q    And I want you to tell us now about the

2    mistake, what happened, who was there, what you did

3    about it, anything else that we ought to know to help

4    us understand the situation."

5           I hope you'll understand an unusual situation

6    in that all the lawyers were there taking, doing this

7    interview.  We had never talked to the lady before but

8    it's being recorded.

9           "I misspoke.  I was stressed.  The gentleman

10   in line was already agitated, was extremely loud,

11   extremely rude because the information that was posted

12   there, he knew he was going to have to choose between

13   Democrat -- the Democrat and Republican and he did not

14   intend to do that."

15          Next, Page 71.  I guess I'm continuing on

16   here.  This is by Ms. Pace.  "He was already agitated.

17   I was already apprehensive.  He was in the line.  He

18   was loud and complaining.  I had already scanned the

19   line to see if we had a uniformed officer in the line

20   because we had several of them because he appeared to

21   me to be under the influence.  When he came in the

22   line, he and the female that was with him were both

23   upset because she kept saying that if he was going to

24   have to register as a Republican or a Democrat, she

25   wanted to be locked in as an independent because that's

```
 1    what she was.  And I asked him persistently to go back
 2    and look at the two ballots that had been posted to
 3    choose a party.  He refused to do that, saying he did
 4    not want to go in and be locked in or locked under one
 5    or the other.  He wanted to have a choice.  And then
 6    because it was causing a scene and because of his
 7    rudeness and his loudness and because our line was
 8    blocked, I tried to give a quick example, which was my
 9    mistake.  It was a poor choice.  And the quickest one
10    in my mind was the most hotly contested race in the
11    county that it was between Kurita and Barnes.  Then I
12    realized after I said that, and it just came out -- I
13    did say -- I don't deny that I said Tim Barnes is a
14    Republican.  I knew that they were both on the same
15    ticket, just as Joe Biden knew the other night in his
16    acceptance speech that George Bush was not the
17    candidate, that it was McCain.  He started immediately
18    saying Freudian slip.  And I made my Freudian slip.
19    Sheila was sitting on my right.  She corrected me.  I
20    corrected and apologized.  And an attractive back lady
21    in the line behind them very rudely started saying over
22    and over Tim Barnes is no Republican, Tim Barnes is no
23    Republican.  I made a mistake.  I corrected it and
24    three people corrected it.  He went on through the line
25    and no more complaints until he cast his vote and then
```

```
 1    he was angry because he could not find the name on the
 2    -- Mr. Barnes' name on the ballot.  He could have
 3    changed his party -- we did change others -- if he had
 4    asked but he waited until he cast his vote and then he
 5    complained.
 6         Q    Was this Mr. Walker?
 7         A    Yes, Wesley Walker."
 8              Next.
 9         Q    "If I might ask you one or two more things.
10              In regard to Mr. Walker, did I understand you
11    to say that he was boisterous?
12         A    Yes, he was, certainly.
13         Q    Did I understand you to say that he appeared
14    to have been drinking? MR. BARRETT:  No, she said he a
15    he appeared to be under the influence.  That's what she
16    -- MARGARET PACE: Seemed to me because he was
17    inappropriately loud at a voting precinct.  It might
18    have been all right at a bar or a national football
19    game or something -- National League Football game.
20    But in a voting precinct he was unusually loud and
21    outspoken about having to choose a party."
22              Mr. Rochelle:
23         Q    "Would you describe his tone as belligerent?
24         A    Very agitated.  He was not going to -- he was
25    not going to sign in or wanted to be locked in, one or
```

```
 1   the other, it was his right not to do that.  And she

 2   kept insisting, the lady, that if he was going to be

 3   locked in, she wanted to be locked in as an independent

 4   because that's how she always voted.

 5        Q    I did hear you right, that you were concerned

 6   enough about his behavior that you looked to see if you

 7   had a uniformed officer there?

 8        A    Yes, because people go into a rage

 9   unprovoked, seems like nowadays, especially if they're

10   under the influence.

11        Q    I'm sorry.  Your answer was yes?

12        A    Yes."

13             This is Sheila Edmondson, and this is my

14   question:

15        Q    "Now, your role as a registrar, where were

16   you physically seated in regard to when a voter walks

17   in the door?

18        A    Margaret Pace, myself" --

19             MR. JOHNSTON:  What page are you reading from

20   in the transcript?

21             MR. ROCHELLE:  On the transcript, 50.

22        Q    "So you were sitting right next to Margaret

23   Pace.

24        A    Yes, sir.

25        Q    I would just ask you the first question.
```

```
 1        A    Okay.

 2        Q    Did you see or hear or observe Margaret Pace

 3   do anything that day that you did not think was

 4   appropriate for the voting place?

 5        A    I don't know if I put in it those words but

 6   yes, she made a mistake that day.

 7        Q    Okay.  Tell me about the mistake.

 8        A    A man and his wife came up, asked which --

 9   Democrat or Republican that Kurita was in.  She told

10   him.  It was the wrong one.  And I heard her because

11   I'm sitting right next to her, right beside her.  I

12   told the man -- I told Margaret, that is not correct.

13   The man is standing right in front of me, his wife is

14   right in front of Margaret.  Both right here

15   (indicating).  He heard me say that.  Margaret said,

16   okay.  Go back to the sample ballot, go look at the

17   sample ballot.  I don't think he ever left the table at

18   all, him or his wife.  Then I heard a lady behind his

19   wife saying yes, that's correct, said that's wrong,

20   she's not in that party.  And that's all -- from there

21   on he filled out his thing and went to his book.

22        Q    And do you know what their names were?

23        A    I don't.  I do from the last time I was here.

24   They were a Walker, I think was their last name.  But

25   no, I didn't know them.
```

1    Q    You didn't know them that day but you

2    subsequently discovered they were Walkers.

3    A    Couldn't tell you the first name, don't know

4    that.

5    Q    So Ms. Pace makes a mistake and tells them --

6    was it that Kurita was in the Democratic primary or

7    Barnes was in the Republican primary?

8    A    He asked about Kurita.

9    Q    He asked about Kurita.  And she told him that

10   Kurita was in the Democratic primary?

11   A    Uh-huh.

12   Q    Do you know what primary he chose to vote in?

13   A    Well, I would say it was probably the one

14   that Kurita was in.  I don't know whether he was voting

15   for her or against her but they were both in the same

16   party so it had to be.

17   Q    Did you hear Ms. Pace tell them -- well, tell

18   me -- repeat again for me what you heard Ms. Pace say.

19   A    She told him -- he asked what party Kurita

20   was in.  She told him the wrong party.

21   Q    She told him Republican?

22   A    Yeah, I guess.  Republican.  I said Margaret,

23   that's not right.  Then, like I said, the man was

24   standing right there.  And she says, okay, go look at

25   the sample ballot.  But he never did go look at it.

```
 1   And then I heard a lady behind his wife say, that's

 2   correct, that's not the right party.  So he got it

 3   coming from two different -- in front of him and behind

 4   him.  But as far as I know, I never saw him leave the

 5   table.

 6       Q    Alright.  Was there any other incident that

 7   day where any similar type of mistake was made by

 8   Mrs. Pace?

 9       A    Not to my knowledge.

10       Q    By anyone else at the voting place?

11       A    No, sir."

12            Then move to Page 53, my question:

13       Q    "Has your experience been that if a voter --

14   until they punch that confirmed button, if a voter says

15   I've made a mistake, I'm in the wrong primary, what has

16   been your experience as to the willingness of election

17   workers in your precinct to back him back out, put him

18   in the other primary if that's what he wants?

19       A    They've done that before.  I mean, you know,

20   I don't really deal with the machines at all.  They're

21   behind us.  I try to get my thing done when they can

22   punch in the right thing, you know, going into the

23   machines.  But I know of one incident, I think it was

24   that day that somebody said, you know, this is not

25   right and they came back out, redid it and went back
```

```
 1    in."
 2              Page 56, my question:
 3        Q    "You've known Margaret Pace for a good while?
 4        A    Oh, yes.  She was my daughter's second grade
 5    teacher, 30 something years ago.
 6        Q    You believe her to be a person of high
 7    character, good character?
 8        A    Yes.
 9        Q    Honesty?
10        A    Yes.
11        Q    Do you think she would deliberately try to
12    cheat Mr. Barnes?
13        A    No, I do not.  Never have seen her do
14    anything illegal or anything like that.  She's just --
15    she's on top of things.  She's very organized, you
16    know, and she just absolutely made a mistake that day.
17        Q    When she made that one mistake and you
18    pointed it out to her that that was incorrect, did she
19    take the proper action to remedy her mistake?
20        A    Yes."
21              I think we've moved to the testimony of Lena
22    Crouch which is Page 39 in your transcript, Page 10 of
23    our document.
24              Price, you want the read that one?  Let Price
25    do it.  I'll drink some water.
```

```
 1              MR. THOMPSON:  I'm going to be reading part
 2   of Mr. Rochelle here.  This is Page 10 of the reply
 3   argument that we filed and it's Page 39 on the actual
 4   transcript.  First question from Mr. Rochelle to Ms.
 5   Lena Crouch:
 6        Q    "Do you know a Lenore Meriweather,
 7   Ms. Crouch?
 8        A    Yes, I do.
 9        Q    Did she make a complaint to you that day?
10        A    If she did, I can't recollect that she did.
11        Q    Specifically, she says that she complained to
12   you about Margaret Pace was telling people that Tim
13   Barnes was a Republican and you said, oh, she's been
14   doing that all day.
15        A    I don't remember that.
16        Q    Did you say that?
17        A    No.  If I did, I don't remember saying it.
18        Q    Is there any circumstances where you might
19   have said that?
20        A    No.
21        Q    Did you know of any circumstance that day
22   when Margaret Pace directed anyone to vote in one
23   primary or the other?
24        A    No.
25        Q    Have you known Ms. Pace for a lengthy period
```

```
 1   of time?

 2        A    Yes, I have.

 3        Q    What is your opinion as to her character and

 4   truthfulness, honesty and reputation in the community?

 5        A    All good.

 6        Q    I believe I asked you, but let me make sure.

 7        A    Okay.

 8        Q    That entire day of election day --

 9        A    Okay.

10        Q    -- did you see or have reported to you any

11   action of Margaret Pace that you do not think was

12   appropriate for the voting place?

13        A    No."

14             Now we're moving to Page 46 of the actual

15   transcript, still on Page 10 of the reply.  This is Mr.

16   Rochelle:

17        Q    "There in the voting place, I'm trying to get

18   a feel for how things were physically.  How close would

19   you have been to where Margaret Pace was located most

20   of the time?

21        A    About from -- well, not as close as I am to

22   her (indicating).  In between me and that table right

23   there (indicating).

24        Q    What is that, about six feet?

25        A    Yeah, I guess you'd say about like that.
```

```
 1   Wasn't a long distance.
 2        Q    Did you hear Margaret Pace that day instruct
 3   anybody as to whether they should vote in the
 4   Democratic primary or Republican primary?
 5        A    No, I didn't.
 6        Q    Did you hear her make any comment about
 7   Mr. Barnes as to whether he was a Democrat or
 8   Republican or what primary he was?
 9        A    No, I didn't.
10        Q    Did you hear her do or say anything that day
11   that you did not think was appropriate for the voting
12   place?
13        A    No, I didn't.
14        Q    How long have you been an election official?
15        A    Oh, it's been a long time because -- I know
16   over 20 years.  I've been there a long time."
17             The next testimony is of Ernst Kugler.
18             MR. JOHNSTON:  Before he moves on from that,
19   may we read some more of that specific person's
20   testimony or how do you want to handle that?
21             CHAIRMAN SASSER:  I have no problem with
22   that, remember though that this counts as your cross,
23   so to speak, from your time.
24             MR. THOMPSON:  How much time do we have?
25             A SPEAKER:  About 45 minutes, roughly.
```

```
 1              MR. THOMPSON:  What about Mr. Barnes?

 2              A SPEAKER:  Nine minutes thirty seconds.

 3              CHAIRMAN SASSER:  My understanding is that

 4    Senator Kurita has 45 minutes, Mr. Barnes has 9 minutes

 5    30 seconds.

 6              MR. JOHNSTON:  Very quickly, let me set this

 7    stage here.  You'll recall that this witness worked

 8    right next to a Mr. Kugler.  Mr. Kugler was the

 9    gentleman who took Mr. and Mrs. Walker off to the front

10    part of the building and showed them the ballots after

11    they had voted.  Questions by me:

12    Q    "Can I ask just a couple of the last things

13    here?

14    A    Okay.

15    Q    You know Mr. Kugler; right?

16    A    Yeah.  The --

17    Q    The gentleman who just left?

18    A    Now, I'm not good on names.

19    Q    But you recognized him?

20    A    Yeah, I recognize him.

21    Q    Do you remember Mr. Kugler that day, on

22    election day taking a man and a woman off to the front

23    door to show them the ballots and go over that?

24         Do you remember that?

25    A    No.
```

```
 1          Q    You don't remember that?

 2          A    No.  And he could have.

 3          Q    You worked on the machine; is that right?

 4          A    Yes, I did.

 5          Q    And which machine?

 6          A    I worked next -- the fourth machine.

 7          Q    No. 4?

 8          A    Yeah.

 9          Q    What machine did Mr. Kugler work on?

10          A    On the fifth machine, the last one.

11          Q    You were right next to him?

12          A    I was in between him and the other lady."

13               Thank you.

14               CHAIRMAN SASSER:  Mr. Thompson.

15               MR. THOMPSON:  For the record, this next

16     witness is Ernst Kugler.

17               CHAIRMAN SASSER:  Mr. Thompson, one second.

18     I think Chip has a question.

19               MR. FORRESTER:  Would it be possible, Mr.

20     Chairman, to get some clarification of Mr. Johnston's

21     reading?

22               I'm not quite sure what context that's in.

23               MR. THOMPSON:  I think when I read the next

24     transcript you'll understand.

25               MR. FORRESTER:  I couldn't connect.
```

```
 1           MR. THOMPSON:  If he wants to clarify, that's
 2   fine, too.
 3           CHAIRMAN SASSER:  I would remind both counsel
 4   that responding to questions from the Committee is not
 5   taking away from your time.
 6           MR. JOHNSTON:  You're about to hear some
 7   testimony from Mr. Kugler.  Mr. Kugler was a machine
 8   operator at the Fairgrounds precinct.  He worked on the
 9   machine next to the woman that you just heard from,
10   and, of course, the testimony is about how she didn't
11   remember things.
12           We all know that Mr. Kugler actually took the
13   Walkers off when they complained that they couldn't
14   find Mr. Barnes' name after they had voted.  She didn't
15   remember that, either.
16           MR. THOMPSON:  Just to refresh the
17   Subcommittee's memory, Mr. Walker testified that after
18   he voted, he was taken by one of the voting machine
19   operators to the front of the building and shown where
20   the ballots were but when he -- in his testimony he
21   said he had already pushed the button that finalized
22   his vote so he could not go back and get a new ballot.
23           Okay.  The testimony of Ernst Kugler.  This
24   is on Page 11 of the reply argument and on the
25   transcript, it is Page 16.  Mr. Rochelle:
```

```
 1        Q      "They call it the Fairgrounds?

 2        A      Right.  It's the Jaycees' building at the

 3   Fairgrounds.

 4        Q      And what is your position there?

 5        A      Judge operator.

 6        Q      You're an operator there.

 7        A      Yeah, the machine operator.

 8        Q      During the day, did you have any contact with

 9   one Michael Biggs?

10        A      I don't know the name.

11        Q      Did you have any contact with Wesley or

12   Lynette Walker?

13        A      I don't know their name, either.

14        Q      At anytime during the day, did you have

15   someone that you might not have known --

16        A      Well, the thing is most of the time the

17   registrar's set-up the piece of paper.  When they walk

18   up and hand me the piece of paper, I look to see for

19   the registrar's initials and I look to see which of the

20   parties are checked.  I ask them they're voting

21   whatever is checked.  That's it.  I mean, the name and

22   everything, really, we don't have any use for it at the

23   machine.  It's on the sheet, but I'm looking at one

24   sheet after another.

25        Q      You just take whatever the little application
```

```
 1    to vote --

 2         A     The registrar's have set-up paperwork for

 3    them to sign, everything else.  All I need to do is to

 4    make sure that the registrar's initials are on there

 5    and I confirm what party they are voting for so I know

 6    which way to trigger the machine.

 7         Q     Was Margaret Pace at this precinct?

 8         A     She was the Officer in Charge, yes.

 9         Q     Did anyone complain to you during the day

10    about Margaret Pace?

11         A     I did not have a direct complaint as such.  I

12    heard from somebody else in the building that someone

13    was saying that the lady in the red coat had given the

14    wrong information out.  I did not get a word -- I think

15    I -- I believe I had the individual, yes.

16         Q     Who is that?

17         A     I honestly can't tell you the name but he was

18    a large gentleman, a little bit bigger than I was,

19    about your build.  There was actually two of them.  I

20    had a lady come to the machine -- and, again, like I

21    say, I don't know their name.  But she walked up and

22    before I could ask her which party she was voting for

23    she informed me she voted all the time, wanted to know

24    where the machines that had the little clickers on them

25    were at.  I told her as far as I knew we had gotten rid
```

```
 1   of the those two Presidential elections ago.  Anyway,
 2   she went in, and checked Republican on her slip.  I
 3   confirmed that was what she wanted.  That's the way the
 4   machine was triggered.  She went in, voted, came back
 5   out.  The machine had showed that she had registered
 6   something.  I think about two other people later, a
 7   tall, heavy-set gentleman showed up.  He went and
 8   voted.  Same thing.  He had Republican written down
 9   there.  He voted.  When he started talking to me, he
10   started talking about not finding Kurita and Barnes'
11   name on it.  When I glanced at the machine he had
12   already processed it and had it and hit the red button.
13   There was nothing I could do about it.  In conversation
14   with him, he wanted to know how do you find out these
15   things?  So I physically went back to the front door
16   with him.  This is where the lady that I had came into
17   it because she went over with us.  She was staying
18   right on his elbow.  I assumed that they were together.
19   I showed them the ballots on the front door.  I showed
20   them how each one of them looks like the exact page in
21   the machine and they can check it on the way in.  We
22   also had them on the wall where they line up for the
23   machines.  But the last election --
24        Q    And those were there -- those sample ballots
25   were there?
```

1       A      The ballots are there on the wall.  There's a

2   Republican one and Democrat one.  They have a separate

3   page for each one of them, just the same way you would

4   see in the machine.

