IN THE UNITED STATES DISTRICT COURT
FOR WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | |
|---|---|
| PATRICE JORDAN ROBINSON, GREATER MEMPHIS DEMOCRATIC CLUB, LATANYA BARBER THOMAS, And JOHNSON SAULSBERRY, III,<br><br>    Plaintiffs,<br><br>v.<br><br>TRE HARGETT, in his official capacity as Tennessee Secretary of State, MARK GOINS, in his official capacity as Tennessee Coordinator of Elections, LINDA PHILLIPS, in her official capacity as Administrator of the Shelby County Election Commission, STEVE STAMSON, ANTHONY TATE, MATT PRICE, BENNIE SMITH, and BRENT TAYLOR, in their official capacities as Members of the Board of Commissioners of the Shelby County Election Commission,<br><br>    Defendants. | Case No. 2:19-cv-02653-JTF-tmp |

**ORDER GRANTING PLAINTIFF'S REQUEST
FOR A TEMPORARY RESTRAINING ORDER**

Before the Court is Plaintiffs, Patrice Jordan Robinson, Greater Memphis Democratic Club, Latanya Barber Thomas, and Johnson Saulsberry, III's (collectively, "Plaintiffs") Motion for Preliminary Injunction pursuant to Fed. R. Civ. P. 65 that was filed on September 27, 2019. (ECF No. 6.) On September 29, 2019, some of named Defendants above—Linda Phillips, in her official capacity as Administrator of the Shelby County Election Commission, and Steve Samson, Anthony Tate, Matt Price, Bennie Smith and Brent Taylor, in their official capacities as Members

1

of the Board of Commissioners of the Shelby County Election Commission, (collectively "certain Defendants") filed a Response in Opposition to Plaintiff's Motion for injunctive relief. (ECF No. 8.) On September 30, 2019, Plaintiffs filed an Amended Complaint which named additional parties to this action—Tre Hargett, Mark Goins, in their official capacities as Tennessee Secretary of State and Tennessee Coordinator of Elections, respectively. (ECF No. 9.) The Court conducted a hearing on Monday, September 30, 2019, taking the matter under advisement. (ECF Nos. 7, 10 & 11.) Following the hearing and at the Court's request, certain Defendants filed Supplemental Documents Relating to Preliminary Injunction Hearing of September 30, 2019. (ECF Nos. 12, 12-1 & 12-2.) On October 1, 2019, certain Defendants filed a Supplemental Response in Opposition to Plaintiff's Motion for a Preliminary Injunction or Temporary Restraining Order while Plaintiffs filed a Notice of Notifications to Defendants Tre Hargett and Mark Goins. (ECF Nos. 18 & 18-1–18-3.)

For the following reasons, the Court finds that a Temporary Restraining Order pursuant to Fed. R. Civ. P. 65(b)(1)(A) should issue in this matter.

## FACTUAL BACKGROUND

Plaintiff, Patrice Jordan Robinson, is an African-American resident of the City of Memphis, Tennessee, who currently serves as a member of the Memphis City Council, on behalf of District 3. (ECF Nos. 9, 2 ¶ 3, 1-1, 4.) Councilperson Robinson is a candidate running for re-election during the upcoming Municipal Election that is scheduled for October 3, 2019. (*Id.* at ¶¶ 2–3.) She has opposition in this election. The Amended Complaint describes the Greater Memphis Democratic Club as a for-profit political organization that hires and manages approximately sixty (60) campaign workers, all of whom are African American, to distribute campaign materials on behalf of the candidates at polling locations throughout the City of Memphis. (*Id.* at 3–4, ¶¶ 4–5.)