5       Q      Do they say anything about Margaret Pace?

6       A      To me, no.  Like I say, I heard from somebody

7   else later that somebody was talking about Margaret

8   Pace.  Now, actually, somebody was talking about the

9   lady in the red coat who happened to be the only one

10  was Margaret Pace.  Now, as far as Margaret Pace goes,

11  the physical aspects of the machinery was that I was

12  behind probably 10 feet or less.  The way the machines

13  are lined up behind the registration tables, I was off

14  to her left.  Normally I would have been to her right

15  if I had the third machine.  But we had a new machine

16  operator and we put her in the middle in case she had a

17  problem, one of us could catch it real quick.  Normally

18  I could hear about 50 percent of what goes on at that

19  table.  The rest of the time I'm either not paying

20  attention or something.

21      Q      Did you hear her advising anybody about --

22      A      I heard her talking to quite a few people.

23  She sets the paper out, they fill out their name and

24  their address on it.  When they're working, she'll have

25  one of them at the end of the table, one here, one

1    there, (indicating).  And I've seen at least four using

2    the table at the same time while they're filling the

3    slip out.  Usually she's talking to two or three of

4    them at the same time.  And after she's finished with

5    the slips -- they finish with the slips and she directs

6    them down to the registrar that's got the book to

7    confirm they're being logged in.

8         Q    Okay.  So it's not a situation where she

9    would tell somebody, Tim Barnes is on the Republican

10   ballot, without a bunch of other folks hearing her?

11        A    As far as I'm concerned, probably not.

12   Because we had --

13        Q    Did you ever hear her say that to anyone?

14        A    Pardon?

15        Q    Did you hear Margaret Pace say that to

16   anybody?

17        A    No, I never heard her say anything like that.

18   I've never heard anybody say that -- down there we're

19   all old-timers, we're a whole bunch together.  I never

20   heard anybody tell somebody that -- something that --

21   first off, you don't usually tell anything to them.  We

22   direct them back -- if they want to question them, we

23   direct them back to the ballots on the door.

24        Q    Did you hear Margaret Pace occasionally do

25   that on election day?

```
 1        A    I heard her do that several times and I've

 2   done it several times.  In fact, one individual was

 3   logged in Republican and stepped back from the machine

 4   and asked where it was.  I said, you had to register

 5   Democrat.  He said well, he had made a mistake.  I

 6   called Margaret over.  And he had not triggered the

 7   machine yet so we were able to back him back out, and

 8   initial the sheet off that he changed it from

 9   Republican to Democrat, and then I re-triggered the

10   machine for Democrat and he voted Democratic."

11           Now we're moving to Page 35.  This is Mr.

12   Rochelle:

13        Q    "If he had asked you at that time when you

14   asked him do you want to vote Republican because that

15   is what you saw on his application to vote -- what if

16   he had said I only want to vote in the Kurita-Barnes

17   race?

18        A    Well, I would have informed him that he had

19   the wrong -- and he needed to go back to the registrar

20   and change it..  Since he wasn't in the machine yet, he

21   could just go back to the book.

22        Q    From your experience with working with

23   Ms. Pace over all the years, have you found her to be

24   that type of person that if someone had a problem or

25   had an objection, you would work to try to find a
```

1  solution?

2      A   If they came to her with a problem, she would

3  find a solution, yes.  I've been familiar with Ms. Pace

4  for many, many years.

5      Q   Have you ever known Ms. Pace to try to steer

6  people either to a Republican primary or a Democratic

7  primary or try to have any clear impact inside the

8  voting place?

9      A   No, I do not.  And I almost always work

10  directly behind her.

11      Q   Do you believe she's a lady of fine

12  character?

13      A   I do."

14          CHAIRMAN SASSER:  Mr. Rochelle, would this be

15  an appropriate point to take a five minute break?

16  Hearing no objection, we're going the take a five

17  minute break.  Limit it to five minutes.

18          Let's get back here and continue our work.

19  It is five minutes after two.  We're going to reconvene

20  at ten minutes after two.

21  (2:08 p.m., a recess was had until 2:18 p.m.)

22          MR. JOHNSTON:  Mr. Chairman, Members of the

23  Committee, continuing on with the testimony of

24  Mr. Kugler that we just heard from, I'm reading from

25  Page 24 of the transcript:

1      Q    "Did you hear her" -- that's Mrs. Crouch --

2   "complain any or did she report anything to you about

3   Margaret Pace?

4      A    No.

5      Q    Or about anybody trying to misdirect voters?

6      A    No.  I had nobody in the place complain about

7   that to me.  There were a couple of the registrars that

8   made a comment to me they had heard it but I had not

9   firsthand heard it, no."

10          Thank you.

11          CHAIRMAN SASSER:  Thank you, Mr. Johnston.

12   Mr. Rochelle.

13          MR. ROCHELLE:  It's been suggested I try to

14   add a little bit more tone into the delivery here.  I'm

15   hesitant to do that.  Mr. Barnes also submitted

16   evidence, or he submitted evidence of Montgomery County

17   election officials potentially misdirected folks to the

18   Republican primary, one Nancy Burchett, a voter who

19   supported Barnes at the Woodlawn polling place.

20          While Burchett alleges in her affidavit that

21   she asked to vote in the Democratic primary election,

22   documents showed that Burchett voted in the Republican

23   primary ballot.

24          That's shown as Exhibit E to the Kurita

25   Exhibit.

1          She stated that she is told by an election

2    officials that Barnes was on both the Republican and

3    the Democratic ballots.  Testimony from the head

4    election official of the Woodlawn voting or polling

5    location, Milan Lewis, refutes these allegations.

6          I'm on Page 15.  Does anybody want to know

7    what page in the transcript I'm at?  Page 7, you can

8    find it on here:

9    Q    "Mr. Lewis, I'm Bob Rochelle and I represent

10   Senator Kurita along with Mr. Thompson here.  You are

11   at the Woodlawn precinct.  The only thing I know that

12   is alleged about the Woodlawn precinct was something

13   about a Nancy Burchett.  Do you know anything about a

14   Nancy Burchett?

15   A    No.

16   Q    She stated that she was told that Tim Barnes

17   was going to be on both ballots that day.  Did you hear

18   anything like that out there?

19   A    No.

20   Q    Is there anything you know about the

21   proceedings on election day that you think would be

22   relevant to us?

23   A    Not really.  We put both the primaries on the

24   wall, the sample ballots, and explained to the people

25   when they came in the door where you could look at them

```
 1   and we did advise them that it was a primary so

 2   everybody understood what is going on.

 3        Q    What was your position on election day?

 4        A    I was the Official Officer over the precinct.

 5        Q    So you were the top dog?

 6        A    I guess you would call it that.  I was the

 7   one that got the most headaches.

 8        Q    Well, did you report to Vickie, the

 9   Administrator of Elections, any irregularities or other

10   concerns that day about anything that happened at the

11   election?

12        A    I had no complaints, sir.  We have an officer

13   that if there's a problem as far as the voting is

14   concerned, we would send them to her.  And if she

15   didn't have it in the book, we would call Vickie.  But

16   we didn't have any complaints about it.

17        Q    People ask are you a Democrat or Republican

18   or do you ask which primary you want to vote in?

19        A    When you come in the door there's a table set

20   there.  It's set for Republican or Democrat.  They give

21   them the sheet of paper and they tell them you have to

22   decide whether you're Republican or Democrat in the

23   primary.

24        Q    Well, do they ask you to declare whether

25   you're a Democrat or Republican or ask you to declare
```

1    which primary you want to vote in?

2        A    I don't right understand what you meant.  On

3    the registered paper it's got Republican or Democrat.

4    You check one or the other.  That's what the girls tell

5    them, check whether or not you're voting Republican or

6    Democrat."

7              At the Outlaw polling location, Mr. Barnes

8    submitted evidence that voter machine malfunction at

9    the Outlaw polling location prevented his supporter,

10   Debra Jones, who you heard from, from voting in the

11   Democratic primary.

12             This evidence was explained and refuted

13   through the testimony of election officials Aspen

14   Landry and her husband Tom Landry, who were the only

15   two machine operators at the Outlaw polling location.

16             My question:

17       Q    "You said you've read the affidavit of

18   Mrs. Jones and you think you know what she is referring

19   to.

20       A    Uh-huh.

21       Q    Why don't you tell is in your own words what

22   you know about it.

23       A    Okay.  So the little cards -- do you know how

24   machines work?  There's a card that each time somebody

25   comes up to the machine, you see on their little white

```
1   sheet that they've brought up if they have chosen --
2   you know, which party they've chosen to vote in.  I put
3   my card in to start the machine, to activate it and it
4   gives me a choice.  And I read it outloud to them,
5   you've chosen Republican, and I would push the
6   Republican button or the Democratic button.
7           Well, it's not like a debit card.  You don't
8   just slide that card in, pull it out quickly.  If you
9   do, it doesn't have time to read the chip and it won't
10  give you the option to choose Democrat or Republican.
11  It picks it for you randomly.  And so it happened.  I
12  pulled my card out -- this is the first year I've done
13  this -- and it skipped the test.  It didn't let me
14  choose.  All of a sudden it was just -- her ballot was
15  pulled up.  I didn't know if it was this woman because
16  it happened three different times.
17          So when the ballot came up, just ironically
18  it was the correct party that she had chosen so we went
19  on with it.  And I didn't do anything because it was
20  the right ballot and I didn't understand why it did
21  that yet.  And it did it again.  And then on the third
22  time when it did, I finally went and talked to the
23  Special Clerk.  I said, sometimes it doesn't give me
24  the option to choose.  So she gave me the phone and I
25  called the tech.  Then the tech explained to me.  He
```

```
 1   said, well, it's not like a debit card, it has a

 2   microchip on the back.  You have to put it in, give it

 3   time to read it and then you can pull it out.  Sure

 4   enough that was the problem.  So sometimes I would

 5   explain that to the people -- I didn't explain the

 6   first three times because I didn't know what was wrong.

 7   So I just said oh, it didn't give me a choice, but, you

 8   know, here is the right one.

 9          Now, on the third one I put in it and I got

10   frustrated because it didn't give me the choice.  This

11   is right before I talked to the Special Clerk, and I

12   called the tech.  So I told my husband.  Said, Tom,

13   this is the third time this has happened, it didn't

14   give me a choice, you know, I said -- pulled it up and

15   I said let me go talk to somebody.  This woman was

16   standing there and she didn't know what was going on.

17   Maybe this was the Debra because this is the one -- I

18   finally vocalized it to somebody and Tom said, well, so

19   she doesn't have to wait, my machine is open, she can

20   come over and use my machine while you figure it out.

21   I said let me at least look at the machine and see.

22   And it happened to be the right one.  So she used it.

23   I mean it was the correct -- everybody that used my

24   machine voted for the party that they wanted to vote

25   for.  But there was some confusion on that because my
```

```
 1    card -- I didn't understand that you can't put it in so

 2    quickly and remove it right away.  You have to give it

 3    a minute.  But everybody voted for the party that they

 4    wanted to vote for."

 5            Remember Debra Jones thought, notwithstanding

 6    all her certifications about the Democratic Party, she

 7    thought she voted in the Republican Party.  She didn't.

 8        Q    "When you say that, do you know that because

 9    you were looking at their application to vote where

10    they had marked either Democrat or Republican?

11        A    That's correct.

12        Q    And I take it you pulled it out quick, then

13    it put in the Democratic primary.

14        A    It must have.  It was the correct one.

15    Because when the ballot comes up it tells you on the

16    upper right hand -- left hand portion of the screen

17    which ballot has been pulled up.  So you can check

18    right there, you know which ballot it is because it

19    tells you.

20        Q    It tells you which one they're voting?

21        A    That's correct.

22        Q    And you can compare what is on the machine

23    with what it says on the application to vote --

24        A    That's correct.

25        Q    -- that you have in your hand?
```

```
 1        A    That's correct.

 2        Q    And so on all three of these instances where

 3   you pull the card out --

 4        A    Yes.

 5        Q    -- on all three of them, whichever primary

 6   popped up, it was the primary that was on the

 7   application to vote?

 8        A    Exactly.

 9        Q    So if Debra Jones was one of those three, she

10   would have heard you say something like this machine is

11   not working or something like that.

12        A    That's correct.  And we had several people

13   complain because they didn't see the person on their

14   ballot that they wanted.  And we had to explain to them

15   this is a primary and they were only going to see the

16   Republican nominees or the Democrats, you know so lots

17   of them didn't understand that that's what they were

18   coming to vote for.  So maybe she was confused on that.

19   She heard me say the machine wasn't working properly

20   and she didn't get to see the name, so perhaps she got

21   confused.  I don't know.

22        Q    Okay.  But on these three instances -- which

23   I take it were the only three instances at the Outlaw

24   precinct when this happened?

25        A    Yes.
```

```
1          Q    On those three instances, all three of them

2    voted in the primary that they had chosen on their

3    application?

4          A    That's correct.

5          Q    In the affidavit it said the woman working

6    the machine said she could not get Democrat to come up

7    and I would have to vote Republican.  You were the only

8    woman machine operator?

9          A    That's right.

10         Q    Did you state to her you could not get

11   Democratic to come up and she would have to vote

12   Republican?

13         A    No, sir."

14              This is the testimony of Tom Landry.  We did

15   have a little spree where we had to talk about Coach

16   Landry.  I wasn't going to repeat it to you.

17              My question:

18         Q    "Your wife has explained to us about an error

19   --

20         A    In the machine.

21         Q    Where she was not keeping the chip down long

22   enough?

23         A    Right.

24         Q    It sounded from her testimony like you two

25   were sitting close to each other?
```

```
 1        A      Yeah.  We were about five feet apart, ten

 2   feet.

 3        Q      Did she voice concerns to you as to what was

 4   happening?

 5        A      Yeah, she explained it as it happened.

 6        Q      Did she make statements to you about whether

 7   she had any instance where the machine wouldn't --

 8   didn't come up with the primary that the voter wanted

 9   to vote in according to their application?

10        A      Yeah.  And, actually, on one occasion I

11   actually stepped in.  As the voter -- there was the

12   question and the voter stood back and I kind of helped

13   her figure out the problem.  Then we realized, like I'm

14   sure she told you, that it happened to be the correct

15   primary list.  And then we let the voter in.  Oh yeah,

16   I was intimately involved as well.

17        Q      Okay.  So for all three -- she said there

18   were three instances.  Were you aware of all three

19   instances?

20        A      Yeah.  I don't remember in what order they

21   happened but I remember that either -- there was the

22   one I told you about where I was part of it beforehand

23   and the other two at least afterwards, if not, during a

24   problem.

25        Q      On all three of those can you verify that the
```

1    primary that came up on the machine -- even though she

2    pulled the card out too fast, the primary that came up

3    on it was the primary that the person had chosen on

4    their application to vote?

5        A    That's what I remembered, yes.  But she told

6    me I wouldn't -- I didn't see the voter registration

7    card -- I'm not sure what you would call it.  But that

8    is what she said to me.  That's from what I remember.

9        Q    Alright.  You were there listening.  Did you

10   hear her tell anybody about -- there was a Debra Jones

11   where Mr. Barnes filed an affidavit that said the woman

12   operator told me I couldn't -- the machine wouldn't let

13   me vote Democrat, I had to vote Republican?

14       A    I don't remember that, no."

15            Mr. Barnes submitted one of his supporters,

16   Peter Napolitano had difficulties in obtaining a

17   primary -- no party primary ballot at the St.

18   Bartholomew (sic) polling location.

19            He alleged in his affidavit that he first

20   requested to vote in the Republican primary but having

21   going through several screens on the voting machine

22   decided he would rather vote in the Democratic primary.

23   Through the assistance of election officials, he admits

24   he was eventually able to vote in the Democratic

25   primary.

1          Nevertheless, he alleged that when he was

2     asked to change his primary choice, election officials

3     initially advised him it's too late.  This allegation

4     is refuted by the following testimony of machine

5     operator Michael Ponder, who was at the St. Bartholomew

6     (sic) polling location and believes he may have

7     assisted Mr. Napolitano.

8          Q    "This was a fella that came in and said I'm a

9     Republican, he signed his application to vote?

10         A    I don't remember that.  I remember -- this is

11    my second time to work at the precinct.  I worked

12    another precinct prior.  But there was an experienced

13    person in front of me.  And she said, even though they

14    marked Republican or Democrat or Independent, whatever,

15    you need to -- I always ask them again so that they're

16    sure.  So I did everybody that day, so you're voting

17    Republican, so you're voting Democrat today? So then I

18    go ahead and punch the card in.  If he asks me -- or I

19    ask him.  I mean, whatever it was, Republican or

20    Democratic.  I don't know which one it was.  I would

21    ask them.

22         Q    Basically what happened was a fella comes in

23    and signs up for one primary, then he gets to you he's

24    marked some of his ballots on the ballot but he hasn't

25    cast a vote yet, pressed the red button, and he changes

1    his mind and decides he wants to be a Democrat that

2    day.  And you had one of those instances?

3         A    Yes.

4         Q    And what you did was to go back and sort of

5    backtrack everything and let him sign he wanted to vote

6    in the other primary, let him sign again the list that

7    he wanted to vote in the other primary, and let him

8    bring that new application to vote to you with a

9    different primary marked on it and you let him vote in

10   a different primary?

11        A    Yes.  I called Karen and she did that.  I

12   didn't do that all -- I didn't do that all of that.

13        Q    And is that what you found, that if a voter

14   will let you know there's a problem or they want to

15   backup on their choices earlier made, that before they

16   cast that vote, that you will work with them to try to

17   find the solution?

18        A    Oh, yeah.  Before they cast that vote.

19             As best I remember, I said we have a person

20   here who wanted to vote for somebody but they marked

21   the wrong ticket but they have not hit the red button

22   to cast their vote.  Can anything be done?  One person

23   says yes, I think you can.  And one person grabbed the

24   rules, or whatever, and we called Karen all at the same

25   time.  And Karen came over there.  They made the

1  decision, yes, what we'll do, he hasn't done that yet,

2  we can cancel that out, we'll go back to the

3  registration table.  Sent him back over there, he

4  filled out the other party, he initialed where he had

5  struck out on the -- where he had struck out the

6  original party to vote for.