2

Plaintiff Latanya Barber Thomas is an African American campaign worker who worked at Raleigh United [Methodist] Church during the early voting period and who plans to work on election day, October 3, 2019. (ECF No. 9, 3 ¶ 6.) While working the polls during this most recent early voting period, Ms. Thomas was denied access to the church building where she worked because she was identified as a campaign worker. Similarly, Johnson Saulberry, III, an African American who suffers from sickle cell anemia, is campaign worker for the Greater Memphis Democratic Club who worked during early voting and will work on election day at the Glenview Community Center and Greater Memphis Baptist Church. When he worked the polls during early voting, campaign workers were not allowed to use restroom facilities inside the polling locations and were forced to find other locations that would allow them to use the restroom. (*Id*. at ¶ 7-8.) Defendant Tre Hargett is the Secretary of State for the State of Tennessee responsible for appointing the Coordinator of Elections, Defendant Mark Goins, who serves as the "chief administrative election officer of the statue who makes rules and regulations that facilitate election code provisions." (ECF No. 9, 3–4 ¶¶ 8–11.) Defendant Linda Phillips serves as the Administrator of the Shelby County Election Commission. (ECF No. 9, 5 ¶ 14.) Defendant Shelby County Election Commission is a five- member governmental commission responsible for conducting all elections in Shelby County, Tennessee, whose membership includes Steve Stamson, Anthony Tate, Matt Price, Bennie Smith and Brent Taylor, the Election Commissioners, all named in this action. (Id. at 8-9, ¶¶ 11-13.)

Plaintiffs take issue with a rule implemented this year, as written in the Candidates meeting handout from August 15, 2019. (ECF No. 6-5.) The rule specifically prohibits campaign workers from entering the building in which the polling place is located to use the restroom. Plaintiffs aver

3

that this rule infringes upon their First, Fifth, and Fourteenth Amendment constitutional rights and violates 42 U.S.C. § 1983, as well as various provisions of the Tennessee Constitution.

## LEGAL STANDARD

"The standard for determining whether to grant a temporary restraining order is the same as the standard for determining whether to grant a preliminary injunction."[1] A request for a preliminary injunction is governed by Fed. R. Civ. P. 65. *Farnsworth v. Nationstar Mortg., LLC*, 569 F. App'x 421, 427 (6th Cir. 2014). "Generally, the plaintiff bears the burden of establishing his entitlement to a preliminary injunction." *Jones v. Caruso*, 569 F.3d 258, 265 (6th Cir. 2009). To obtain a preliminary injunction, a plaintiff must demonstrate a strong or substantial likelihood or probability of success on the merits. *PGP, LLC v. TPII, LLC*, 734 F. App'x 330, 333 (6th Cir. 2018). Courts must examine four factors in deciding whether to grant a preliminary injunction: (1) whether the movant is likely to succeed on the merits; (2) whether the movant will suffer irreparable injury in the absence of an injunction; (3) whether the injunction will cause substantial harm to others; and (4) whether the injunction will serve the public interest. *Id.* at 332.

## ANALYSIS

*Plaintiffs' Standing*

Defendants argue that all Plaintiffs lack standing. (ECF No. 8, 11.) "Article III . . . gives the federal courts jurisdiction over only 'cases and controversies,' and the doctrine of standing

---

[1] The only meaningful distinction is whether notice must be given to an adverse party. Rule 6 of the Federal Rules of Civil Procedure provides that while a Court may issue a preliminary injunction only on notice to the adverse party, the "court may issue a temporary restraining order without written or oral notice to the adverse party or its attorney only if: (A) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and (B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required." Fed. R. Civ. P. 65(b).

serves to identify those disputes which are appropriately resolved through the judicial process." *Whitmore v. Arkansas*, 495 U.S. 149, 154–55 (1990). Standing is therefore "an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Standing requires three elements. *Id*. First, the plaintiff must show "it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Friends of the Earth, Inc. v. Laidlaw Envtl. Services (TOC), Inc.*, 528 U.S. 167, 180–81 (2000). Second, the plaintiff must show that "the injury is fairly traceable to the challenged action of the defendant." *Id.* at 181. Third, the plaintiff must show "it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.*

As to the standing of Plaintiff Patrice Jordan Robinson ("Plaintiff Robinson"), Defendants argue that she has only "asserted conclusory allegations that are not the sort of concrete and specific factual allegations from which this Court could infer that campaign workers who find alternate locations to use bathrooms will miss opportunities to distribute campaign materials to prospective voters." (ECF No. 8, 13.) The Court does not agree. Plaintiff Robinson has specified concrete and specific factual allegations. As she explains in her affidavit, "[n]ot allowing campaign workers to use the restroom will logically result in less time and missed opportunities for campaign workers to distribute my campaign materials to voters who come to cast their votes because the campaign worker is required under [the rule]." (ECF No. 6-2, 2 ¶ 5.) She testified similarly during her hearing testimony. The fact that her campaign volunteers and campaign workers must travel off premises, even for relatively short periods of time, to use the restroom is sufficient for the Court to conclude that campaign workers will miss opportunities to interact with

5

the voters and promote their candidate. This concrete, particularized, imminent injury is sufficient to establish Plaintiff Robinson's standing.