7      Q    So your recollection is the two election

8  persons came over before Karen did, one was yay and one

9  was nay?

10     A    Oh, I don't remember a nay.  I don't remember

11  a nay. "

12          Remember Mr. Napolitano today was telling you

13  oh, we can't do anything.  The testimony of these folks

14  is everybody was saying if you want to backup, we'll

15  help you back up.

16     Q    "I thought you said one of them said you

17  could and one of them said you couldn't?

18     A    No.  If I did, I'm sorry.  I didn't mean to

19  mislead you there.  No, they were saying, can we do

20  something?  Of course, I didn't know whether you could

21  or not.  I presumed you could.  I didn't know how to do

22  it, not knowing the process.  No, I don't recall

23  anybody saying you could not do that.  Obviously we

24  know you cannot do that after you hit the red button."

25          The Sango polling location is the failsafe

```
 1   thing.  He asserts that -- well, he said two supporters

 2   in the last documents that he filed.  There is no

 3   evidence whatsoever about this Mrs. Quiles, and she was

 4   not alleged in the original contest.  We didn't know

 5   about her until we got the last document from

 6   Mr. Barnes' team.  We're going to talk about him

 7   anyway.

 8            "We were improperly denied the opportunity to

 9   vote at the Sango polling plate.  Contestant presumably

10   supports this allegation with the affidavit of Jesus

11   Quiles in which affidavit there is no mention of

12   Mr. Quiles's wife.

13            Nevertheless, Vickie Koelman the

14   Administrator of Election, testified Mr. Quiles was not

15   a registered voter at the Sango polling location and

16   never had been to her knowledge.

17            Further, Ms. Koelman testified that if Mr.

18   Quiles had never lived in the Sango voting -- polling

19   precinct, then he would not have been entitled to a

20   provisional or failsafe ballot."

21            Ms. Koelman specifically testified as

22   follows:  Here we go:

23      Q    "As I understand it, Mr. Quiles was

24   registered in the 20th District?

25      A    Yes, sir.
```

```
 1          Q     Which one is that?

 2          A     Currently Clarksville High School.

 3          Q     He was registered in 2002?

 4          A     Yes, sir.

 5          Q     And in 2007 he moved?

 6          A     That's correct.

 7          Q     But he moved within the 20th precinct?

 8          A     That's correct.

 9          Q     And the next we knew of him was in August of

10    '08 where he shows up at the Sango precinct.

11          A     I don't know that.

12          Q     You don't know that he showed up at the Sango

13    precinct?

14          A     No, sir.

15          Q     You know in the affidavit is filed by

16    Mr. Barnes --

17          A     That's correct.

18          Q     -- it's alleged that he showed up at the

19    Sango precinct to vote?

20          A     (Witness moves head up and down.)

21          Q     Of course, if he shows up there and they

22    don't have him on their list -- if he had just gone to

23    the voting place on his registration card, would he

24    have been able to vote?

25          A     If that's where he still lives, yes, sir.
```

1      Q    As far as you know, your records don't

2  indicate that he has filed any other change of address?

3      A    No, sir.

4      Q    Let me go back to Mr. Quiles for a minute.

5  Now, I I have on your record that he registered in

6  2002, he notified you December 31st.  I think that"--

7  "of '07.  You listed his new address at 3123 Holly

8  Point.  I see nothing else.  Does that mean he's not

9  made any contact with you about changing his address

10  from 3123?

11      A    That's correct.

12      Q    Have you had any contact from Mr. Quiles with

13  regard to his inability to vote on election day?

14      A    No, sir.

15      Q    Are you aware of whether or not -- I take it

16  other employees are here.  You can't be here all the

17  time, although I'm sure you're here most of the time.

18  You have other employees.  I take it they're aware of

19  this contest.  I take it they're probably aware of

20  Jesus Quiles.  Have any of your workers reported

21  anything at all about Mr. Quiles?

22      A    I won't say my staff is aware of all the

23  allegations or of all of the -- with this contest.  But

24  that copy I made for you was made after you arrived

25  here today.  And that card would reflect if we had

1    updated his address and it does not.

2        Q    Have any of your employees notified you or

3    informed you of any contact with Mr. Quiles with this

4    office?

5        A    No.  That's what I'm trying to say.  That

6    record right here would have reflected had we updated

7    his address.

8        Q    Well, I'm just talking about any contact at

9    all with the office in regard to election day or change

10   of address, any type of contact with Mr. Quiles with

11   this office, have you had anything reported to you?

12       A    No, sir.

13            Mr. Johnston:  May we get a copy of that by

14   the way?

15            Mr. Maness:  Sure.

16       Q    Is there any record at all that he showed up

17   at the Sango precinct other than his affidavit?

18       A    I do not have anything to reflect that he

19   showed up there."

20            Mr. Barrett:

21       Q    Now, if I walk in a precinct, show an I.D.

22   card and ask for a ballot, they are going to first

23   determine if I'm a register voter, right?

24       A    If I could explain the procedure.  When you

25   first enter the precinct, you'll go to the application

1  table wherein you will fill out your application.  Once

2  it's complete, then you'll be sent to the table with

3  the signature book or the poll books on them for your

4  letter of the alphabet.  At that point, we will

5  determine if you are a registered voter in that

6  precinct, if your address matches and where you go from

7  there.

8      Q    Suppose my address doesn't match my

9  application?

10     A    What's in the book doesn't match what's in

11  the application, then you are sent to what I call a

12  Special Clerk.  I have one, possibly two in every

13  precinct.  And that person is trained to have you fill

14  out a failsafe change of address form at which time a

15  phone call is made into the election office.  We will

16  take that information that the person has placed on the

17  form and we will precinct them into the proper precinct

18  with their new address.  And at that point we will say,

19  okay, you're in the same -- if they stayed in the same

20  precinct, they get to vote.  You mark a certain thing

21  on your application and then you authorize them to vote

22  there.  Or if they have been precincted to a different

23  precinct, we tell them that they will no longer get to

24  vote there, you will send them, you know, to another

25  precinct.

1      Q    Suppose it's too late to go to the other

2  precinct, that the polls would be closed by the time

3  you had to go all the way across Montgomery County?  If

4  I showed up at a quarter till 7 in the east end of the

5  county and I'm a registered voter but I'm in the wrong

6  precinct there's no way to get to the west end of the

7  county by 7:00, am I allowed to cast any kind of

8  ballot?

9      A    No, sir.

10     Q    Can't vote.

11     A    No, sir.  You're entitled to vote but you're

12 entitled to vote while the polls are open at the

13 precinct for your address where you currently live.

14     Q    There's no provisional ballot or failsafe

15 ballot for that purpose?

16     A    No, sir."

17          There's been nothing mentioned thus far today

18 about the early polling location, I don't believe, but

19 they asserted it in the contest.  George may get the

20 last say today, may bring it up then so I got to give

21 you what I got.

22          CHAIRMAN SASSER:  Mr. Rochelle, I wanted to

23 check and see.

24          A SPEAKER:  13 minutes.

25          MR. JOHNSTON:  We have a little bit of

```
1   testimony to read in.

2            CHAIRMAN SASSER:  Okay.  Mr. Johnston.

3            MR. JOHNSTON:  This is from Page 128 and 129

4   of the transcript beginning here at line 22, asking:

5       Q    "Did you have any calls about

6   questions/queries of officers of any of the elections

7   about the right of the person who has marked but not

8   cast his or her ballot and then wanting to change the

9   vote because they can't find Tim Barnes or Rosalind

10  Kurita's name on the ballot and realized they were in

11  the wrong primary?  Did you have any calls?

12      A    Yes, sir.  We would have had several calls.

13  We had several inquiries during early voting as well.

14  Voters in general were very confused as to what party

15  they wanted to vote in."

16           Then continuing over on Page 145:

17      Q    "Did you contact your state contact -- I

18  guess it would be Brook Thompson -- as to those rumors

19  you had heard?"

20           These were rumors about Republican messing

21  around in the Democratic primary.

22      A    "I did have a conversation with Brook

23  Thompson concerning people crossing over and voting in

24  one primary versus another.

25      Q    Was in it response to the rumors that you had
```

```
 1   heard or for some other reason?
 2        A    Just general information."
 3             Thank you.
 4             CHAIRMAN SASSER:  Thank you, Mr. Johnston.
 5             MR. ROCHELLE:  You hadn't heard anything
 6   about this but it was in the contest, an allegation
 7   that a lady named Catherine Grizzard made a complaint
 8   about Senator Kurita soliciting votes during the early
 9   voting period and so we questioned Vickie Koelman, the
10   Election Administrator, about that.  The early vote box
11   was at the Election Commission:
12             Mr. Barrett:
13        Q    "Would you explain the nature of that
14   complaint, what you did about it?
15        A    I had walked to the front office to the front
16   lobby to assist someone coming in that I felt was
17   handicapped, needed assistance coming to the door.
18   This lady approached me and she was leaving the
19   building and she asked me why she was here.
20        Q    Well, what did you understand she was
21   referring to?
22        A    I said, are you referring to Senator Kurita?
23   She said yes.  Well, she's here to vote.  She said,
24   well, she shouldn't be allowed to do that.  I said,
25   well, she's entitled to vote.  And she said, well, what
```

1    about all the cameras?  I said, well, that's the media

2    and they're allowed to be here as well.  And she said,

3    I thought your sign said no campaigning in the polling

4    place and you won't let us wear buttons and stickers

5    and pins.  I said, that's correct.  She said, next time

6    I'm going to wear mine.  I said, no, ma'am, you can't.

7    She said, well, she shouldn't be allowed to do that.  I

8    said, she's entitled to vote.  And she said, somebody

9    should do something about that.  I said, well, I'm the

10    administrator and there's not anything I can do; she's

11    entitled to vote and the media is entitled to be here.

12    And she continued to complain."

13          Then there was my questioning:

14       Q    "I think the gist of her complaint was that

15    she was here and the media and cameras -- and the media

16    were here, the cameras.  Well, if Senator Kurita

17    appeared at your door during early voting, is she an

18    eligible voter?

19       A    Yes, sir, that's what I tried -- that's what

20    I explained to the lady.

21       Q    So she would be allowed -- I think the

22    statute specifically allows her to come in and vote.

23       A    That's correct.

24       Q    Do you have any knowledge that she did

25    anything other than what the law allows her to do?

```
 1        A    No, sir."
 2             MR. ROCHELLE:  Now, there hadn't been any
 3   testimony offered about two unexplained voters that
 4   came in, that was discovered by the local --
 5             MR. BARRETT:  Let me pop in on that.
 6             CHAIRMAN SASSER:  Did you want to add
 7   something to that bit of testimony?
 8             MR. BARRETT:  Just about three lines.  This
 9   is after the complaint from Ms. Grizzard:
10        Q    "Alright.  As a result of your conversation,
11   did you issue any caution or warning to Senator Kurita
12   or anything?
13        A    I did not.  I was not close enough to Senator
14   Kurita to anything she was saying to people so I did
15   not."
16             She's talking about Senator Kurita was in the
17   early voting precinct.  So she really didn't -- wasn't
18   in a position to know whether or not she campaigned or
19   not in the early voting precinct.
20             CHAIRMAN SASSER:  Thank you Mr. Barrett.  Mr.
21   Rochelle.
22             MR. ROCHELLE:  Alright.  On Page 27, it says
23   two unexplained votes.  That came in after the five day
24   jurisdictional time limit.  I'm not going to read all
25   this to you unless you want me to.
```

```
 1            I don't think you can consider it.  Mr.
 2   Barrett may differ with me.  He if he does, I'll come
 3   back and ask to read it.
 4            Over on complaints or lack thereof to
 5   Administrator of Elections, it's on Page 29, you can
 6   read that as you wish but it's sort of duplicative and
 7   very long.  And so I'm going to skip that part unless
 8   you tell me you want to hear about it.  I would
 9   encourage you to read it.
10            When we get to crossovers and absence of poll
11   watchers to challenge them, again, I encourage you to
12   read it and I would say to you that even though they
13   haven't introduced any evidence yet, we're assuming
14   they're going to talk about it at the same time, we're
15   going to have Mr. Thompson now, Price Thompson come and
16   talk to you about this idea of crossover polling or
17   crossover voters.  Price.
18            MR. THOMPSON:  Ladies and gentlemen of the
19   Subcommittee, I would like to direct you to Page 33 of
20   the reply argument that was filed on behalf of
21   Ms. Kurita.  It's portion that says, "'CROSSOVERS' AND
22   ABSENCE OF POLL WATCHERS TO CHALLENGE THEM".
23            Mr. Barnes alleges that there were at least
24   731 individuals who had voted in past Republican
25   primaries and no past Democratic primaries that voted
```

1    in the District 22 Democratic primary.  While this

2    statistic gives no indication as to which Democratic

3    candidate for whom these individuals voted or why these

4    individuals crossed the line, whether they were even

5    interested in Mr. Barnes' race, Barnes argues that

6    since these individuals constitutes -- I've got

7    8.02 percent.  It's actually 8.019 percent.

8            I will tell you why it's important in a

9    second.  8.019 of all Democratic primary voters, the

10   election should be invalidated because of the massive

11   volume of Republican raiders.

12           Mr. Barnes fails to provide any context

13   however to support this conclusion and I just wanted to

14   submit these other results for your consideration.  If

15   8.019 is a massive influx of the Republican raiders as

16   Mr. Barnes quotes, then the 17,517 Republican voters

17   that voted in the 2006 Democratic primary for U.S.

18   Senate is preposterous, and that's only 3.81 percent

19   but it's still a massive amount of Republicans voting

20   in the Democratic primary.  We didn't hear any of these

21   outcries of the election needed to be invalidated.

22           If you'll turnover to the next page, you'll

23   see in the Republican primary for the U.S. Senate that

24   year, Mr. Corker's race, there were 31,799 Democrats

25   that crossed the line and voted in that primary who had

1   never voted in the Republican primary before.  That's

2   6.57 percent.

3          So that's nearing the measure that Mr. Barnes

4   has stated is a massive influx.  It appears Democrat

5   party members are just as, quote unquote, guilty of

6   crossing over as Republicans.

7          You move on down to house District 65, in

8   '06, there were 586 individuals that had never voted in

9   a Republican primary -- excuse me, never voted in a

10  Democratic primary before who had voted in the past

11  Republican primary that crossed the line and voted in

12  the Democratic primary.  7.07 percent.

13         Move on down District 42, Democratic primary,

14  5.65 percent.  Again, we're talking about one or two

15  percentages different from this election that is

16  claimed to be just a disenfranchised of his supporters.

17         Now, we couldn't get the 2008 results until

18  this morning but I would like to point out that in

19  House District 77, this is only a month ago, Judy

20  Barker won her primary and there was an influx of 536

21  Republican voters who had never voted in a Democratic

22  primary before but had voted in past Republican

23  primaries, and I'll put it up on the evidence presenter

24  to see better.  That is 8.024 percent, which it greater

25  than the amount that Mr. Barnes claims invalidates his

```
 1    selection.
 2             So Ms. Barker, your friends need to tell her
 3    about that because she may have problems next year --
 4    two years.
 5             What this boils down to is I don't think the
 6    number that has occurred in Montgomery County is
 7    something that is unusual, it's been that way, and for
 8    us to try to make a referendum about it here today, I
 9    believe as Mr. Rochelle put in his brief, is playing
10    with razor blades as someone said in one of the
11    articles that I've read about this event.
12             One other thing that Mr. Barnes, in one hand
13    he claims there was just this massive influx of
14    Republicans voting in this primary.  He claims that he
15    heard rumors that this was going to happen yet he
16    didn't utilize the remedy in the State Law for
17    preventing crossover voters.  That's to have poll
18    watchers in the polling location and challenge voters
19    if you don't think they're a person that needs to be
20    voting in the Democratic primary.
21             He just didn't do that.
22             And Ms. Koelman, who is the Administrator of
23    Elections in Montgomery County had this to say about
24    poll watchers on Page 34 of our reply argument.  This
25    is in relation to the rumors that she heard prior to
```

```
 1    the election that there was going to be a lot of

 2    Republicans voting or Republican primary voters voting

 3    in the Democratic primary.

 4          Ms. Koelman says, "I spoke with Brook

 5    Thompson and there was no instruction from him that

 6    there was any action on my part to take."  Mr.

 7    Rochelle:

 8       Q    "Alright.  When you spoke with Brook, you

 9    said you spoke to him about -- am I correct that you

10    say you want to be a Democrat that day, you can be a

11    Democrat for a day or for an hour or for 15 minutes,

12    however long it takes you to vote?  Is that the nature

13    of the conversation you had with Mr. Thompson?

14       A    That's correct.  My concern was in regard to

15    challenging the voters, what obligation do we have as

16    election officials concerning that.

17       Q    Do you know whether Mr. Barnes' poll watchers

18    challenged any voters because they weren't Democrats

19    and they had chosen to vote in the Democratic primary?

20       A    There were no poll watchers for either party

21    in this election.

22       Q    And there were no challenges made in the

23    voting places in regards to the rights of some person

24    who says I want to vote in the Democrat primary.

25       A    That's correct, no, sir."
```

```
 1              What we're getting at, he had every right in
 2    the world to have voters there, poll watchers there to
 3    challenge and he didn't take this opportunity to do it.
 4    So that's the gist of this.
 5              I think that 8.019 percent is not too many.
 6    Is not an unusual occurrence.  It happens ever year in
 7    Tennessee primaries.  For this to be invalidated on
 8    this basis is just not supported by the evidence.
 9              Thank you.
10              If I could file as exhibits, this voter
11    analysis of House District 77, and I apologize if my
12    voice is about gone.
13              CHAIRMAN SASSER:  We'll consider both of
14    those.  It's been brought to my attention that counsel
15    for both sides has right about five minutes left.  I
16    understand there might be a witness that this Committee
17    would like to have some time to hear from.
18              I don't want to keep -- this Committee has
19    been very, very patient.  Would it be helpful to each
20    side if we gave each side about another five more
21    minutes?  We don't agree on that, I'll stick to the
22    time limit we set.
23              Would that be alright?  For the record, can
24    both counsel indicate that is acceptable?
25              MR. ROCHELLE:  Yes, sir.
```

```
 1               MR. JOHNSTON:  On behalf of Mr. Barnes,
 2     that's acceptable.
 3               MR. ROCHELLE:  We'll do our best.
 4               CHAIRMAN SASSER:  We're going to have to add
 5     five minutes to each person's time and be very
 6     stringent on what we keep.
 7               Mr. Owen has got a question.  Again, when
 8     you're taking questions from the Committee, doesn't
 9     count against your time.
10               MR. OWEN:  Thank you very much.  On these
11     cases that you cited with the crossovers and percentage
12     and everything, are you -- what was the new -- you
13     specifically cited the Barker race.
14               What was the margin in that race, margin of
15     victory?
16               MR. THOMPSON:  I do not know that answer, Mr.
17     Owen.  All I have is the primary analysis that the
18     party did.
19               MR. OWEN:  The other races, do you know if
20     those were close races or maybe someone from
21     Ms. Barker's district can --
22               CHAIRMAN SASSER:  If I can respond to Mr.
23     Owen's request, if it's okay with counsel for both
24     parties, we have Internet access and can provide
25     answers to the questions of margin of victory, who won
```

1    each one of elections as received based upon the State

2    of Tennessee's website?