As to the standing of Plaintiff Greater Memphis Democratic Club ("GMDC"), Defendants argue that GMDC lacks both associational standing and organizational standing. (ECF No. 8, 13–14.) Associational standing is granted to an association who can "bring suit on behalf of its members, when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Sandusky County Democratic Party v. Blackwell*, 387 F.3d 565, 573 (6th Cir. 2004). Furthermore, "[t]he individual participation of an organization's members is 'not normally necessary when an association seeks prospective or injunctive relief for its members.'" *Id.* at 574. Under these principles, GMDC has standing to assert the rights of its hired campaign workers who worked the polls during early voting and those who will work the October 3, 2019 election. GMDC has identified two specific campaign workers who have been affected and will be affected by Defendants' rule. Beyond that, GMDC employs over sixty campaign workers whose First Amendment rights will be violated. Clearly, these workers would have standing to sue in their own right, assuming Defendant's campaign rules are enforced on election day. Furthermore, GMDC's purpose is to promote certain candidates. If its campaign workers are forced to leave the premises for extended periods of time to find alternate restrooms, and thus forgoing precious minutes of exercising their right to free speech and to associate, GMDC's goal in promoting its candidates is directly impacted. Thus, the campaign workers' First Amendment interests at stake are germane to GMDC's purpose. Lastly, neither this claim nor the injunctive relief sought requires participation of the individual campaign members. Therefore, the Court finds that GMDC has associational standing. Because of this

conclusion, the Court finds it unnecessary to reevaluate whether GMDC has suffered an injury itself.

As to the standing of Plaintiff Latanya Barber Thomas ("Plaintiff Thomas") and Plaintiff Johnson Saulsberry, III ("Plaintiff Saulsberry"), Defendants argue the harms are not particularized to them, but rather are harms suffered by all campaign workers in Shelby County. (ECF No. 8, 15.) It is true that "a plaintiff raising only a generally available grievance about government—claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large—does not state an Article III case or controversy." *Hein v. Freedom From Religion Found., Inc.*, 551 U.S. 587, 620 (2007). "[W]here large numbers of Americans suffer alike, the political process, rather than the judicial process, may provide the more appropriate remedy for a widely shared grievance." *Fed. Election Comm'n v. Akins*, 524 U.S. 11, 23 (1998). However, the asserted harm by Plaintiff Thomas and Plaintiff Saulsberry is not a "generalized grievance shared in substantially equally measures by all or a large class of citizens." *Warth v. Seldin*, 422 U.S. 490, 499 (1975). The only people who share this non-generalized grievance are the campaign workers who have been specifically targeted by the Defendant's rule. Other groups of citizens were not targeted by the rule. Campaign workers do not constitute "all or a large class of citizens" of Shelby County. Plaintiff Thomas and Plaintiff Saulsberry's claims are particularized and specific to them. Thus, the Court finds that Plaintiff Thomas and Plaintiff Saulsberry have standing.

*Notice to Defendants*

Before reaching whether the temporary injunction should be issued, the Court must first ensure that Plaintiffs have complied with the conditions of Rule 65(b)(1) of the Federal Rules of Civil Procedure. Rule 65(b)(1)(A) requires a movant to include "specific facts in an affidavit or a