3            Is that accept to both counsels?

4            MR. ROCHELLE:  Yes.

5            MR. JOHNSTON:  Yes.

6            CHAIRMAN SASSER:  Let the record show counsel

7    for both parties agreed with that conclusion.

8            Mr. Yarbro, if you could determine what those

9    were, we will make that information available right

10   prior to closing arguments, if that's okay.

11           MR. THOMPSON:  I would point out for the

12   record in response to Senator Owen, that the allegation

13   here that there's been a massive influx of Republican

14   crossover votes -- not as much in this particular

15   argument, that the 19 votes is what they're complaining

16   about.

17           I do have four other exhibits just for the

18   record I'd like to make.

19           CHAIRMAN SASSER:  We'll be glad to accept

20   those exhibits.  I wanted to make sure, has Mr. Barnes

21   seen what's being offered as an exhibit?

22           MR. BARRETT:  No, we have not.

23           MR. THOMPSON:  These are the four exhibits on

24   my reply and this one is the one I brought up this

25   morning.  I think you were e-mailed by the party.

```
 1              MR. BARRETT:    Our copy?

 2              MR. THOMPSON:  I'll need to keep that one.

 3   This is what I'm making an exhibit.

 4              MR. JOHNSTON:  May I respond to Senator

 5   Owen's question as well?  I think he was kind of

 6   addressing everybody in this.

 7              Let me try to go through and explain because,

 8   Senator, you've hit the nail on the head with your

 9   question about the margin of victory and why the

10   percentage in this case is as we described it massive.

11              I really didn't have time because I didn't

12   get these other four until this morning to look at them

13   in any detail, but I tried to look at the first four or

14   three, four that they had and try to analyze those.

15              Let me kind of -- as I go through this, I'll

16   put this up so you can see what I'm talking about.  The

17   first one here was the --

18              MR. ROCHELLE:  Could I inquire, is this part

19   of the evidence that you're presenting or --

20              MR. JOHNSTON:  It's a response to Senator

21   Owen's question about the percentage and why they're

22   important.

23              MR. ROCHELLE:  I need you to ask me a

24   question.

25              CHAIRMAN SASSER:  What we'll do, we'll let
```

Beres & Associates

1   Mr. Johnston use this time as a response to Mr. Owen's

2   question and then I'm going to let Mr. Rochelle present

3   some rebuttal testimony to whatever Mr. Johnston wants

4   to say.

5           I would encourage both parties, you know, be

6   as efficient in your use of the English language as you

7   can.

8           MR. JOHNSTON:  First of all, I've got some

9   handwritten notes, I won't put those up because nobody

10  will be able the read them.

11          In the U.S. Senate Democratic primary in

12  2006, there's a total -- this is on this, 420 --

13  421,996 total votes in that race.  You'll recall that

14  that was a multiperson race although we probably don't

15  remember very much other than Congressman Ford.

16  Congressman Ford won that race with a total vote of

17  333,000 plus votes.

18          Looking at the -- looking at the document

19  here, just to make sure that everybody understands what

20  we're looking at, the top portion of this shows a

21  breakdown of the Democratic vote by prior Democratic

22  primaries and the first number up there, 113,400,

23  represents Democratic voters, voters who voted in that

24  Democratic primary who had never before voted in a

25  Democratic primary.

1          The second is a breakdown of that 113,400.

2    Giving the benefit of the doubt here -- it shows that

3    95,883 of that 113,000 or 84.6 percent had never voted

4    in the Republican primary, either.

5          So these are people that have just moved

6    here, never voted before whatever.  Taken into

7    consideration we're talking about the last nine years

8    as well.

9          If you add together the zeroes and the 1s

10   which I think we all would agree, those aren't hardcore

11   Republican voters.  Those are Independents, people who

12   could swish, whatever.

13         93.4 percent of that 113,000, the more

14   hardcore Republicans are those who have voted

15   consistently over that period of time in Republican

16   primary after Republican primary after Republican

17   primary.

18         Just arbitrarily I picked four or more.  If

19   you add those together that comes up to a wopping

20   1,536.  That is 1.3 percent of those voters who had not

21   previously voted in a Democratic primary.  1.3 percent.

22   That's 1,536 people.  There's no way that that would

23   have had any influence whatsoever on a victory of

24   333,000 votes.

25         Moving on to in the Republican primary, I

```
 1   don't know the margin of victory here but what you're
 2   seeing is very similar numbers, the zeroes, those
 3   people who had never before voted in a Republican
 4   primary, in this case, 78 1/2 percent.  Adding the 1s
 5   and zeroes together, 89.4 percent.
 6           The more hardcore Democrats that crossed
 7   over, a total of 3,921, 2.6 percent.  Hardly anything.
 8   Didn't affect the outcome in that race at all.
 9           House District 65 is another one of those
10   that they've picked out.  This I've also got some
11   handwritten up there.  This was Eddie Bass and Lee
12   Bussart Bowles.  The totals there, 4,378 for Mr. Bass,
13   3503.  Vote difference of 875.
14           Looking down at the second number, if you
15   added up the four and overs, that comes to 3.1 percent
16   of the total vote.  You're talking about 15 votes.
17   That didn't make a difference in this race.
18           In fact, if you added up all of the
19   Republican votes cast, every single one of them from 1
20   on down, it only comes to 586.  It didn't make a
21   difference.
22           In House 42, the other one that they asked
23   for.  This was a multicandidate race, Louis Coomer,
24   Henry Fincher, Thomas Willoughby and Charles Womack.
25           I've taken these numbers from the website so,
```

1    Mr. Coomer, 1956; Henry Fincher, 3515; Thomas

2    Willoughby, 204, Charles Womack, 2817.

3              The difference between Mr. -- between number

4    1 and number 2, 698.  The total Republican vote, any

5    person that had voted previously in a Republican

6    primary one or more times, 496.  It did not make a

7    difference.

8              Seventy-five percent of these voters were

9    first time voters.  88 percent adding the 1s and the

10   zeroes and the more persistent of the Republican

11   crossover, a total of 39 or two percent.

12             Now, let's contrast that with this race.  In

13   this particular race, you had a total of 9,115 ballots

14   cast.  Of those, 1,289 had never previously voted in a

15   Democratic primary.

16             That's the second breakdown.  The total

17   there, 1,289 conforms to the top number up here.

18             Of that number, only 558 or 43 percent, way,

19   way less than the other numbers we've looked at, all in

20   the 70s or even 80 percentile of those first time

21   voters crossing over.

22             Adding the 1s and the zeroes, only brings it

23   up to 57 percent.  Substantially below the other

24   numbers that we've seen here.

25             Importantly, let's take a look over here at

 1   the consistent Republican voters, four or more times,

 2   adds up to 284 votes.  That is 15 times the margin of

 3   victory in this case and it amounts to 22 percent of

 4   that vote.  The numbers are drastically different and

 5   that is why this is different.

 6        CHAIRMAN SASSER:  Mr. Rochelle, would you,

 7   rather Mr. Johnston to answer that question, I would

 8   like to extend the same courtesy to you to respond to

 9   Senator Owen's question.

10        MR. ROCHELLE:  Well, I'm not the one to

11   respond to Senator Owen's question.

12        MR. BARRETT:  Cannot hear you, Bob.

13        MR. ROCHELLE:  The fact of the matter is when

14   they started asking for these voter analysis things,

15   evidently for Doug to go through, we went looking and

16   we came back with comparisons based on the same

17   formulas used by the party in building the sheet, and

18   that comes back and says while there's some more in

19   2008, that it is not a massive number.

20        Now, we can talk about that more in our

21   closing arguments.  The key thing is did anybody

22   perpetuate a fraud?  You got Republicans crossover,

23   Democrats crossover.  Where is the fraud?

24        You have Mr. Thompson here.  I think he's

25   still sitting back there.  You may want to call up and

```
 1    ask him.  Who committed a crime that day?  Who

 2    committed a fraud that day?

 3              So, no.  We did the analysis according to the

 4    way the party had done the analysis.  We're not aware

 5    that Mr. Barnes' team was going to run other formulas

 6    to them, other computer analysis to them.

 7              I'm sure if we had more time we could show

 8    you the different analysis that they've done and I

 9    think it will come out the same, the same result.

10              CHAIRMAN SASSER:  Thank you.  We're going --

11    as soon as Mr. -- Mr. Rochelle are you ready to call

12    the witness?  As soon as Mr. Rochelle calls his next

13    witness, we're going to start the timers again with the

14    notation that we're going to give you five more minutes

15    time than we originally allocated.

16              I would ask to stick to that time and we'll

17    move directly to closing statement.

18              MR. ROCHELLE:  We have one witness.  Call

19    Senator Rosalind Kurita.

20

21

22

23

24

25                          - - -
```

1                    ROSALIND KURITA,

2     having been first duly sworn, testified as follows:

3  DIRECT EXAMINATION BY MR. ROCHELLE:

4     Q    Senator Kurita, if you would, tell us about

5  yourself, who you are, and how did you get here?

6     A    For those of you who don't know, I'm Rosalind

7  Kurita.  I am State Senator.

8          I never started out to be in politics.  The

9  way that I got involved in politics, when my children

10 were small they attended East Montgomery Public School.

11 There was no lunch room at the school.  I wanted my

12 children to have the best public education they could

13 and like many women, I started speaking up.  I worked,

14 I spoke up, I organized and I got us a lunch room.

15         I ran for the County Commission because I

16 wanted to be sure that public education in Montgomery

17 County was funded.  I saw that I could do that, that I

18 could help people and I found a home in the Democratic

19 Party where I could work for the things that I believe

20 in.

21         I'm a pro choice woman and I have been an

22 unwavering supporter of reproductive rights for women

23 in the State Senate.

24         I have helped many Democratic candidates.  I

25 worked, gave great numbers of time for Bredesen when he

1    ran.  In fact, I was one of his designated speakers.

2              I've worked in a number of Senate campaigns.

3    Senator Henry.  Had my children in Senator Jim Kyle's

4    district putting up yard signs for him.  I have been a

5    member of the Tennessee Democratic Finance Committee

6    for years where I've given money.

7              I also have especially tried to help women

8    candidates to learn how to run for office because I

9    think that we need more women in politics and, again, I

10   found the Democratic Party to be the place where women

11   could make moves forward.

12             I have a one hundred percent voting record

13   with the TEA.  That means that on every single issue

14   that the Tennessee Education Association had an issue,

15   I was there for them because I support public

16   education.

17             I am incredibly green.  I was even an

18   environmentalist before it was cool.  This year I

19   received an award from the conservation voters.  I

20   serve on the Governor's Energy Task Force.  I am

21   committed to seeing us get off the fossil fuel

22   addiction.  We cannot drill our way out of this

23   problem.

24             I represent Fort Campbell uniquely.  I take

25   care of my Veterans.  This year I was able to get tax

```
 1    relief for my disabled Veterans that had never had it
 2    before.  Those are the kinds of issues that I work on.
 3    That's what I do.
 4              I have been -- I am a nurse.  I care about
 5    healthcare.  For years I personally worked to get the
 6    cigarette tax increased and I also got cigarette
 7    smoking outs of the Capitol, much to the chagrin of
 8    some.
 9              In the absolutely last moments of trying to
10    pass the cigarette tax I think my single coup was that
11    I was able to add two cents to the cigarette tax to
12    fund our trauma hospitals.
13              And so you know what a trauma hospital is,
14    it's a place where you go when you have your child in
15    your arms and they're hurt bad.  You go to Vanderbilt,
16    you go to the Erlanger.  It's where you go when you
17    have to have big time care, and I made sure that they
18    were funded.
19              That's who I am.  Those are the kinds of
20    issues that I work on.  I believe that I am my
21    brother's keeper and I will continue to work on those
22    kinds of issues.
23              The Democratic Party is the big tent and it's
24    where I live.  Thank you.
25         Q    Senator Kurita, thank for your comments.  Let
```

```
 1   me ask you about some of the details of this thing.
 2           We have "Pottygate" where you supposedly went
 3   to a building known as Harpeth High School.  If you
 4   would, explain to us what happened.
 5       A    What happened, on election day I tried to go
 6   to as many of my polling places as I could because I
 7   would waive and try to encourage people and come and
 8   vote for me.  I was very careful always to stay outside
 9   the boundary.
10           When -- I had been working all day.  When we
11   came down to Cheatham County, went to Harpeth High
12   School I stopped at a filling station because, quite
13   frankly, I needed to go to the bathroom.  When I got to
14   the filling station the restroom was broken.  I
15   couldn't get in.
16           So we went on to Harpeth High and the fact of
17   the matter, is I needed to go.  I made sure I had no
18   campaign insignia.  I went into Harpeth High School.
19   I've been there many times before.  I went into the
20   school.  The polling took place in a completely
21   separate, enclosed area.  Voting took place in the gym.
22           I never entered the gym, I never spoke with
23   one human being.  I made sure that I put my head down.
24   I wanted to go in, go to the bathroom and return, went
25   outside the boundary and that's where I stay.  So I
```

```
 1    never engaged one human being, never looked one human
 2    being in the eye.
 3              CHAIRMAN SASSER:  Mr. Rochelle, I note that
 4    takes your time.  I do not want to cut Senator Kurita
 5    off, however.  I want to give everybody in this hearing
 6    as much of a chance as possible.
 7              MR. ROCHELLE:  Mr. Barrett and I both had a
 8    misunderstanding when we started not understanding the
 9    rules.  We didn't understand cross examination was
10    going to count.
11              A SPEAKER:  Move for five more minutes for
12    Senator Rochelle and Senator Kurita.
13              CHAIRMAN SASSER:  No problem here.
14              MR. ROCHELLE:  Thank you very much.  We all
15    appreciate it.
16        Q    The next allegation I want you to address is
17    this, that some Grizzard lady or something said you
18    were soliciting -- she didn't say you were soliciting
19    votes, she said you were present at the early vote
20    location.  You were in the interviews the other day
21    when Vickie Koelman talked about that.
22              If you would, tell us, did you solicit any
23    votes at the early voting place?
24        A    Absolutely not.  I had been campaigning at
25    early voting location in Montgomery County that day.  I
```

1    was there with a lot of my Veterans.  We were standing

2    out waiving.  I was going to early vote that day and

3    many of my folks wanted to all come.

4              I went in to vote.  I did not have on an

5    insignia.  I did not solicit a single vote there were

6    people with me who were my friends who had come in with

7    me.  Maybe she got confused about that.  Maybe she just

8    didn't like me voting.  I voted, I left.  I went back

9    to my place.  No insignia, never shook a hand, never

10   solicited a vote.

11       Q    Next.  It's been suggested there was some

12   conspiracy out there among election officials to gang

13   up on Mr. Barnes and then that there was some

14   conspiracy by the Republican Party to have their folks

15   go vote in the Democratic primary.  I'll ask you a

16   question.

17             Did you have any knowledge, any knowledge,

18   any type of activity by the election workers to cheat

19   Mr. Barnes?

20       A    No, I did not.

21       Q    Did you have any knowledge or have you

22   obtained any knowledge of any organized effort by the

23   Republicans to have impact in your race?

24       A    No, I have not.

25       Q    One final thing.  I know this one is

```
 1    difficult for you but I have to ask you anyway.

 2              There's an allegation that was put in one of

 3    the last affidavits about a Ms. Haines down in Cheatham

 4    County who is the Vice Chairman of the Republican Party

 5    in Cheatham County, that she voted in the Democratic

 6    primary.

 7              I don't know whether one vote constitutes a

 8    conspiracy or not, but I need you to address in regard

 9    to that one Republican.

10              Do you know her?

11    A     Yes, I know her.

12    Q     Did she discuss with you that she was going

13    to vote in the Republican primary or whatever?

14    A     Faye Haines may have been an officer in the

15    Republican Party in Cheatham County but she is also my

16    personal friend and has been for many years.

17              Faye and I have shared some personal

18    tragedies together.  She had a child who committed

19    suicide, I have a nephew who committed suicide, and we

20    have known each other and shared sympathies for a long

21    time.

22              I know her and I would assume she would have

23    voted for me.  She's my friend.

24              MR. ROCHELLE:  Alright.  That's all.

25              CHAIRMAN SASSER:  Mr. Barrett, do y'all have
```

```
 1    any questions?

 2

 3                          - - -

 4

 5    CROSS EXAMINATION BY MR. JOHNSTON:

 6         Q    Senator, I'm Doug Johnston.  I think we met

 7    before.  I don't have a whole lot of questions for you

 8    but I do want to ask you a few things and I want to

 9    call your attention, if I could, to the last page of

10    the response that you and your counsel filed on your

11    behalf to this contest, not counting the exhibits.

12              If you don't have a copy, I can --

13         A    Thank you.

14         Q    Let me start --

15              A SPEAKER:  What page is that?

16              MR. JOHNSTON:  Page 13.

17         Q    It says, and you mentioned this just a minute

18    ago, that she has been recognized as a leader in

19    protecting the environment and developing alternative

20    energy sources.

21              In the last session of the Senate, there was

22    an energy efficiency bill.  Do you recall that?

23         A    There were a number of energy efficiency

24    bills.  I wonder if you could be a little more

25    specific.
```

```
 1        Q    Let me try to be a little bit more specific.

 2             In May of this year, there was a substitute

 3   bill that was put forth by Senator Kyle to the bill

 4   that was on the table and Senator Kyle was attempting

 5   to get the Democratic substitute to that bill passed

 6   and, in fact, you voted with the Republicans and were

 7   the only Democrat to vote with the Republicans to kill

 8   the Democratic substitute; isn't that true?

 9        A    No, it is not true.  As a matter of fact, the

10   bill that you're talking about, the Democratic

11   initiative came from Representative Les Winningham in

12   the House.

13             It was voted on unanimously in the State

14   Senate Education Committee.  Senator Kyle, being from

15   Memphis, had a different take on it from Memphis.  He

16   wasn't interested in trying to help high growth

17   communities to build schools that could use geothermal.

18   He was more interested in lowering the overall lottery

19   scholarship, the GPA.

20             I represent my district and I stuck with what

21   my district wanted and needed and that was to be able

22   to build schools and to be able to use geothermal and

23   to have money, a hundred million dollars to be able to

24   put into environmentally efficient buildings.

25             I represent my district first.  I don't
```

1    usually ask other Senators what I'm supposed to do.