7

verified complaint" that "clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition." Fed. R. Civ. P. 65(b)(1)(A). Rule 65(b)(1)(B) requires the movant's attorney to certify "in writing any efforts made to give notice and the reasons why it should not be required." Fed. R. Civ. P. 65(b)(1)(B). Plaintiffs' counsel has satisfied those requirements. The Amended Verified Complaint (ECF No. 9) clearly specifies immediate and irreparable injury. The election day is October 3, 2019—the day Plaintiffs will be subjected to continued enforcement of the rule at issue. If the Court waited until the newly added Defendants responded to the Amended Verified Complaint, October 3, 2019 may very easily have passed. Plaintiffs seek immediate relief, and thus the Court must undertake immediate review in light of this impending date. Furthermore, Plaintiffs' counsel has filed a Notice with the Court outlining her attempts at contacting the newly added Defendants, Tre Hargett and Mark Goins. (ECF No. 18.) The Court is satisfied that her efforts were diligently made in good-faith. The Court is also satisfied with Plaintiffs' counsel's reason for Defendants Tre Hargett and Mark Goins not receiving notice sooner. Certain Defendants, excluding Tre Hargett and Mark Goins, did not file their Response to Plaintiffs' Motion for Preliminary Injunction and Temporary Restraining Order until the evening of Sunday, September 29, 2019. (ECF No. 8.) Thus, Plaintiffs in good faith did not realize that they needed to name these additional defendants. Accordingly, the Court is satisfied that the conditions of issuing a temporary restraining order under Rule 65(b)(1) of the Federal Rules of Civil Procedure are satisfied.

*The First Amendment*

The Sixth Circuit has held that "[w]hen a party seeks a preliminary injunction on the basis of the potential violation of the First Amendment, the likelihood of success on the merits often will be the determinative factor." *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir.

8

1998). Furthermore, the possibility of irreparable harm and the determination of public interest is dependent on the Court's decision with regard to the likelihood of success on the merits of the First Amendment challenge. *Id.* Therefore, "because the questions of harm to the parties and the public interest generally cannot be addressed properly in the First Amendment context without first determining if there is a constitutional violation, the crucial inquiry . . . is . . . whether the [rule] at issue is likely to be found constitutional." *Id.* To determine if the rule at issue is constitutional, the Court must first determine the proper level of scrutiny to apply.

*Constitutional Level of Scrutiny*

The First Amendment, applicable to the States through the Fourteenth Amendment, guarantees the right to freedom of speech. U.S. Const., amdt. 1. Additionally, the Supreme Court has "long understood as implicit in the right to engage in activities protected by the First Amendment," such as the right to freedom of speech, "a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Roberts v. United States Jaycees*, 468 U.S. 609, 623 (1984). When there is a rule burdening these First Amendment rights, the Court must first determine the level of scrutiny to be applied in evaluating the constitutionality of the rule.

Regulations may be content-based and viewpoint-based, content-based but viewpoint-neutral, or content-neutral and viewpoint-neutral. *Planet Aid v. City of St. Johns, MI*, 782 F.3d 318, 326 (6th Cir. 2015). While it no easy task to determine whether a regulation is content-based or content-neutral:

> Generally . . . if a law treats speech differently based on the viewpoint or subject matter of the speech, on the words the speech contains, or on the facts it conveys, the [law] is based on the content (and the communicative impact) of speech. By contrast, if a law focuses on the noncommunicative aspects of the speech, and treats speech the same regardless of what the speech says, [the law is] content-neutral.

9

*Id.* (citation omitted). This distinction between content-based and content-neutral is of the utmost importance because the outcome dictates the level of scrutiny applied to the regulation. *Id.* A content-based law is subject to strict scrutiny, requiring the government to prove that the law is narrowly tailored to serve compelling state interests. *See, e.g., Reed v. Town of Gilbert, Ariz.*, 135 S. Ct. 2218, 2226 (2015). "If a less restrictive alternative would serve the [g]overnment's purpose, the [City] must use that alternative." *Planet Aid*, 782 F.3d at 330. Innocent and benign government motives for enacting the law, as well as any lack of animus for the ideas contained in the restricted speech, do not lessen the strict scrutiny level of analysis required for content-based regulations. *Reed*, 135 S. Ct. at 2228. On the other hand, laws that are content-neutral are subject to a lesser level of scrutiny—intermediate scrutiny. *See Turner Broad. System, Inc. v. F.C.C.*, 512 U.S. 622, 662 (1994). Intermediate scrutiny dictates that a content-neutral regulation will be sustained if "it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on the alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *Id.* (citation omitted).

Tennessee Code Annotated § 2-7-103(a) states, "[n]o person may be admitted to a polling place while the procedures required by this chapter are being carried out except election officials, voters, persons properly assisting voters, the press, poll watchers appointed under § 2-7-104(a) and others bearing written authorization from the county election commission." Tenn. Code Ann. § 2-7-103(a) (2019) ("T.C.A. § 2-7-103(a)"). Tennessee Code Annotated § 2-7-111(b)(1) states:

> Within the appropriate boundary as established in subsection (a), and the building in which the polling place is located, the display of campaign posters, signs or other campaign materials, distribution of campaign materials, and solicitation of votes for or against any person, political party, or position on a question are prohibited. No campaign posters, signs or other campaign literature may be displayed on or in any building in which a polling place is located.