2        Q    And, in fact, again, you were the only

3    Democratic Senator to vote against that Democratic

4    alternative, weren't you, the vote was 17 to 15 and all

5    the Republicans and you voted against it, voted to

6    table it, right?

7        A    I voted my conscience.  I can't speak for

8    anyone else.

9        Q    And, in fact, that's not the only time in

10   this last session that you have been the only Democrat

11   voting against --

12            CHAIRMAN SASSER:  Mr. Johnston, I want to

13   caution you here a little bit.  We're here on a

14   election contest.  We know our history.  We're going to

15   try to give everybody a lot of leeway but let's make

16   sure the questions are relevant to the contest.

17            MR. JOHNSTON:  I'm looking at the last page

18   of her own submission that she's placed before you and

19   she's been talking about the things that she's done so

20   I'm simply responding to that.  But I'll move on.

21       Q    Let's look at another sentence here.  It

22   says, "The Senator has shown her ability to make a

23   short-term decision which may be unpopular for awhile

24   but which will result in long-term benefits for the

25   State's citizens."

1          That appears to be at least to me a reference

2     to your vote to elect Ron Ramsey as Lieutenant

3     Governor.  Is that kind of what that's supposed to be

4     saying?

5          A    I don't know how you interpret it.  It could

6     be a joke by Senator Rochelle that I increased the tax

7     on cigarettes.

8          Q    Well, let's just -- let's talk about that a

9     little bit.  Is it your contention that a vote to

10    create Lieutenant Governor -- to create a Republican

11    Lieutenant Governor --

12         CHAIRMAN SASSER:  Excuse me, I think Mr. Owen

13    wants to make a statement.

14         MR. OWEN:  Pardon me and I appreciate what

15    you're saying here Mr. Johnston and I appreciate

16    Senator Kurita being here, but I have all this marked

17    to raise the issue as well and from what Mr. Barnes had

18    said and what y'all have said about Mr. Barnes being

19    the great Democrat and Senator Kurita being a great

20    Democrat and all that, all of it is irrelevant as far

21    as -- I think it's irrelevant as far as the contest

22    that we are here to decide, and certainly any previous

23    votes on the floor of the State Senate or anything

24    else.  What people have done in the past, as far as I

25    can tell, is irrelevant to the contest before us.

```
 1            We're here to decide whether or not this

 2   election contest was accurate or whether it was --

 3   there's a problem, whether we can -- going to accept

 4   Senator Kurita as the Senator or whether we're going to

 5   remove her and accept Mr. Barnes as the Senator or --

 6   excuse me, the nominee, or whether we're going to do

 7   something else and the rest of it.

 8            We've been here a long time.  So I would ask

 9   the Committee that or suggest to the Committee that

10   this is irrelevant and that we move on to some more

11   relevant things.

12            A SPEAKER:  Is that a second?

13            CHAIRMAN SASSER:  I would hope at this point

14   in time Mr. Johnston has heard from two, three people

15   on the Committee about the relevancy of this line of

16   questioning.  You might want to consider moving on.

17            MR. JOHNSTON:  Let's talk about this race.

18   BY MR. JOHNSTON:

19       Q    Did you, Senator Kurita, authorize your

20   campaign to make calls to registered Democratic voters,

21   tell them that Tim Barnes was a Republican and if they

22   wanted to vote for him, they should vote Republican or

23   was that Republicans?

24       A    I did not make any calls that would have

25   tried to get people to think that Tim Barnes was a
```

```
1   Republican.  I mailed and called primary voting

2   Democrats.  Those were the only people that I ever

3   campaigned to.

4           I purchased lists of primary voting

5   Democrats.  That's who I campaigned to.  Those are the

6   people that were going to vote for me.

7     Q    Did you authorize your campaign to make

8   repeated harassing telephone calls to potential Tim

9   Barnes supporters and hang up the phone so that they

10  would get upset and wouldn't vote for him or was that

11  Republicans doing that on your behalf?

12    A    I did not authorize anyone to make a call of

13  any kind.  Certainly no politician with any kind of

14  sense would call somebody at 6:30 in the morning.

15    Q    Did you authorize your committee to steal Tim

16  Barnes' picture and use it in a negative piece for

17  yourself or was that Republicans?

18    A    Your question is so posed that you say did I

19  do something or was it the Republicans.  No, I did not

20  do it.  Do I know if Republicans did something?  I

21  can't answer that because I was not in communication

22  with the Republicans.

23    Q    One of things that Mr. Barnes testified to a

24  little bit ago was that you had called the Board of

25  Regents complaining about his wife and his wife got
```

```
 1    called in to the President's office.

 2              Did you call the Board of Regents or anyone

 3    there to complain about Tim Barnes's wife?

 4        A    No, I did not.  And, in fact, I think that

 5    Mr. Barnes even said that his wife in a previous race

 6    sought them out to ask what the rules were.

 7        Q    Do you know who did call over there?

 8        A    I don't know anything about it.

 9        Q    I've got just one last thing that I want to

10    ask you about and that is, you were a sitting Senator

11    when the Ophelia Ford matter was brought up, correct?

12        A    Does this have something to do with my race?

13        Q    Yes, it does.

14        A    I am a sitting State Senator.

15        Q    And you voted to throw out that election and

16    have Senator Ford run again, did you not?

17        A    Senator Ford is a Senator.  She's now a

18    Senator with no cloud hanging over her.

19        Q    You voted to void her election in 2007,

20    didn't you?

21        A    I did vote to void her election.

22        Q    And in that election contest, the difference

23    between her vote and the second person's vote was 13

24    votes.  You recall that, don't you?

25        A    I don't believe numerosity was the problem.
```

1        Q    That's exactly correct.   There was only 12

2   votes that were actually called into question and yet

3   you voted to throw that out.

4             CHAIRMAN SASSER:  Mr. Johnston, you're

5   getting kind of close to the line again.

6             MR. JOHNSTON:  That's all I have.

7             CHAIRMAN SASSER:  Anybody on the Committee?

8   You want any redirect, first, Mr. Rochelle?

9             MR. ROCHELLE:  I'll defer to any questions on

10   the Committee.

11             A SPEAKER:  I do.  I guess one of my

12   questions here today would be why did any of the

13   Election Commission not come forward where we could ask

14   them questions, the ones you took depositions from?

15             MR. ROCHELLE:  We were in a delicate

16   situation in that the attorney for the Montgomery

17   County Election Commission said he did not want us

18   talking to his clients until he had adequate time to

19   investigate it.

20             And he construed as his clients a

21   relationship because -- I understand it's hard to get

22   poll workers.  He construed his relationship with the

23   Election Commission as a relationship with the election

24   workers, also.

25             So, we could not contact them, legal ethics

1    we couldn't contact them without his permission.  He

2    then arranged the interviews for Tuesday.  We conducted

3    the interviews for Tuesday and I think there was

4    satisfaction with the -- from our side there was

5    complete satisfaction with the comments that they made

6    in the interviews that are contained in the

7    transcripts.

8           We didn't feel the need to call them because

9    we had the transcripts that refuted everything they had

10   made.  And then the deadline for witnesses came

11   Thursday at noon and Mr. Barnes' team had not

12   subpoenaed them or had not -- we can't subpoena but had

13   not included them on the witness list.

14          MR. PHILLIPS:  If I may, I just wanted to

15   echo what Senator Rochelle said, make sure the vote of

16   the Subcommittee and the Primary Board both are aware,

17   unlike a Court case where parties have the ability to

18   use the Court to issue subpoenas to compel witnesses to

19   attend, either if they refuse to appear voluntarily, we

20   don't have that power.

21          We were unable to offer that power to either

22   side and so to the extent they were able to get

23   witnesses here, it was only if that witness was

24   agreeable to do it.  So I just wanted to confirm what

25   Senator Rochelle was just saying.

```
 1              MR. OWEN:  Thank you.  Did both sides have

 2    the right to invite witnesses, the people that have

 3    submitted affidavits but are not here?

 4              Did they have the right to invite them and

 5    could they have come voluntarily if they wanted to or

 6    they were available?

 7              MR. PHILLIPS:  Both sides certainly had the

 8    option to invite witnesses.  I think what Senator

 9    Rochelle was trying to point out, the folks who were

10    election workers on behalf of the Montgomery County

11    Election Commission are represented by county legal

12    counsel and I feel quite certain, although I can't

13    confirm this for one hundred percent, but I feel quite

14    confident in telling the Committee and the Primary

15    Board, more generally, I doubt very seriously any of

16    those witnesses would have been allowed to appear

17    without the approval of the county's legal counsel.

18              Certainly if I were in that person's shoes,

19    that would be the position I would take.

20              So I don't know that anyone should draw any

21    inferences or conclusions from the fact that the poll

22    workers from Montgomery County Election Commission did

23    not attend today.  I suspect that decision was made by

24    someone else above their pay grade.

25              MR. ROCHELLE:  No other questions.  Senator
```

1   Kurita, you're excused.  And subject to enduring the

2   lawyer's closing arguments, we close.

3           CHAIRMAN SASSER:  Thank you.  Let me see a

4   show of hands from the Committee.  We're going to have

5   closing arguments from each side.

6           Each side has got 15 minutes.  Show of hands

7   quickly from the State Primary Board Members.  How many

8   of y'all want to take a break?

9           Seeing that we've got a lot that want us to

10  plow through, we're going to open this up for closing

11  arguments, 15 minutes each, and we'll start with Mr.

12  Barrett and Mr. Johnston.

13          I would say if anybody needs to take a quick

14  break, you can go ahead take a quick break and come on

15  back quickly.

16          MR. JOHNSTON:  I would like to reserve about

17  five minutes for rebuttal.  So if you can kind of let

18  me know when I hit ten, that would be great.

19          I think the key words that we need to keep in

20  mind, ladies and gentlemen, is "incurably uncertain".

21  If ever there was a race where that label could be

22  applied, this is the one.

23          It is incurably uncertain, it is incurably

24  uncertain because we know, we've seen that Republicans

25  crossed over, not just because they happened to want to

1    vote for somebody, not because of the normal and usual

2    situation where people occasionally change over, but

3    because there was a massive, concentrated, organized,

4    movement by the Republican Party to do that, and

5    because we know that there was massive confusion on the

6    part of voters in the 22nd District.  We know that

7    through a number of different ways.

8         Let me start by just taking a look at the

9    questions that you're going to be requested to answer.

10   There's two of them.  One of them is what we've called

11   the numerosity issue and that is whether or not we have

12   shown that the number of votes that might have been

13   cast for Mr. Barnes could overcome the 19 vote margin

14   of victory that Ms. Kurita enjoyed on August the 7th.

15        The second is the one that includes in a

16   phrase, "incurably uncertain".

17        And in that, as you can see from the rules

18   that you have, should have there in front of you, it

19   tells you that you can look at whether or not this is

20   incurably uncertain regardless of whether or not you

21   can ascertain with mathematical certainty whether or

22   not this was overcome.

23        Now, we start, of course, with the knowledge

24   that back in at least in July or perhaps earlier than

25   that, Ron Ramsey made it known publicly that he was

1   going to do what he could to support Rosalind Kurita,

2   and it worked.  And we've heard testimony here about

3   telephone calls that were made into this district

4   telling voters that Tim Barnes was a Republican,

5   telling them that if they wanted to vote for him, they

6   had to vote Republican and we've seen the results.  The

7   results are clear.

8          There were a number of people who showed up

9   at these polls asking to vote for Tim Barnes thinking

10  he was a Republican or, even worse, showing up at the

11  polls, telling the officials in those polls who are

12  obligated by law to do what they can to support a voter

13  and do it honestly, telling them that they -- that the

14  voter had to vote Republican if they wanted to vote for

15  Tim Barnes.

16         We're not talking about one place or two

17  places.  We're talking about in a number of different

18  district or precincts.

19         At the Fairgrounds we heard Mr. and

20  Mrs. Walker corroborated by Ms. Meriweather.  Mr. and

21  Ms. Walker told the election officials specifically I

22  want to vote for Tim Barnes.  What were they told?

23  He's Republican, you got to vote Republican Party

24  primary if you want to vote for Mr. Barnes.  That's

25  exactly what they did.

```
 1              The woman behind her, Lenore Meriweather

 2   overheard that and she confronted the official and

 3   said, "You can't do that, that is incorrect."

 4              Now, they say, of course, that they did that

 5   right there in front of the Walkers but that doesn't

 6   make any sense.  The Walkers went there to vote for Tim

 7   Barnes.  If they had been told right then and there

 8   that he was a Democrat, then they would have changed

 9   it.  They didn't because they weren't told.

10              They voted Republican because that is exactly

11   what they were told to do when they went to vote for

12   Tim Barnes.  And Ms. Meriweather talked to another

13   election official there and what did she say?  Been

14   happening all day, been going on all day.

15              Now, of course, that election official

16   suddenly doesn't remember that anymore but that's okay.

17   There's another part of her, what we know happened that

18   she didn't remember, either.  She just didn't want to

19   remember anything because she understood the gravity of

20   that situation.

21              How many others who didn't come forward at

22   the Fairgrounds were told exactly the same thing and

23   ended up without a vote for Tim Barnes?  Incurably

24   uncertain.

25              Woodlawn district.  Nancy Burchett, same
```

1    thing.  Outlaw Field, Debra Jones, same thing.

2    Bethlehem United Methodist Church, Peter Napolitano,

3    same thing over and over and over again.

4            And at East Montgomery School, there was a

5    write-in on the Republican for him along with two more

6    Republican write-ins at St. Bethlehem's Church.  All of

7    that is in the materials that you've been provided.

8            This happened in five separate places that we

9    know of.  Now, maybe it is that the election officials

10   themselves were just confused because there had been so

11   much of this calling and the rest.

12           A little while ago I read to you the

13   testimony of Ms. Koelman, the Election Coordinator and

14   a very competent and wonderful woman who we met the

15   other day.  She's very good.

16           She had heard those rumors.  She did exactly

17   what she was supposed to do.  She called Mr. Thompson

18   to find out what, if anything, she could do.  But even

19   she had heard the rumors that the Republicans were out

20   to mess this vote up.

21           Now, the question I guess is this:  Is it

22   illegal, is it illegal to vote in the other party's

23   primary?  We have an open system in Tennessee.  There

24   is no party registration and we all mostly like it that

25   way and we're not in anyway attempting to get you to

```
 1   suggest that that should be changed or anything else.
 2           But I think it's important, why don't we take
 3   a look at the statute and just see what the statute
 4   says about what is required.
 5           The statute is very clear.  Reading here,
 6   2-7-115 (b), "A registered voter is entitled to vote in
 7   a primary election for offices for which the voter is
 8   qualified to vote at the polling place where the voter
 9   is registered if, number 1, the voter is a bona fide
10   member of an affiliated with the political party in
11   whose primary the voter seeks to vote or, 2, at the
12   time the voter seeks to vote, the voter declares
13   allegiance to the political party in whose primary the
14   voter seeks to vote and states that the voter intends
15   to affiliate with that party."
16           Do we seriously believe, ladies and
17   gentlemen, that the Republicans, those people who voted
18   four or more times over the last nine years in
19   Republican primaries and had never, ever before voted
20   in a Democratic primary, were they honestly, honestly
21   declaring allegiance to the Democratic Party and
22   stating that they attempted to affiliate with that
23   party?
24           I can't imagine such a thing.  They were not.
25   They were doing the bidding of the Republican
```

1    Lieutenant Governor that Rosalind Kurita helped put in

2    power.

3              There is no Republican who is seeking to run

4    in the general election.  So they go in and they help

5    her win in the primary and she's there.  That, ladies

6    and gentlemen, is exactly what has happened, incurably

7    uncertain based on the statute, based on the evidence,

8    based on the totality of the circumstances.

9              Thank you.

10             CHAIRMAN SASSER:  Thank you, Mr. Johnston.

11   You'll have about five minutes when Mr. Rochelle gets

12   through.

13             MR. ROCHELLE:  I don't know about y'all, I'm

14   getting a little tired.  I'm going to try not to take

15   15 minutes but I've been known to fail at that in the

16   past.

17             Let me tell you, first, this is about law so

18   let's talk about the law first.  To void an election on

19   the basis of irregularities or statutory violations the

20   alleged wrong must be so gross and palatable, a failure

21   of the opportunity for a free and equal expression of

22   the popular will that the Courts cannot permit the

23   election to stand.

24             A SPEAKER:  Where is that law?

25             MR. ROCHELLE:  I'm reading from my brief,

1    brief of law.  The focus of the Court's inquiry, the

2    Board's inquiry, paraphrase, must thusly be kept in

3    mind, that is whether the violations are so serious as

4    to thwart the will of the community upon a particular

5    question.

6              I was going to argue a little bit but I enjoy

7    reading the cases.  You might have heard about the

8    Forbes case.  That was back in 1991.  They said that to

9    determine whether alleged violations are serious

10   enough, you got to compare case -- the case with prior

11   cases.

12             So they start out by considering a 1951 case,

13   "Shoaf", where you had the election officials marking

14   the ballots, intentionally failing to deliver

15   sufficient ballots to the precincts where the contestee

16   was believed to be strong, specific alleged and proved

17   instances of intimidation and duress.

18             Then they cited State versus "Kibbitt", 1944

19   and that case voters were brought in from Kentucky.