Tenn. Code Ann. § 2-7-111(b)(1) (2019) ("T.C.A. § 2-7-111(b)(1)"). The Shelby County Election Commission rule at issue states, "[n]o signs, bumper stickers, posters, literature, or campaign workers are allowed within the 100 foot area or in the building except when casting their own vote. <u>The practical effect of this is that campaign workers have to find somewhere else to use the restrooms</u>." (ECF No. 6-5.) Defendants posit that this rule is based on T.C.A. § 2-7-103(a) and T.C.A. § 2-7-111(b)(1).

These statutes, taken in context with the rule at issue, make clear that only speech relating to campaigns and candidates is being burdened; any other speech is permitted. This rule is therefore content-based, as it clearly focuses on the very content and subject matter of the speech. The fact that the rule is viewpoint-neutral, in that all political speech is banned within the 100-foot zone, does not overcome the strict scrutiny analysis to which this rule is subject.

Applying strict scrutiny, the Court finds that Defendants have not satisfied their burden of showing that the rule is narrowly tailored to serve a compelling government interest. *See Reed*, 135 S. Ct. at 2226. During the hearing held on September 30, 2019, Defendants pointed to a compelling government reason for enacting the rule banning all campaign workers from entering the buildings housing the polling places. They posited that the state has a compelling interest in preserving the integrity of the election. It is well-settled and widely recognized that the "right to vote freely for the candidate of one's choice is of the essence of a democratic society." *Reynolds v. Sims*, 377 U.S. 533, 555 (1964). To protect that right, a state has compelling interests in "protecting voters from confusion and undue influence" and "preserving the integrity of its election process." *Burson v. Freeman*, 504 U.S. 191, 199 (1992). Accordingly, this Court concludes that Defendants have pointed to a compelling government interest.

However, that is not enough to survive strict scrutiny. Defendants must also demonstrate that its rule is narrowly tailored to serve the compelling government interest and that there are no less restrictive alternatives available. The Court struggles to understand how the rule, barring all campaign workers from entering the 100-foot zone and the buildings housing the polling places, is narrowly tailored to preserving the integrity of the election. Campaign workers, even after removing all campaign-related clothing and accessories and putting away all campaign-related literature, are still forbidden from entering the buildings to use the restroom. The rule states, very clearly, that "[t]he practical effect of this is that campaign workers have to find somewhere else to use the restrooms." (ECF No. 6-5.) The "practical effect," however, is much graver than simply "find[ing] somewhere else to use the restrooms." Although no election commission official directly forces workers off the premises, indirectly, the effect of the rule accomplishes the same result. The "practical effect" is that campaign workers are forced off the property; campaign workers are forced to find completely separate buildings to use the restroom; campaign workers are forced away from the polling places for extended periods of time; campaign workers are forced to give up access to voters. The "practical effect" is that campaign workers' rights to free speech and rights to associate are being unnecessarily and unreasonably burdened. When they are forced off the premises to find a restroom, their speech promoting a candidate is being silenced. Their ability to interact with the voting public and associate with a particular political party or candidate is being impinged. While they are away, no voter will hear them advocating for a certain candidate or see their campaign materials. Their voices and identities have been, and will be suppressed by this rule. Thus, Defendants' view that forcing campaign workers off the property of the polling place is narrowly tailored to preserving the integrity of the election is not well-taken by the Court.