20   Poll tax receipts were purchased in bulk.  Poll

21   watchers were forcibly ejected from various polling

22   places.

23             Then they went to "Hollis versus Vaughn",

24   fraudulent ballots were printed without the name of the

25   contestant were printed on them.  Then they cite the

1    "Southhall versus Billings".  Allegations of poll tax

2    receipt purchases.  That was a big thing back then when

3    you had the poll tax.

4              Ejected poll watchers and a fella who ran at

5    them with a 4 X 4 temper, cussing and swearing at them.

6    That's what you compare this case to.

7              King versus Sevier, just decided this last

8    July 31st said the Courts should be reluctant to

9    declare an election void.  They appreciate that honest

10   mistakes will be made in the context -- conduct of

11   elections.  Not every irregularity or even a

12   combination of irregularities will necessitate the

13   invalidation of an election.

14             Law can be boring but I think you see sort of

15   the groundrules for that.  I have to talk a little bit

16   about the case here today.  I know you've heard it and

17   I'm going to briefly address it for my argument.

18             I started out talking about there was a

19   pattern of election officials that ganged up on

20   Mr. Barnes to cheat him.  They didn't prove that.

21             They proved that one lady, Ms. Pace, was a

22   second grade school teacher for 41 years, that she made

23   a mistake.  The lady next to her, Sheila Edmondson,

24   said immediately you made a mistake.  Ms. Pace said,

25   "I'm sorry, I did, and proceeded to tell the walkers

 1   standing in front of them you need to go and look at

 2   the sample ballot to determine which primary you want

 3   to vote in."  They didn't.  They didn't.

 4          As we went down through each one of those

 5   interviews with the county election officials, we

 6   refuted every allegation that was in that contest about

 7   this theory of election workers ganging up on

 8   Mr. Barnes.

 9          So then we go to the "Pottygate" theory.

10   They knew what is going on.  Why they put that in this

11   contest, I don't know.  Just evidently there wasn't

12   anything else they could find.

13          You heard her explain that she went into the

14   high school, into the entrance of the school; that the

15   voting was going on in the gym, I think and I think I

16   told you what the definition of a polling place is, the

17   room or rooms where voters apply to vote and mark and

18   cast their ballots, not the school.

19          The school is the building that houses the

20   polling place.  The polling place is the actual room

21   where they are.  That was the gym.  Rosalind Kurita

22   never went near the gym.

23          You have her own testimony further she didn't

24   see anybody, she didn't talk to anybody and what else?

25   Did they produce any one person who was inside that gym

```
 1    or that school to say she did something wrong?  No.

 2           Pretty soon they learned that the "Pottygate"

 3    theory was not going to carry.  I'm trying to resist

 4    cliches.

 5           Then they go, this thing about early voting.

 6    You heard the early vote thing.  The woman goes down to

 7    the Election Commission office to early vote.  She's on

 8    her own testimony without accusations and this

 9    Ms. Grizzard, she didn't solicit any votes.  She went

10    in to vote and she came out.

11           The only thing that upset the other lady was

12    she had a bunch of cameras with her.  Had a bunch of

13    media.  Well, if you're a smart candidate that's what

14    you do.

15           You get down close to election day anything

16    you can could to get on television or radio or in the

17    newspaper you want to invite the media to come.  You

18    always tell them you're going to early vote.  That's

19    good sense.

20           No violation of the early voting location.

21           Are you holding up fingers over there for me?

22           A SPEAKER:  You're good.

23           MR. ROCHELLE:  It's almost like they say it

24    in the contest about some of these folks, they said it

25    in the affidavits about some of these folks and they
```

1    keep talking about it today, about these allegations on

2    the election officials.

3          It's like they think that if they keep saying

4    it over and over again you'll come to believe it, or it

5    will mean that things are uncertain because you've

6    heard it so much.  Repetition does not the truth make.

7          It's up to you to sort through that type of

8    lawyering.  You can't identify where the violations

9    are.  You won't find any.  They're not there.

10         Now, I don't know whether they don't do this

11   or not.  They say they don't want to change anything

12   about party registration so I was ready to argue about

13   that, I guess, and then -- but they file these voter

14   analysis starting earlier in the week saying somehow or

15   another there's something wrong, that Republicans have

16   crossed over and other races.

17         I think you've seen democrats crossover to

18   Republican races.  Now, you got a way to do it now.

19   That's appoint a poll watcher.  We gave you copies of

20   the statute.  Poll watcher can challenge.

21         It goes before the three election officials

22   that were approved by their party for the election

23   place they decide, those three Democratic election

24   officials decide whether or not to let that challenge

25   voter vote.

1           You got to have somebody at the polling

2    place.  The only way do you that is to appoint poll

3    watchers.  That's how you do it now.

4           How do they suggest we change it in the

5    future?  They say they don't want party registration.

6    Great.  This is a lousy time to be talking about party

7    registration.  It's an off year.

8           Since they didn't bring it up talking about

9    party registration, I'm not going to talk about party

10   registration because I include that in my argument but

11   I don't think it's good for this party, for us to be

12   talking about such a thing right here in the middle of

13   an election.  It's dangerous.

14          It can be misrepresented that the Democratic

15   Party stands for something that is not popular at all

16   with the constituents out there, the citizens out there

17   who we got a lot of candidates, lot of Democratic

18   candidates out there trying to get to vote right now.

19          I want to be able to say to a Republican, I

20   want them to be able to say to an Independent come

21   November, I want your vote and I value you.  So I'm not

22   going to talk anymore about that.

23          The most hurtful thing I guess to Senator

24   Kurita was this allegation about the Republican

25   Chairwoman in Cheatham County, Ms. Haines, part of this

1    big conspiracy and, you know, you imagine there's three

2    executive committees, they all got members, all got

3    officers, they find Ms. Haines, the only one cited to

4    you.

5         All the rest of the Republicans that you

6    heard about voted for Mr. Barnes.  Ms. Burchett, she

7    never voted in a Democratic primarily.  Mr. Napolitano,

8    he's a Republican.  Said he was when he walked in the

9    door.  But they come back to you and they say

10   Ms. Haines.

11        Senator Kurita didn't want to have to tell

12   you about that relationship today because it's a

13   personal relationship and while I understand that, I

14   felt like you needed to know because this is an

15   important case and you set a lot of precedent today.

16        So I made her tell you that.

17        So the fact that one Republican officer out

18   of all of those Republicans who signed up saying I'm a

19   Republican is the only one they could bring in here and

20   that's been addressed to you.

21        They tell me I got four more minutes.  I

22   don't know that I got four more minutes to say.  Y'all

23   got any questions for me?  Anybody got anything you

24   want me to address that we didn't address in the

25   evidence, we're here ready to do so?

```
 1              Well, then, I want to compliment you and
 2      these folks sitting back here.  You got a tough job.
 3      When you ran for this office I don't know whether you
 4      knew it envisioned all this sort of stuff.
 5              You got a tough job.  You heard them say
 6      you've got unlimited power.  Well, you may have
 7      unlimited power.  That's a bunch of legalese arguments
 8      to make in the future.  You got yourselves.
 9              Just because somebody got unlimited power
10      does not mean that they should abuse that power.  I
11      have confidence in you.  That's why we're here today.
12      We have confidence in you to listen to the facts, to
13      apply reasonable interpretations, to listen to the law
14      and to do what the statute calls.
15              Seek justice and fairness.  Seek justice and
16      fairness.
17              I don't think the facts construed in any way
18      possible would authorize overturning this election.
19      The people of these three counties have expressed their
20      will.
21              Close vote.  She obviously took it for
22      granted.  Her polling is running strong.  You know how
23      incumbents are, pollers tell you how great you are, how
24      much ahead you are.   You start sitting back some.  She
25      took it for granted.
```

1          I understand this is a district that's a

2    borderline district and if we go messing with that

3    thing we could lose it real easily.

4          Senator Kurita has done a good job.  She

5    hasn't agreed with everything you wanted, everything

6    you wanted or, Lord knows, she raised the price of my

7    cigarettes out the roof, but she's an independent cuss.

8          She knows that it's important first that she

9    represent her constituents and then she knows that it's

10   important that you be able to answer to yourself, do I

11   feel good about myself, am I satisfied that I have done

12   the best that I can do for the people that I represent

13   and for their children and their children and their

14   children and all the future generations that come on

15   every vote at every opportunity?

16         That's what she's tried to do.  We're going

17   to differ.  Lord knows we're going to differ.  You're

18   going to differ with her occasionally.  But she's doing

19   what she was elected to do.

20         We ask you to disallow this contest.  Thank

21   you.

22         CHAIRMAN SASSER:  Thank you, Mr. Rochelle.

23   Mr. Johnston, I think you have a little less than five

24   minutes.

25         MR. JOHNSTON:  Thank you, Mr. Chairman and

1   Members of the Committee, and thank you all very much

2   for being so patient and paying such close attention to

3   the presentations have been made for both sides.

4           The issue really is justice and fairness but

5   the issue is whether or not this particular race under

6   these particular circumstances was incurably uncertain.

7           It's incurably uncertain because of all the

8   reasons that I've just told you, because of all the

9   involvement of hardcore Republicans who vote repeatedly

10  over and over and over again in Republican primaries

11  and never in Democratic primaries, and they did this at

12  the behest of the Lieutenant Governor, the Republican

13  Lieutenant Governor of this State.

14          I know that no matter what Democrat sitting

15  in whatever seat, that Democrat is never going to do

16  something that we all agree with.  There are going to

17  be major differences.  There are going to be times when

18  we disagree.

19          But that's not what we're talking about here.

20  We're talking about a situation in which the Republican

21  Party starting with the top leader in this State

22  actively sought to involve his party in the choosing of

23  a Democratic nominee for the 22nd District.

24          It worked.  He got his folks out and it made

25  the difference.  Not only did it work, but he had the

1   assistance, either inadvertently or not, of many of the

2   campaign officials at the various polling places, at

3   least in Montgomery County.

4          Let me address just a few quick things that

5   Mr. Rochelle has raised.  He talked about Margaret Pace

6   and how she had completely refuted his word, those of

7   the Walkers.

8          Let me remind you what Ms. Pace did.  I've

9   been practicing law for 31 years.  I have found

10  repeatedly that the people who aren't telling the truth

11  start attacking the other side and that's exactly what

12  Margaret Pace did.

13         Margaret Pace didn't just sit back and say

14  you know what, you're right, I just made mistakes, I

15  messed it up.  No.  No.

16         She said that Mr. Walker, he was under the

17  influence of something.  He was rude and loud and

18  boisterous.  In fact, he was so boisterous I had to

19  look to see if there was a uniformed police officer out

20  there.

21         The only people that were being boisterous,

22  ladies and gentlemen, are the election officials that

23  were saying he's singing he's a jolly good fellow.

24         Maybe that's why Mr. Walker couldn't hear

25  this alleged apology that she says she made.  Ms. Pace

```
 1    got caught and she didn't like it and she went after

 2    the person that caught her.

 3            Now, "Pottygate".   Ms. Kurita and Mr.

 4    Rochelle made a big joke out of what they call

 5    "Pottygate" but, frankly, it isn't a joke.  It is not a

 6    joke to do this.

 7            We showed you earlier, this is what the Court

 8    says about that.  "No person should be within the

 9    100-foot distance and be in a position to have someone

10    believe he may or may not be trying to influence a vote

11    or the operation of the election process."

12            Senator Kurita, Senator Kurita violated that.

13    She violated that trust.  There was a School Board

14    member who is right there.  What did she do?  She went

15    across the street to somewhere else when she went to

16    the bathroom.  And you know what?  They have never said

17    anything about what was going on with the campaign

18    manager.  The campaign manager went in there, too, and

19    he was in there.  They've not refuted one thing that

20    we've argued on that.

21            There were 284 --

22            CHAIRMAN SASSER:  That's time, Mr. Johnston.

23            MR. JOHNSTON:  -- Republicans that made the

24    difference, fifteen times the difference.  Thank you.

25            CHAIRMAN SASSER:  Before we move on I would
```

```
 1    like to ask the Members of the Committee to bear with

 2    me for just a second.  We've got to take care of some

 3    legal things to get down.

 4             I need a motion to attach as Collective

 5    Exhibit 1 to the transcript, today's hearing, the

 6    following items:  Number 1, Contest of Election; number

 7    2, Supplemental Filing Contest of Election; number 3,

 8    Senator Kurita's response to Election Contest; number

 9    four, Mr. Barnes' witness list; number 5, Senator

10    Kurita's witness list.

11             Also as part of this motion, I'd like you to

12    authorize that we attach as Exhibit 2 to today's

13    transcript, Mr. Barnes' prehearing brief.

14             Also as part of this motion, I'd like to ask

15    the Committee to attach as Collective Exhibit 3 to

16    today's transcript, copy of Senator prehearing brief.

17             Also as part of this motion, I'd like to ask

18    the committee to attach as Collective Exhibit 4 to

19    today's transcript copy, all the witness interview

20    transcripts, and also as part of this very lengthy and

21    motion attached as Exhibit 5 to today's transcript, a

22    copy of the agreed rules as amended, and we're doing

23    this so we can have a good record of the case for

24    anybody who might want to read that after we're done.

25             Can I have such a motion?
```

Beres & Associates

```
 1              A SPEAKER:  So moved.

 2              CHAIRMAN SASSER:  Is there a second?

 3              A SPEAKER:  So moved.

 4              CHAIRMAN SASSER:  Yes.

 5              MR. THOMPSON:  We had two briefs.  There's

 6    just one exhibit here.

 7              CHAIRMAN SASSER:  We got everybody in the

 8    Committee in favor, aye.  Opposed?

 9              Quickly some instructions for the Committee.

10    After consultation with counsel for the Tennessee

11    Democratic Party, and after consultation with Mr. Brook

12    Thompson, State Coordinator of Elections, this

13    Committee can really make one of three recommendations:

14              First, this committee can certify the results

15    as they stand, declare Senator Kurita the nominee.

16              Second, the Committee can overturn the

17    results and declare Mr. Barnes the nominee.

18              Third, this Committee could, quote, set aside

19    the results of the election and require the three

20    counties involved, which would be Cheatham, Houston and

21    Montgomery Counties, to hold a joint convention and

22    that joint convention would determine the nominee.

23              According to the rules adopted by the State

24    Primary Board and agreed to by Senator Kurita and

25    Mr. Barnes, this Committee and the Primary Board as a
```

1   whole may decide the following in addition to any other

2   relevant questions:  Number one, whether more probably

3   than not the number of votes placed in question as a

4   result of the improper, illegal and/or fraudulent acts

5   complained of, if true, exceeded the margin between the

6   total number of votes cast for the contestee, the total

7   number of votes for the contestant; number two,

8   whether, more probably than not, there is sufficient

9   evidence of improper, illegal and/or fraudulent acts

10  which so permeated the primary election as to render

11  the outcome of the election incurably uncertain, even

12  though it cannot be shown to mathematical certainty

13  that the result might have been different.

14          Finally, I'd like to admonish both this

15  Committee and the entire State Primary Board that any

16  decision reached today should be based on the evidence

17  presented today and not on any pre-existing opinions of

18  Mr. Barnes or Senator Kurita.

19          So, we're going to open it up to the

20  Committee.  You could ask for a motion and discussion

21  for a --

22          A SPEAKER:  Move --

23          CHAIRMAN SASSER:  Is there any discussion

24  among --

25          A SPEAKER:  I didn't hear the motion.

```
 1            CHAIRMAN SASSER:  I was asking if the

 2    Committee has a motion, if we have a motion on the

 3    Committee that we can then discuss that motion.

 4            MR. OWEN:  I have a motion.  Thank you

 5    Mr. Chairman, thank everyone for staying so long.

 6            The purpose of this subcommittee was to allow

 7    the lawyers to present the case and have questions

 8    asked on -- by a limited number of people and that way

 9    it would hopefully expedite the matter a little bit.

10            Now we're going to, I guess, the idea is that

11    we discuss among ourselves and then we report to the

12    full committee and then discuss with the full

13    committee.  The full committee is already here.

14            I would move that we, as a subcommittee, go

15    out of existence and refer everything back to the full

16    committee since everyone is already here and allow the

17    members of the full committee to, the full Primary

18    Board who have been here all this time to have a chance

19    to comment themselves, otherwise they won't be able to

20    comment until we get into a full meeting and just

21    extend everything.

22            CHAIRMAN SASSER:  Thanks Bill.  I'll note

23    that we did approve the rules of this when we started.

24    It was designed so that this discussion would be fully

25    open and we want everybody -- again, I encourage
```

```
 1    everybody in the State Primary Board to hear our
 2    deliberation.
 3            Once we make the decision, we will then
 4    report it out as designed to the entire Primary Board.
 5            At that point, it will be a motion from the
 6    Committee.  The entire Primary Board then would have a
 7    chance, just like we do, to discuss the motion, to
 8    amend, adopt or reject the motion and do anything they
 9    want to do.
10            I do think, in my Chairman's opinion, I think
11    the procedure we have in place works well.  As I said,
12    it's been agreed to by the parties involved and I would
13    encourage this Committee, let's get to work here, make
14    a determination.
15            I'm sorry.  Mr. Owen did offer a motion.  Is
16    there a second?
17            MR. FORRESTER:  I'll second.
18            CHAIRMAN SASSER:  All in favor of Bill's
19    motion, aye?
20            Can you raise your hand on the Committee?
21    Opposed?  Can y'all raise your hands?  I got three in
22    favor, four opposed.
23            Sandra, are you going to vote?  I think
24    according to my count, I have three in favor of the
25    motion and everyone else opposed, so this Committee
```

```
 1   will make a recommendation.

 2            Is there a motion on the Committee?

 3            MS. HARRIS:  Can I ask you a question?  Can

 4   you elaborate a little bit on the -- would you

 5   elaborate a little bit, Gray, or somebody on the

 6   convention process that the three counties would have

 7   if that decision were to be one that we come to today?

 8            CHAIRMAN SASSER:  I'd be glad to.  If it's

 9   okay with counsel, I'll let you describe it as

10   described in the letter we got from Brook Thompson, the

11   State Coordinator of Election.  And the letter that

12   Brant is about to reference is in everyone's pack.

13            MR. PHILLIPS:  Thank you, Mr. Chairman.

14            To answer your question, Ms. Harris, the

15   process that we inquired of the State Coordinator of

16   Elections about was what procedure should the State

17   Primary Board follow in the event that it determines

18   that the evidence supports voiding the election

19   results.

20            We were advised by Mr. Brook Thompson who, as

21   a part of his recommendation back to us, consulted with

22   the Attorney General's Office about what procedure

23   should be used.

24            That procedure is set out in the letter that

25   he provided to us and that everyone should have in
```

 1    their packet.  Specifically, it talks about the

 2    procedure that is outlined in Tennessee Code Annotated

 3    Section 2-13-204 (b)(4) which would allow us in the

 4    event of a voided election to return the matter to

 5    the -- to a joint convention of the Executive

 6    Committees of the Democratic parties of Houston,

 7    Cheatham and Montgomery.

 8            That meeting, that joint convention would

 9    need to be called by the Chairman of the Montgomery

10    County Democratic Party within ten days of any decision

11    of this body.  And they would then, through a joint

12    convention process, select a nominee.