The rule of not allowing campaign workers from entering the building is premised on T.C.A. § 2-7-103(a), which lists six categories of people authorized to enter a polling place. Excluded from that list are campaign workers. Also excluded from that list are pastors and employees of the churches designated as polling places, as well as youth and older citizens that use community centers designated as polling places. The Court must assume that in keeping with the letter and spirit of T.C.A. § 2-7-103(a), during early voting and on election day, 157 Poplar, a county building used as a polling place has been and will be emptied of all county employees on election day. Of course, this is illogical, which is presumably the reason this rule, which has been in existence since 2008, has never been enforced. Until now, campaign workers were free to enter the buildings to use the restroom, so long as they removed all campaign apparel and refrained from promoting their candidate of choice.[2] Defendants generally point to unspecified incidents in the past few years that led them to begin enforcing the rule. They also rely on the Barnes v. Kurita proceeding, held before the Tennessee Democratic Party State Executive Committee, which brought to light an incident in a previous election involving a candidate entering a polling place and interacting with voters. (ECF No. 8-1.) Notably, Defendants have not identified, and at the September 30, 2019 hearing would not identify, any specific dates, locations, or people involved in these incidents. No election cycle is perfect and there have been and will be an occasional violation. However, if there were truly as many incidents regarding campaign workers violating

---

[2] Defendants also posit that campaign workers may still enter through alternate entrances, when available. This permission was explained to Plaintiffs' counsel in response to her September 17, 2019 letter to Defendant Linda Phillips, Administrator of Elections, in which Plaintiffs' counsel voiced her concern about the enforcement of the challenged rule. (ECF No. 6-3.) This response appears to lessen the impact of the rule. Attached to the letter, however, was a list of early voting locations with comments about the availability of alternate entrances. (ECF No. 6-3.) After reading the comments, it is clear to the Court that even this "permission" for campaign workers to enter through alternate entrances is still inadequate because the majority of polling places have no alternate entrances. (ECF No. 6-3.)

the 100-foot rule as Defendants assert there are, one would presume that Defendants would be more willing to share such incidents with the Court. Based on the testimony from the hearing, the Court sees no logical reason to suddenly start enforcing a non-enforced rule that has been in existence for over a decade, when doing so would result in an infringement upon campaign workers' First Amendment rights.

Banning campaign materials within the 100-foot zone is constitutional, which logically implies that forbidding campaign workers from having campaign materials within the 100-foot zone is also constitutional. But completely barring campaign workers themselves from the 100-foot zone is not constitutional. Such a bar is not narrowly tailored to promoting the compelling state interest in preserving the integrity of elections. Defendants can ensure the integrity of elections through the less restrictive alternative of simply barring campaign workers from bringing campaign materials into the polling place, which has always been the practice. That has been the status quo, and the Court sees no compelling reason to suddenly change the status quo and allow Defendants to infringe upon campaign workers' First Amendment rights.

*Temporary Restraining Order*

A. <u>Likelihood of Success on Merits</u>

The Court finds that Plaintiffs present a substantial likelihood of success on the merits of the First Amendment, and Fourteenth Amendment, claims.[3] To establish a likelihood of success on the merits, it is not necessary for Plaintiffs to "convince the Court that it will prevail or present such an overwhelming flood of favorable evidence such that the Court cannot help but conclude

---

[3] As for the likelihood of success of Plaintiffs' other claims, the Court finds no need to assess them at this stage in the proceeding. The likelihood of success on the First Amendment claims are sufficient to grant the temporary restraining order.

that it will win on the merits." *Corp. Express Office Prods. v. Warren*, Nos. 01-2521 DBRE, 01-2667 DBRE, 2002 U.S. Dist. LEXIS 27653, at *21 (W.D. Tenn. May 24, 2002). At the same time, "Plaintiff must do more than show the mere possibility of success in its substantive claims in order to establish a likelihood of success on the merits." *Id.* "[I]t is ordinarily sufficient if the plaintiff has raised questions going to the merits [that are] so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation." *Id.* at *21–22. Given the above conclusions that under a strict scrutiny analysis, Defendants' rule is unconstitutional, there is a likelihood of Plaintiffs' success on the merits of their First Amendment claims.

    B. <u>Irreparable Injury</u>

The Court finds that Plaintiffs have adequately shown that absent this Court's intervention they will likely suffer irreparable injury. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). "[T]o the extent that [a party] can establish a substantial likelihood of success on the merits of its First Amendment claim, it also has established the possibility of irreparable harm as a result of the deprivation . . . ." *Reno*, 154 F.3d at 288; *see also McNeilly v. Land*, 684 F.3d 611, 621 (6th Cir. 2012) ("Because [the plaintiff] does not have a likelihood of success on the merits . . . his argument that he is irreparably harmed by the deprivation of his First Amendment rights also fails."). As previously discussed, there is a substantial likelihood that Plaintiffs will succeed on the merits of their First Amendment claims. Thus, Plaintiffs have established irreparable injury.