13            And that needs to be certified to the State

14    Election Commission by September the 25th in order for

15    it to be on the ballot.

16            MR. ROCHELLE:  Mr. Chairman, could I ask

17    counsel to point out that before you start filling the

18    seat, you have to vote to overturn the election?

19            If you don't vote to overturn this election,

20    there's no need --

21            CHAIRMAN SASSER:  We'll point that out, Mr.

22    Rochelle.  You had ample opportunity to argue your

23    case.  You had ample opportunity to argue the case.

24    This now is a meeting of the Committee.  The Committee

25    is going to decide.

```
 1              MR. PHILLIPS:  I thought that I had made that
 2   clear in my explanation, that that process would only
 3   be available to the body in the event that the body
 4   determined collectively that the evidence supported
 5   voiding the election, and only in that event.
 6              CHAIRMAN SASSER:  Now, I've also been advised
 7   we can have some informal discussion about the evidence
 8   prior to having a motion.  Entertain a motion or
 9   continue to have discussion as a committee about what
10   we might or might not like to do.
11              MR. HARPER:  Mr. Chairman, I'm David Harper
12   from the 17th, and I've heard a lot of good evidence
13   today and I have a lot of heartburn with a convention.
14              I've seen those go really bad, and having
15   said all that, I'd like to make a motion that the
16   election stand as certified.
17              CHAIRMAN SASSER:  There's a motion that the
18   election stand as certified.  Is there a second on
19   that?
20              MR. CHEEK:  I'll second that.
21              CHAIRMAN SASSER:  Let the record reflect that
22   Mr. Harper voted and Mr. Cheek seconded it.  Let's call
23   the role on this Committee.
24              MR. OWEN:  Discussion on that motion?
25              CHAIRMAN SASSER:  Any discussion of that
```

1  motion?

2          MR. MAYNARD:  I don't know whether it's

3  appropriate for somebody from the Primary Board to ask

4  a point of order.

5          CHAIRMAN SASSER:  I think if it's okay with

6  you, Mr. Maynard, the way we can handle that, once the

7  Committee has a report and I think it would be

8  appropriate to question the Committee about that.

9          MR. MAYNARD:  Can I say the point of order,

10  you can ignore it, Mr. Chairman, and I deeply respect

11  you and your time.  I appreciate you.

12          I see the look on your face, Gray.  As your

13  friend, let me say it and you can tell me shut up.  If

14  y'all establish a threshold for overturning this

15  election and --

16          CHAIRMAN SASSER:  Again, there's two

17  standards that have been enunciated among the

18  Committee.  Just to clarify them, the two standards

19  are -- and both of these have been agreed to by

20  counsel.

21          Whether more probably than not the number of

22  votes placed in question as a result of the improper,

23  illegal and/or fraudulent acts complained of, if true,

24  exceeded the margin between the total number of votes

25  cast for the contestee, the total number of votes for

```
 1    the contestant; number two, whether more probably than

 2    not there is sufficient evidence of improper, illegal

 3    and/or fraudulent acts which so permeated the primary

 4    election as to render the outcome of the election

 5    incurably uncertain, even though it cannot be shown to

 6    mathematical certainty that the result might have been

 7    different.

 8              MR. MAYNARD:  The reason why I ask that

 9    question, Mr. Chairman, the point of order, are y'all

10    then voting on whether, since the burden of proof is on

11    Mr. Barnes, that he has not met those two thresholds?

12              Are y'all voting on that?

13              CHAIRMAN SASSER:  I think that would be

14    implicit in the motion if the Committee votes that

15    to -- if the Committee votes that to uphold or to

16    certify the election results as Senator Kurita as the

17    winner, I think that would be implicit in the vote that

18    Mr. Barnes has not met his burden of proof.

19              Because I understand it, we have a motion on

20    the table.  There is a second from the Committee.  Is

21    there any discussion of that motion on the Committee?

22              Ms. Ables?

23              MS. ABLES:  I'll be right back.

24              CHAIRMAN SASSER:  Is there any discussion of

25    the motion?
```

```
 1              MR. CHEEK:  Just vote.
 2              CHAIRMAN SASSER:  We have a majority of votes
 3    to pass the motion, majority of people.  Takes six
 4    votes to pass the motion.
 5              I'm going to start it.  Mr. Harper?
 6              MR. HARPER:  Yes.
 7              CHAIRMAN SASSER:  Ms. Perkinson?
 8              MS. PERKINSON:  No.
 9              CHAIRMAN SASSER:  Mr. Owen?
10              MR. OWEN:   Pass.
11              CHAIRMAN SASSER:  Ms. Davis?
12              MS. DAVIS:  No.
13              CHAIRMAN SASSER:  Mr. Farmer?
14              MR. FARMER:  No.
15              CHAIRMAN SASSER:  Mr. Forrester?
16              MR. FORRESTER:  Pass.
17              CHAIRMAN SASSER:  Mr. Cheek?
18              MR. CHEEK:  Yes.
19              CHAIRMAN SASSER:  Mr. Woods?
20              MR. WOODS:  No.
21              CHAIRMAN SASSER:  Ms. Parker?
22              MS. PARKER:  No.
23              CHAIRMAN SASSER:  So it seems there's not six
24    votes to pass the motion, the motion fails.
25              Is there any additional discussion among
```

```
 1   ourselves?

 2             MR. OWEN:  I may move to take a five minute

 3   recess.

 4             CHAIRMAN SASSER:  I'm happy to give everybody

 5   five minute recess.  I would remind --

 6             A SPEAKER:  No.  No.

 7             MR. OWEN:  Even my motions aren't going

 8   anywhere.

 9             CHAIRMAN SASSER:  Is there another motion?

10             KIM SASSER HAYDEN:  Is there another motion

11   on the floor?

12             CHAIRMAN SASSER:  Anybody on the Committee

13   have any discussion?

14             MS. DAVIS: I guess my question is, it's been

15   sent back you said for convention, that we have that

16   alternative.

17             Has that ever taken precedence before that we

18   know of?

19             CHAIRMAN SASSER:  My understanding is and I

20   don't know if it's ever taken -- I'm not sure it's ever

21   happened under these circumstances.  There has been

22   conventions used to select nominees from time to time.

23             In fact, a member of this Committee has been

24   selected by a convention, if I'm not mistaken.

25             MR. OWEN:  Executive Committee.
```

```
 1              CHAIRMAN SASSER:  It is not -- it has
 2   happened before, yes.  Mr. Farmer.
 3              MR. FARMER:  Mr. Chairman, I move that we set
 4   the convention -- send it to the convention of the
 5   three counties that are involved of Cheatham,
 6   Montgomery and Houston County.  Order them as a Primary
 7   Board for them to call for the -- be nominated by those
 8   conventions.
 9              MS. DAVIS:  Second.
10              CHAIRMAN SASSER:  There's a motion to second.
11   Mr. Farmer made a motion, Ms. Davis seconded it.  Let
12   me confer with counsel for one second.
13   (Discussion off the record.)
14              CHAIRMAN SASSER:  In order to take such an
15   action, this body would have to decide that the
16   election results were incurably uncertain.
17              Would you be willing to amend your motion so
18   that this Committee would state that the election
19   results were incurably uncertain and refer it back to
20   the counsel?
21              MR. FARMER:  I would move that they be
22   incurably uncertain, the results of the election, and
23   they be moved back to the conventions.
24              CHAIRMAN SASSER:  There's a motion.  A
25   second?  You're going to have plenty of time to address
```

```
 1   this after we get through here today.

 2            You're not a member of this committee, Mr.

 3   Rochelle.  You had a chance to make your case.  I'm

 4   sorry.

 5            MR. ROCHELLE:  It's not going to do any good

 6   afterwards.  I have information that I think would be

 7   beneficial to you.

 8            CHAIRMAN SASSER:  Anybody at this Committee,

 9   Mr. Rochelle, wants to ask you a question, you can --

10   they can ask you a question.  Right now we have a

11   motion on the table and a second and it's time for

12   discussion of that motion.

13            MR. OWEN:  Pursuant to that motion, I have a

14   question, Mr. Chairman.  Regarding the letter from

15   Election Coordinator Brook Thompson -- is Mr. Thompson

16   still in the audience?

17            CHAIRMAN SASSER:  No.

18            MR. BARRETT:  He's hiding back there.

19            MR. OWEN:  My concern, this race or this

20   contest -- I have a personal interest in this because

21   my nephew is with the 101st Airborne and he can't be

22   here because he's in Afghanistan, and I am very

23   concerned about when we are able to mail out the

24   overseas ballots for military and overseas, the

25   military and overseas ballots and the requirement that
```

```
 1    this be done by September the 20th.

 2            And the letter says that the relevant County

 3    Election Commission by September 15th, they must -- by

 4    September 15th realize the counties involved will have

 5    to mail out the military and overseas ballots without

 6    the office -- with the office having a write-in line

 7    for the candidate space, and this is one of the most

 8    important elections for the coming century and these

 9    people are over there fighting so we have the right to

10    be here and pontificate all day long.  I am concerned

11    about that.

12            Mr. Thompson, if there is a convention or a

13    County Executive Committees, if they meet this week,

14    will you be able to include or would the ballot be able

15    to include whomever is the nominee on this?

16            CHAIRMAN SASSER:  Brook, if you can answer

17    that question quickly.  First of all, I'd like to thank

18    Brook Thompson for being here today and listen to all

19    the testimony.

20            MR. BROOK THOMPSON:  Mr. Chairman, as we

21    have, I think repeatedly said from our office, the

22    closer we get to a deadline, the more difficult it is

23    for us to ensure that the process moves forward in a

24    way that doesn't jeopardize the election.

25            We said the 15th and the question from
```

1    Senator Owen, I believe is, what day do we have to have

2    a name.  We are under a statutory duty the get them out

3    by the 20th, which is next Saturday.

4           We have differing needs in different

5    counties.  In Montgomery County we have a couple

6    thousand military ballots that have to be sent out.

7    We can't give them a name on Friday and have them

8    printed and have them all stuffed and sent out.  It

9    doesn't work that way.

10          In Cheatham, Houston County we might could

11   get the names a little later and still comply with

12   that.  If we don't have a name by Monday, Tuesday, we

13   will be forced to send out military and overseas

14   ballots without a name on there and if we get a name

15   subsequent to that, we will do what we can to send out

16   a subsequent ballot.

17          The further we go the more difficult it gets

18   for us to mail and get back ballots from overseas

19   personnel.

20          MR. OWEN:  Mr. Chairman, it's my

21   understanding, Mr. Thompson, that in the Shelby County

22   primary earlier this year, you were able to delay

23   sending the ballots out and then delay getting them

24   back and counting them.

25          Could you elaborate a little bit on that

```
 1   situation?

 2           MR. BROOK THOMPSON:   We were delayed in

 3   sending ballots out with the Presidential primary.  We

 4   were then sued by the United States Department of

 5   Justice and came to an agreement where we could accept

 6   ballots for a few days after election day.

 7           That was because we were dealing with the

 8   Presidential primary, with the Presidential race.  We

 9   do not want to get in a position where we're not

10   meeting the 45 day deadline.  That's what happened to

11   us in February because of a variety of factors.

12           We need to send out Presidential election

13   ballots by the 20th of September and we're going to do

14   that so that we meet the law, and if we have to

15   follow-up later with other things or try to send a

16   separate ballot a second time, we're going to do what

17   we have to do if we don't have a name by the time we

18   have to start sending out these ballots.

19           MR. OWEN:  2000 sounds like a lot.  2000 is

20   not really that much.  Kinko's can print that off in a

21   half hour.  I don't mean to be flippant on this.  I do

22   think this is a very, very important issue.

23           MR. BROOKS THOMPSON:  I couldn't agree more.

24           We take very seriously our legal

25   responsibilities with the military and overseas voters.
```

```
 1   That's one reason why we have insisted that we got to
 2   send the ballots out by the 20th.
 3            Now, I can't stand here and tell you if you
 4   give me a name on Wednesday that we might get real
 5   lucky and be able to get it all done.  I don't know.
 6            I'm just telling you everyday that goes by
 7   makes it less likely that we can make it happen in an
 8   early fashion.
 9            CHAIRMAN SASSER:  Mr. Thompson, just to
10   clarify, is there any Republican you know on the ballot
11   in the State Senate race in the election?
12            MR. BROOKS THOMPSON:  It is an uncontested
13   race.  There are no Republicans or Independents
14   qualified to appear on the ballot.
15            CHAIRMAN SASSER:  We have a motion and
16   second.  Any further discussion on this motion?
17            MR. CHEEK:  I have a question.  I thought
18   Mr. Barnes got write-ins on the Republican side of the
19   ballot.  Would he not be the Republican nominee?  I'm
20   just curious.  I'm just asking.
21            CHAIRMAN SASSER:  Mr. Thompson, if you want
22   to respond to that question.
23            MR. CHEEK:  I couldn't help myself.
24            MR. BROOKS THOMPSON:  First of all, anybody
25   that wants to have the write-in ballots counted has to
```

```
 1   file a certification to have them counted.

 2          Secondly, in order to gain the party

 3   nomination, you have to receive five percent of the

 4   registered voters of the district in order to be a

 5   party nominee by the write-in method.

 6          MR. CHEEK:  Is that new?

 7          MR.  BROOKS THOMPSON:  Used to be five

 8   percent of the people voting in the primary.  Now it's

 9   five percent of the registered voters in that district.

10          MR. CHEEK:  Why?

11          CHAIRMAN SASSER:  Okay.  There's a motion,

12   there's a second for that motion.  Is there any

13   discussion?

14          MR. FORRESTER:  Would you read the motion

15   again, Mr. Chairman?

16          CHAIRMAN SASSER:  The motion is, that this

17   election was so incurably uncertain, that the results

18   of this election were so incurably uncertain that we

19   hereby recommend that it be referred back to the County

20   Executive Committees of Cheatham, Houston, Montgomery

21   County to select a nominee.

22          Is there any other discussion on this motion?

23          MR. CHEEK:  Can we separate those questions?

24   Wouldn't it make more sense to separate the questions?

25          CHAIRMAN SASSER:  If we declare the election
```

```
 1   as incurably uncertain, then the election is thus void.

 2   If we do not send it back to the counties to pick a

 3   nominee, how would you suggest that a nominee be

 4   selected?

 5           MR. CHEEK:  By the folks right here in this

 6   room.  There's some discussion here on this end of the

 7   table that you're not hearing that folks are

 8   interested --

 9           CHAIRMAN SASSER:  It would be very helpful if

10   there's any discussion that y'all grab a microphone so

11   I can hear it.

12           MR. CHEEK:  I'm sorry, Gray.  There's been

13   some discussion over here that it probably makes some

14   sense to go ahead and get this thing over with today,

15   we've got the power to do it, we don't have to worry

16   about the military.

17           Some people think it's kind of a cop-out, I

18   guess.  I'm kind of one of them.

19           CHAIRMAN SASSER:  Okay.  Well, I think then

20   you might want to vote against the motion that

21   Mr. Farmer has made.

22           MR. CHEEK:  Well, I shall.

23           MS. ABLES:  I have a question, Gray.  If this

24   motion carries and we send this back to those counties

25   to make this decision, if there are reports of
```

1   irregularities or a problem with the vote there, would

2   it not come back to us again?

3           CHAIRMAN SASSER:  I think there's a chance,

4   Ms. Ables, that I'm going to be seeing a lot more of

5   this election irregardless of whatever action we take

6   here today.

7           Judging by the number of lawyers in this

8   room, I think we're going to be dealing with this

9   contest for several more weeks.

10          MR. MULLINS:  Can we ask one question for

11   clarity?

12          CHAIRMAN SASSER:  If we can get this motion

13   done Mr. Mullins -- once we pass this motion we'll open

14   it up.  Y'all can ask as many --

15          A SPEAKER:  We're hearing double things,

16   convention and election.  If this motion that's on this

17   table now fails, is what Will just suggested a real

18   possibility?

19          MR. OWEN:  That's up to the Committee.

20          CHAIRMAN SASSER:  If this motion fails, no.

21   It becomes -- we've got --

22          MR. FORRESTER:  Mr. Farmer has indicated,

23   Gray, that he will accept a friendly amendment to his

24   motion.  Mr. Farmer has indicated that he would accept

25   a friendly amendment to parse the question, parse the

1    motion, hear the question of the incurably uncertainty

2    first and then the issue of where the election would

3    take place.

4         You've made the motion.  Do you accept that?

5    He'll accept that amendment to his motion.

6         CHAIRMAN SASSER:  I've been advised by

7    counsel the difficulty with declaring the election

8    incurably uncertain and then selecting a nominee, that

9    does not necessarily comply with Federal case law

10   that's out there.

11        If we declare the election incurably

12   uncertain, then we have some leeway and latitude in

13   sending it back to the counties.  If we declare,

14   however, the election void, which is somewhat of a

15   higher standard, then we can select the nominee.

16        If we declare the election -- again -- is

17   that correct?  No.  I'm sorry.  Please disregard what I

18   said.

19        MR. PHILLIPS:  I don't mean to insert myself

20   but let me try to explain the process as I understand

21   from consulting with the State Election Coordinator as

22   well as my understanding of the law that arguably

23   applies to this situation, the statutes that apply to

24   the situation, the process that should be in place.

25        The body should decide, the subcommittee as a

1    part of its reporting recommendation process should

2    make a decision about whether or not the majority of

3    its members believe that the evidence shown here today

4    or offered here today by the parties renders the result

5    of the election, the certified result of the election

6    incurably uncertain.