C. <u>Weighing the Balance of Injury to the Parties</u>

The Court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 24 (2008) (citation omitted). If the temporary restraining order is denied, Plaintiff would suffer deprivation of their right to free speech and right to associate, as previously discussed. Let us not forget that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod*, 427 U.S. at 373. Defendants, on the other hand, argue that they "will be harmed to a far greater extent by allowing campaign workers to enter polling places to use bathrooms than Plaintiffs are harmed by having to find alternative facilities." (ECF No. 8, 8.) However, as the Court has tried to make clear, this is not a case about simply using the restroom; this is a case about campaign workers' First Amendment rights being infringed upon. Having to "re-train" the poll workers to allow campaign workers inside will not be difficult—that has always been the status quo. Only recently were poll workers instructed that campaign workers were not allowed inside, under any circumstance. Reversing that mandate should not be difficult, especially in light of the fact that campaign workers' First Amendment rights are being directly affected. Defendants also contend that if the Court grants the temporary restraining order, "poll workers would not only have to make sure campaign workers do not enter precincts with campaign materials or campaign paraphernalia but would also have to police the bathrooms to ensure that campaign materials were not 'inadvertently' left behind in the polling place." (ECF No. 8, 8.) Hiring of additional staff or poll workers does not appear to be necessary. Poll workers are already stationed at the polling places to ensure that voters do not enter with prohibited items. They are already tasked with watching the doors for violators. (ECF No. 6-2.) The Court finds that there is little difference in watching for *voters* to

have prohibited items and watching for *campaign workers* to have prohibited items—they are all people, they are all entering through the same door or doors, and they all presumably are not violating the 100-foot rule. If poll workers do their jobs and ensure that no one—voters and campaign workers alike—enters the polling place with campaign materials, there is little harm that campaign materials will end up in the restrooms. Thus, there is little worry of poll workers becoming bathroom monitors. Furthermore, it is important to remember that the rule Defendants are upset about having to not enforce is most likely unconstitutional. If the rule was constitutional, Defendants may have stronger arguments about their harm. *See Reno*, 154 F.3d at 288 (noting that "the government presumably would be substantially harmed if enforcement of a *constitutional* law . . . were enjoined"). Upon balance of the harm to Defendants if the temporary restraining order is granted and the harm to Plaintiffs if the temporary restraining order is denied, the Court finds that the harm to Plaintiffs greatly outweighs the harm to Defendants.

    D.  Public Interest

"[T]he determination of where the public interest lies also is dependent on a determination of the likelihood of success on the merits of the First Amendment challenge because 'it is always in the public interest to prevent the violation of a party's constitutional rights.'" *Reno*, 154 F.3d at 288. Defendants argue that the interest in "allowing campaign workers to enter polling places to use the bathroom pales in comparison to the public's significant interest in being free from the undue influence of campaign workers . . . in polling places." (ECF No. 8, 10.) Defendants are trivializing this case. It was clearly so when Linda Phillips, Administrator of the Shelby County Election Commission, testified that in her view, this law suit and the issues it involves are "ridiculous." Contrary to their repeated contentions, this case is not simply about using the restroom. This is a case about infringement upon American citizens' First Amendment rights, and

17

in the process, political candidates seeking public office, their volunteers and workers' loss of access to valuable voters on election day. There is no question that the public has a significant interest in being part of an honest election. But being part of an honest election necessarily means that others' First Amendment rights are not being curtailed. The Court has already concluded that Plaintiffs have a substantial likelihood of succeeding on the merits of the case, and there is a substantial likelihood that Defendants' rule is unconstitutional. Thus, the public interest would best be served by the Court issuing the temporary restraining order.

## CONCLUSION

For the foregoing reasons, Plaintiffs' request for a temporary restraining order is **GRANTED**. Accordingly, Defendants are hereby temporarily restrained, during the election scheduled for Thursday, October 3, 2019, from forbidding campaign workers, wearing and possessing no campaign materials, from entering the building in which the polling place is located for the purpose of using the restrooms or for other legitimate purposes such as voting.

**IT IS SO ORDERED** this 2nd day of October 2019.

*s/John T. Fowlkes, Jr.*
JOHN T. FOWLKES, JR.
United States District Judge