7            If it reaches that decision, it should then

8    decide if it wants to void the election.  If it wants

9    to void the election, then, as I understand, the advice

10   that we've been given by Mr. Thompson's office and

11   indirectly through him from the Attorney General's

12   Office, that the process, the only process by which a

13   new nominee would be selected or could be selected if

14   the election is voided is through the County

15   Convention.

16           If there are any questions about that in

17   terms of the process, I'm here and happy to answer

18   them.

19           MR. FORRESTER:  Mr. Chairman, I'll withdraw

20   my friendly amendment.

21           MR. OWEN:  Point of clarification.

22   Mr. Phillips, you just said County Convention.  When

23   you say "County Convention", are you talking about the

24   County Executive Committee meeting or the counties

25   calling a convention of all the Democrats in the county

```
 1   and having the Democrats show up at a convention?

 2              MR. PHILLIPS:  The statute that we have been

 3   advised would apply involves or contemplates a Joint

 4   Convention of the County Democratic Party Executive

 5   Committees only.

 6              Those would be the only persons who would

 7   vote to decide who the nominee would be, would be the

 8   persons who are duly elected members of those three

 9   County Executive Committees.

10              A SPEAKER:  Call for the question.

11              CHAIRMAN SASSER:  Thank you.  I'm going to

12   start with Mr. Harper.

13              MR. HARPER:  No.

14              CHAIRMAN SASSER:  Ms. Perkinson?

15              MS. PERKINSON:  Yes.

16              CHAIRMAN SASSER:  Mr. Owen?

17              MR. OWEN:  Pass.

18              CHAIRMAN SASSER:  Ms. Davis?

19              MS. DAVIS:  Yes.

20              CHAIRMAN SASSER:  Mr. Farmer?

21              MR. FARMER:  Yes.

22              CHAIRMAN SASSER:  Mr. Forrester?

23              MR. FORRESTER:.  Yes.

24              CHAIRMAN SASSER:  Mr. Cheek?

25              MR. CHEEK:  No.
```

```
 1              CHAIRMAN SASSER:  Mr. Woods?

 2              MR. WOODS:  No.

 3              CHAIRMAN SASSER:  Is that a no?  I didn't

 4   hear.  Mr. Woods, I'm sorry, what did you vote?

 5              MR. WOODS:  No.

 6              CHAIRMAN SASSER:  Ms. Ables?

 7              MS. ABLES:  Yes.

 8              CHAIRMAN SASSER:  Ms. Parker?

 9              MS. PARKER:  Yes.

10              CHAIRMAN SASSER:  That's six.  The motion

11   carries.

12              Everybody bear with me for another moment.

13   Okay.  I hereby reconvene the State Primary Board to

14   report out the recommendation of the Special Committee.

15              The Special Committee has voted and approved

16   a motion whereby the election was incurably uncertain

17   and agreed to refer it back to the County Executive

18   Committees of Houston, Montgomery and Cheatham County

19   to determine a nominee.

20              That is the report.

21              MR. OWEN:  Mr. Chairman, I apologize but --

22              CHAIRMAN SASSER:  The committee will now

23   disband.  Mr. Bassett.

24              MR. BASSETT:  I move that we accept the

25   report of the Committee.
```

```
 1              CHAIRMAN SASSER:  There's a motion to accept
 2    the report of the Committee.  Is there a second?
 3              A SPEAKER:  Second.
 4              CHAIRMAN SASSER:  All in favor, aye?  We're
 5    going to -- I want to call the roll.
 6              A SPEAKER:  What about discussion?
 7              CHAIRMAN SASSER:  I'm sorry, is there any
 8    discussion?
 9              MS. PATTERSON:  I just say it's a shame that
10    we're going to disenfranchise 9,000 voters.  It's going
11    to -- I'm sorry, my name is Mary Patterson.
12              I've sat through this like all of you today.
13    I've listened.  And my peak concern is that we do not
14    disenfranchise 9,000 voters and I think that's going to
15    be a real crime if we're not very careful about this,
16    and we will have a lot of people saying look at the
17    Democrats, they're over there fighting with each other
18    and they're going to not be -- ignore what the people
19    voted.
20              We may not like open primaries but that's
21    what we have in this state and until we change the law,
22    I don't know how we can say, because a lot of
23    preponderance of this evidence was based on Republicans
24    muddying up our primaries.
25              I'm sorry.  I just can't see that.
```

1          CHAIRMAN SASSER:  Any further discussion?

2          MR. MAYNARD:    Thank you Mr. Chairman.  Jerry

3     Maynard, Senate District 19.

4          I speak because I'm concerned about the

5     precedent that the Democratic Party will be setting in

6     the Executive Committee, especially when we have a

7     Fifth Congressional District and other districts where

8     Republicans can't win dog catcher in the 5th District

9     and that Republicans didn't vote in the 5th District,

10    especially on off year Congressional races.

11         When there's no competitive Republican

12    primary, they voted the 5th District.  And I will say

13    to you, you we will be setting the precedent for the

14    person who may have lost who was a more progressive,

15    more liberal Democrat who is running in the

16    Congressional District and we have a more conservative

17    Democrat to win the election because we have more

18    Republicans voting in that Congressional primary that

19    would then offset what then may occur, may occur with

20    Mr. Barnes' counsel was able to show similarly with the

21    percentages, high percentages.

22         So before we take the vote, I just want this

23    Executive Committee to understand that we have many

24    districts where Republicans vote in the primaries

25    because Republicans can't win those general elections,

```
 1    and if someone is disgruntled, they can come back to
 2    this Executive Committee.
 3              And if we vote to support this -- you know,
 4    doesn't matter with me whether we vote for it or not.
 5    I'm concerned about precedent.  You will have other
 6    contested elections based on the precedent that we're
 7    setting today which is that we have too many
 8    Republicans voting.
 9              If we're going to do that, we should then
10    further at the next meeting determine what the
11    threshold is for too many Republicans and when is it
12    that you're muddying up the waters and when do you have
13    a little dirt sprinkled in the water?
14              Because if it's 8 percent, fine, if it's
15    22 percent, that's too many.  We need to make sure it's
16    clear what the threshold is for overturning an election
17    because too many Republicans voted in the primary.
18              I hope you would give that consideration
19    before you vote.
20              CHAIRMAN SASSER:  Thanks, Mr. Maynard.
21              MS. CLARKE:  I'm Maryanna Clarke.  I
22    represent the 18th District.  You know, we're all aware
23    of Senator Kurita's unfortunate vote that has gotten so
24    many of us angry.
25              What troubles me is that the contestant's
```

```
 1    counsel has brought it up several times, and I don't

 2    think it should have been an issue in this particular

 3    vote, what troubles me is that looks more to me like

 4    we're voting not for fairness but for retribution and

 5    that really upsets me, upsets me a lot.

 6              CHAIRMAN SASSER:  I would caution anybody who

 7    is not a member of the Executive Committee please let

 8    us have a conversation.

 9              A SPEAKER:  I'm a voter in the district.

10    You're taking my vote away because you guys won't sit

11    and do your job and that's it.

12              A SPEAKER:  Sit down.

13              CHAIRMAN SASSER:  Mr. Jessee.

14              MR. JESSEE:  Mr. Chairman, Members of the

15    Commission, I sat and listened to all this.  I happen

16    to be one of those fellas that represent people that

17    are accused of some of the crimes that Senator Kurita

18    talks about in her campaign and, Jerry, I respect what

19    you have to say.

20              I live up on the end of the state where the

21    Republicans run everything and when the election starts

22    with their leader saying we're going to influence our

23    election, it ends there.  There is no reason for us to

24    even question what has been presented.  They influenced

25    our election.  They intended, they ran in and they
```

1    changed the result.

2          Now, we all know that the Tennessee people

3    crossover, for whatever reason, but I have yet, even up

4    on our end to have the party announce at the beginning

5    by its leader that we're going over to their side and

6    vote to influence their election.  That's what they

7    did.

8          The other thing that bothers me very much is

9    nobody said in the argument that Senator Kurita made --

10   we keep talking about well, she just went in the

11   building.

12         Read the statute.  It doesn't say you can't

13   go into the polling place area, it says into the

14   building where the polling is going on.

15         That young man who has been accused of

16   trespassing or that young convicted misdemeanor person

17   who goes back to Wal-Mart because he has to pee but

18   he's on probation for stealing from them, will then

19   spend 30 days in jail because that's the law.

20         She knew better than to go in that building.

21         Now, it is the appearance of impropriety that

22   we also have to be careful of.  The appearance of

23   impropriety started with Lieutenant Governor Ramsey

24   when he made the announcement he's going to mess in our

25   election and it continued through Senator Kurita going

1    in the building.

2              So I suggest that we uphold the vote of the

3    Committee and send it back and let's do it right this

4    time.

5              CHAIRMAN SASSER:  Any further discussion?

6    Ms. Ables?

7              MS. ABLES:  In response to Mr. Maynard's

8    comments about setting precedent, I understood that

9    this was certainly not the first time that a primary

10   challenge has come to this Primary Board.

11             This has happened before and we even have

12   Supreme Court cases that are cited where -- when they

13   are for decision.  And so it's certainly not the first

14   case.

15             My second point is that we are elected to

16   represent Democratic voters.  We are the Democratic

17   Executive Committee.  Of course we're concerned about

18   fairness because we've been on the end of no fairness

19   in many elections.

20             But the fact of the matter remains our job is

21   to protect the integrity of the Democratic process as

22   it pertains to Democrats.

23             So, therefore, I call for the question.

24             A SPEAKER:  I was recognized and I would like

25   to speak very briefly.  We heard many hours of evidence

```
 1   today.

 2           The standard is whether or not the outcome of

 3   the election is incurably uncertain.  I think that Ms.

 4   Kurita's side, Senator Kurita's side more than rebutted

 5   the evidence presented by Mr. Barnes' side and

 6   Mr. Barnes, I think, failed to meet his burden of

 7   proof, and therefore I'm going to vote against the

 8   motion.

 9           But I don't feel that Mr. Barnes has met his

10   burden of proof and I think that we could safely, after

11   hearing all the evidence, vote against the motion.

12           Thank you.

13           CHAIRMAN SASSER:  Thank you.  Question has

14   been called for.  Let's call the role.

15           A SPEAKER:  Could the Chair explain the

16   motion one more time to everybody?

17           CHAIRMAN SASSER:  Is it possible to get the

18   motion read back to me?

19           It's a motion to adopt the recommendation of

20   the Committee.

21           KIM SASSER HAYDEN:  Paula Combs? Larry

22   Mullins?

23           MR. MULLINS:  Abstain.

24           KIM SASSER HAYDEN:  Charline Kilpatrick?

25           MS. KILPATRICK:  Yes.
```

```
 1              KIM SASSER HAYDEN:  Is that a yes?

 2              MS. KILPATRICK:  Yes.

 3              KIM SASSER HAYDEN:  Weldon Markham?  Mary

 4     Anglin?

 5              MS. ANGLIN:  No.

 6              KIM SASSER HAYDEN:  Terry Lee?  Kathy

 7     Parrott?  Marty Taylor?  Brenda Ables?

 8              MS. ABLES:  Aye.

 9              KIM SASSER HAYDEN:  Fred Hobbs?

10              MR. HOBBS:  Yes.

11              KIM SASSER HAYDEN:  Paul Davis?

12              MR. DAVIS:  Yes.

13              KIM SASSER HAYDEN:  Betty Fraley?

14              MS. FRALEY:  Yes.

15              KIM SASSER HAYDEN:  Geeta McMillan?

16              MS. MCMILLAN:   No.

17              KIM SASSER HAYDEN:  Carol Garner?

18              MS. GARNER:   Yes.

19              KIM SASSER HAYDEN:  John Wiseman?

20              MR. WISEMAN:   Yes.

21              KIM SASSER HAYDEN:  David Harper?

22              MR. HARPER:   No.

23              KIM SASSER HAYDEN:  Mary Patterson?

24              MS. PATTERSON:   No.

25              KIM SASSER HAYDEN:  Bill Bassett?  Maryanna
```

```
 1    Clarke?

 2            MS. CLARKE:    No.

 3            KIM SASSER HAYDEN:  Inez Crutchfield?

 4            MS. CRUTCHFIELD:    No.

 5            KIM SASSER HAYDEN:  Jerry Maynard?

 6            MR. MAYNARD:    No.

 7            KIM SASSER HAYDEN:  Bruce Johnston?  Sue

 8    O'Dell?  Angie Cannon?

 9            MS. CANNON:  Yes.

10            CHAIRMAN SASSER:  I'm sorry, I didn't her.

11            Sue, did you vote?

12            MS. O'DELL:  I said no.

13            KIM SASSER HAYDEN:  You said no.  Okay.

14    sorry.  Chip Forrester?

15            MR. FORRESTER:    Yes.

16            KIM SASSER HAYDEN:  Will Cheek?

17            MR. CHEEK:    No.

18            KIM SASSER HAYDEN:  Doris Medlin?

19            MS. MEDLIN:    Yes.

20            KIM SASSER HAYDEN:  Keith Jackson?  Martha

21    Brooke Perry?  John Faill?

22            MR. FAILL:    Yes.

23            KIM SASSER HAYDEN:  Elisa Parker?

24            MS. PARKER:    Yes.

25            KIM SASSER HAYDEN:  Paige Burcham-Carlton?
```

```
 1              MS. BURCHAM-CARLTON:   Yes.

 2              KIM SASSER HAYDEN:  Robert Patterson?

 3              MR. PATTERSON:   Yes.

 4              KIM SASSER HAYDEN:  J.W. Hampton?

 5              MR. HAMPTON:   Yes.

 6              KIM SASSER HAYDEN:  Martha Shepard?

 7              MS. SHEPARD:   No.

 8              KIM SASSER HAYDEN:  Diane Davis?

 9              MS. DAVIS:   Yes.

10              KIM SASSER HAYDEN:  Michael  Kiddy?

11              MR. KIDDY:   Yes.

12              KIM SASSER HAYDEN:  Don Farmer?

13              MR. FARMER:   Yes.

14              KIM SASSER HAYDEN:  Patsy Johnson?

15              MS. JOHNSON:   Yes.

16              KIM SASSER HAYDEN:  Jay Bailey?

17              MR. BAILEY:   Yes.

18              KIM SASSER HAYDEN:  Gale Carson?   Henry

19     Hooper?  Joyce Moore Adams?  Pamela Harris?  Tom

20     Jessee?

21              MR. JESSEE:   Yes.

22              KIM SASSER HAYDEN:  Hazel Longstreet?

23              MS. LONGSTREET:   Yes.

24              KIM SASSER HAYDEN:  David Upton?

25              MR. UPTON:  Yes.
```

```
 1              KIM SASSER HAYDEN:  Leslie Byrd?  Joe

 2    Weinberg?  Gladys Crain?

 3              MS. CRAIN:   Yes.

 4              KIM SASSER HAYDEN:  Roger Warmath?

 5              MR. WARMATH:  Yes.

 6              KIM SASSER HAYDEN:  Sidney Chism?  Hazel

 7    Moore?  Joyce Hopson?

 8              MS. HOPSON:   Yes.

 9              KIM SASSER HAYDEN:  Bruce Seal?  Beth

10    Hickman?  Mike Toomey?

11              MR. TOOMEY:   Yes.

12              KIM SASSER HAYDEN:  Harold Woods?

13              MR. WOODS:   Yes.

14              KIM SASSER HAYDEN:  Sylvia Woods?

15              MS. WOODS:   Yes.

16              KIM SASSER HAYDEN:  Gayle Alley?

17              MS. ALLEY:   No.

18              KIM SASSER HAYDEN:  Bill Owen?

19              MR. OWEN:  Pass.

20              KIM SASSER HAYDEN:  Dan Lawson?  Barbara

21    Wagner?

22              MS. WAGNER:   Yes.

23              KIM SASSER HAYDEN:  Jim Bilbo?

24              MR. BILBO:   Yes.

25              KIM SASSER HAYDEN:  Sandra Perkinson?
```

```
 1              MS. PERKINSON:   Yes.

 2              CHAIRMAN SASSER:  Mr. Bassett?

 3              MR. BASSETT:  I vote yes.

 4              KIM SASSER HAYDEN:  The motion carries with

 5    33 yeses and 11 nos.

 6              MR. FARMER:  Two abstentions.

 7              KIM SASSER HAYDEN:  Two abstentions.

 8              CHAIRMAN SASSER:  Alright.  The Primary Board

 9    stands in recess.  I'd like to call to order the

10    meeting of the State Executive Committee.

11    ********************************************************

12                             (The above-referred to
                               document was thereupon
13                             marked Smith Exhibit No.
                               1, and is attached
14                             hereto.)
                               (The above-referred to
15                             document was thereupon
                               marked Smith Exhibit No.
16                             2, and is attached
                               hereto.)
17                             (The above-referred to
                               document was thereupon
18                             marked Smith Exhibit No.
                               3, and is attached
19                             hereto.)
                               (The above-referred to
20                             document was thereupon
                               marked Smith Exhibit No.
21                             4, and is attached
                               hereto.)
22                             (The above-referred to
                               document was thereupon
23                             marked Smith Exhibit No.
                               5, and is attached
24                             hereto.)

25
```

```
 1    (4:50 P.M.)

 2    (Thereupon the hearing was concluded)

 3
                                    - - -
 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

STATE OF TENNESSEE    )

COUNTY OF DAVIDSON    )

         I, James P. Beres, Court Reporter and Notary Public in and for the State of Tennessee at Large, do hereby certify that the foregoing proceedings were taken at the time and place set forth in the caption hereof; that the witness was duly sworn on oath to testify the truth; that the proceedings were stenographically reported by me in machine shorthand, and that the foregoing proceedings constitute a true and correct transcript of said proceedings to the best of my ability.

         I further certify that I am not a relative or employee or attorney or counsel of any of the parties hereto, nor a relative or employee of such attorney or counsel, nor do I have an interest in the outcome or events of this action.

         IN WITNESS WHEREOF, I have hereunto affixed my official signature and seal this 29th day of September, 2008, at Nashville, Davidson County, Tennessee.

                _____

                JAMES P. BERES, Notary Public
                for the State of Tennessee

My Commission Expires:  July 28, 2010